## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LVI INTERMEDIATE HOLDINGS, INC., *et al.*, | Case No. 20-    (    ) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF LISA MELAMED, INTERIM
## CHIEF EXECUTIVE OFFICER AND PRESIDENT OF THE DEBTORS,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST-DAY PLEADINGS

I, Lisa Melamed, declare and state as follows:

1.      I am the Interim Chief Executive Officer ("CEO") and President of LVI
Intermediate Holdings, Inc. and certain of its affiliates, d/b/a Vision Group Holdings (collectively,
the "Debtors" or the "Company"), which have filed voluntary petitions (the "Chapter 11
Petitions") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")
commencing these chapter 11 cases (the "Chapter 11 Cases").  I am over the age of 18, competent
to testify, and authorized to submit this Declaration on behalf of the Debtors.

2.      I have been serving as the Interim CEO and President of the Company since
approximately January 2020.  I joined the Company in 2017.  Before starting in my current role as
Interim CEO and President, I was the Company's Chief Legal Officer and Chief Compliance

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: LVI Intermediate Holdings, Inc., (7674); Total Vision Institute, LLC (7571); QualSight, LLC (3866); The LASIK Vision Institute, LLC (7564); Cataract Vision Institute, LLC (7697); Healthcare Marketing Services, LLC (9982); LVI Missouri, LLC (7088); Cataract Vision Institute Florida, LLC (3423); TLC Vision Center Holdings, LLC (5400); TLC Whitten Laser Eye Associates, LLC (0182); TLC Vision Centers, LLC (8271); TruVision, LLC (3399); TruVision Contacts, LLC (3399); Laser Eye Surgery, LLC (3448); TLC Laser Eye Centers (Refractive I), LLC (2702); TLC The Laser Center (Pittsburgh) L.L.C. (2881); TLC The Laser Center (Indiana) LLC (8456); and TLC The Laser Center (Institute), LLC (0959).  The Debtors' executive headquarters are located at 1555 Palm Beach Lakes Blvd., Suite 600, West Palm Beach, Florida 33401.

Officer.  Before joining the Company, I served as the VP of Corporate Compliance and General

Counsel for the Laser Spine Institute.  I hold a B.S. degree from University of Miami, a J.D. degree

from the University of Florida, and a Graduate Certificate in Health Corporate Compliance from

George Washington University.  In aggregate, I have approximately 20 years of experience in the

health care industry.

      3.      In my capacity as Interim CEO and President, I oversee all the Debtors' operations

and business activities.  As such, I am familiar with the Debtors' businesses, operations and

financial affairs. As part of my duties in the Chapter 11 Cases, I will be overseeing and advising

the Debtors on their day-to-day business operations, budgets, cash flows, financial analysis and

overall restructuring and reorganization efforts.

      4.      To minimize the adverse effects of filing for chapter 11 while at the same time

preserving value for the benefit of stakeholders, the Debtors have filed a number of pleadings

requesting various kinds of "first day" relief (collectively, the "First Day Pleadings").[2]  I submit

this Declaration in support of the Chapter 11 Petitions and the First Day Pleadings.  I am familiar

with the contents of each First Day Pleading (including the exhibits and other attachments thereto)

and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First

Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal

disruption; (b) is critical to the Debtors' efforts to preserve value and maximize the likelihood of

the successful restructuring of their businesses; and (c) best serves the Debtors' estates and

creditors' interests.

---

[2]  Unless otherwise defined herein, capitalized terms in this Declaration shall have the meanings ascribed to them in
the relevant First Day Pleading.

5.      Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents, including the Debtors' books and records; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

6.      This Declaration is divided into two parts.  **Part I** provides background information regarding the Debtors, their businesses, their capital structure and the circumstances surrounding the commencement of the Chapter 11 Cases.  **Part II** sets forth the relevant facts in support of each of the First Day Pleadings.

## PART 1

### I.      THE DEBTORS' CORPORATE STRUCTURE

7.      The Company's current ownership structure is the result of a March 2019 transaction (the "March 2019 Ownership Transaction") in which 9597930 Canada, Inc. ("959 Canada"), a Canadian corporation indirectly owned and controlled by Mark Cohen, M.D. and Avi Wallerstein, M.D., purchased a majority ownership position in LVI Super Intermediate Holdings, Inc. ("LVI Super") from Audax Private Equity Fund IV, L.P ("Audax"), the Company's then majority owner.  As part of that transaction, Falcon Strategic Partners IV, LP ("Falcon") and Macquarie Sierra Investment Holdings, Inc. ("Macquarie") obtained minority equity positions in LVI Super.  Through a series of interrelated transactions, LVI Super, a non-Debtor, became the ultimate parent holdings company of the Debtors and their affiliates.  A copy of the Company's organizational chart, which identifies Debtors and non-Debtors, is attached hereto as **Exhibit A**.

3

8.      As of the Petition Date, 959 Canada owns 84% and Falcon and Macquarie each own 8% of LVI Super.  LVI Super owns 100% of LVI Hold Co., LLC ("LVI Holdco"), a non-Debtor intermediate holdings company, which owns 100% of Debtor LVI Intermediate.    LVI Intermediate either directly or indirectly owns 100% of the equity interests of all the Debtors and 100% or a majority interest in non-Debtor affiliates.

## II.      THE DEBTORS' BUSINESSES

### A.      General Background of Business

9.      Headquartered in West Palm Beach, Florida, Vision Group Holdings develops and manages, through its various subsidiaries, among other businesses, two of the leading LASIK surgery brands in the nation:  The LASIK Vision Institute and TLC Laser Eye Centers.




10.     The Company also owns and manages certain select general ophthalmology practices and QuaslightLasik, the Country's largest licensed Preferred Provider Organization for LASIK surgery providers.



11.     In the discussion that immediately follows, I provide a brief explanation of the role and businesses of each of the Debtors within the Vision Group Holdings enterprise.

4

### B.    LVI Intermediate

12.    LVI Intermediate serves as the corporate level management company for the entire enterprise.  As such, LVI Intermediate employs the Company's administrative and corporate employees, including, executive roles, accounting and finance, human resources, IT support, legal and risk, warehouse personnel, and customer call center personnel.  LVI Intermediate's operating subsidiaries also have their own personnel, who are primarily in customer facing or operational roles associated with their respective businesses.

13.    The Debtors' business model is, generally, to provide turn-key management and administrative support services to physicians and/or their medical practices.   Neither LVI Intermediate nor any of its Debtor subsidiaries practice medicine or otherwise provide any medical services to patients.  Many states prohibit the corporate practice of medicine (the "CPM States").[3] In those states, LVI Intermediate's relevant operating subsidiary will enter into a management services agreement with an entity owned by one or more licensed physicians.  The physician-owned entity, in turn, will employee all the doctors for clinic.  In non-CPM States, where corporate practice of medicine is not restricted, the Company generally owns the practice, but only employs the non-medical personnel, and pays the doctors under 1099 arrangements.  No doctors who practice medicine are employed by the Company for the purpose of practicing medicine.  A handful of doctors are employed by the Company for purposes unrelated to conducting surgeries or otherwise practicing medicine.  In all cases, the physician-own entities and/or the independently contracted individual physicians have sole and exclusive control over patient care and maintain their own malpractice insurance.

---

[3] In such states, a professional association or corporation owned by a licensed physician must own patient records and other medical assets.

14.     Laser eye surgery is considered an elective procedure and is therefore not covered by most insurance providers in the United States, including Medicare and Medicaid. As a result, the primary sources of revenue generated by the Debtors' LASIK centers is derived from amounts charged to patients for procedures performed at laser centers and (i) collected by the Company on behalf of the medical care professional who performed the procedure or (ii) collected by the medical professional and transferred to the Company in accordance with the Company's management contract.

### C.     The LASIK Vision Institute

15.     The Company manages refractive surgery practices under two core brands. The first is The LASIK Vision Institute, LLC, d/b/a LVI ("LVI"). LVI's roots go back to 1999, when it was formed as a Florida company. The business grew for several years, and in recent years, suffered financial losses which, coupled with COVID-19, has resulted in certain centers necessitating permanent closure through this restructuring process. As of the Petition Date, LVI has approximately 57 go-forward centers across the U.S. that the Company intends to reopen post-COVID-19. LVI's business model relies primarily on direct-to-patient marketing to derive its business. Most of the LVI locations are managed by LVI.[4]

16.     As part of the strategic go-forward plan for the business contemplated at the time of the March 2019 restructuring, Dr. Cohen spearheaded the Company's retention of a group of new refractive surgeons from a competitor who are highly regarded in the industry (the "RMD Surgeons"). To entice the RMD Surgeons to "team-up" with the Debtors, upon the closing of the March 2019 restructuring, the Debtors entered into purchase agreements with these RMD

---

[4] LVI Missouri, LLC manages a single location in Missouri.

Surgeons to sell their interests in certain local management entities to be formed in connection with the transactions.  These transactions resulted in the formation of thirteen (13) non-Debtor subsidiaries under the LVI corporate structure.

17.    As of the Petition Date, eleven (11) of the local management entities are still owned by LVI, while two (2) of those entities closed with the RMD Surgeons who now own the interest in those entities, in exchange for certain consideration, including promissory notes payable to LVI Intermediate.  The Debtors have obligations to close on the remaining eleven (11) subsidiaries with RMD Surgeons under similar arrangements, at which time the respective subsidiaries would no longer be owned by LVI, and LVI Intermediate would obtain certain contract rights, including rights to payment under promissory notes.  I believe that the purchase agreements and related documents that have not yet closed relating to these 11 locations are "executory contracts" as defined under the Bankruptcy Code.

### D.    TLC Laser Eye Centers

18.    The other core brand of the Company's business is "TLC Laser Eye Centers."  On October 15, 2014, the Company acquired all of the outstanding interests of TLC Vision Center Holdings, LLC ("TLC Vision Holdings"), which serves as a holdings company for all the TLC branded entities, and TLC Vision Centers, LLC ("TLC") is the operating company for the brand. At its height, in 2018, the LVI and TLC centers comprised over 140 freestanding centers located in the U.S.[5]  As of the Petition Date, the Company intends to reopen and operate approximately 34 TLC locations throughout the U.S.

---

[5] There is also a single center in Canada, owned by TLC Vision (Canada) Corp. ("TLC Vision Canada"), which is not a Debtor herein.  TLC Vision Canada is wholly owned by TLC Vision Capital, LLC, which is wholly owned by TLC Vision Holdings.

19.      In contrast to LVI, which primarily utilizes a direct-to-patient model, TLC's primary source of customer origination comes from optometrist referrals.  TLC has established relationships with thousands of optometric practices across the United States.  TLC "partners" with the optometrists to provide TLC promotional materials to their patients.  The optometrist will typically continue to "co-manage" the patient's care with the TLC surgeon who performs the procedure, including by handling any pre- or post- operative patient care.

### E.      Total Vision Institute, LLC (the "Elite Centers")

20.      The Company formed Total Vision Institute, LLC ("TVI") in 2015 for the purposes of purchasing and holding general ophthalmology practices, as part of management's objective to expand its management services outside of the Company's core-LASIK market.

21.      The Company acquired general ophthalmology practices that were already well known and established in their respective markets.  Accordingly, it made sense for these "Elite Centers" (as we refer to them in the Company) to continue operating under their existing brands, rather than bringing them under the LVI or TLC brands, which are known as only offering refractive surgery services.  Also, because general ophthalmology practices bill third-party payors including Medicare, and are covered entities under HIPAA, the regulatory compliance requirements of those entities are significant compared to that of LVI and TLC, which are private pay only, do not bill third party payors electronically and are thus not HIPAA covered entities. Thus, keeping the general ophthalmology practices under a separate entity insulates the core LVI and TLC brands from any regulatory compliance issues that might occur in TVI centers.

22.      As of the Petition Date, there are two (2) Elite Centers.  The Debtors' current plan is to reopen them post-COVID-19 and to merge the one in Oklahoma with an LVI.

### F.      QualSight LASIK

23.      The Company acquired QualSight in November 2015.  Founded in 2004, Quaslight, LLC ("QualSight") has established, maintains, and manages a preferred provider organization (a "PPO") of participating LASIK and other refractive surgery providers ("Participating Providers"), which include LVI, TLC, and other providers unaffiliated with the Company.  QualSight contracts with the Participating Providers to provide LASIK or other refractive surgery and vision correction services to its members at pre-negotiated rates.   QualSight's members include insurance companies, health maintenance organization, employers, unions and other sponsors of health plans.  Through its call center, QualSight assists patients with selecting a physician or practice within its network and also will schedule the procedure for the patient.  QualSight generally takes a deposit from each patient it refers and earns a fixed-fee per procedure.

### G.      Cataract Vision Institute and Healthcare Marketing Services

24.      In 2015, the Company formed Cataract Vision Institute, LLC ("CVI") with the intention of developing the first national cataract surgery provider.  The entity piloted locations in Florida, Oklahoma and Texas.  Due to a number of factors (including, among others, unanticipated regulatory and operational challenges), the proof of concept ultimately was not realized, and the brand stopped offering services in the fall of 2018, with all follow-up surgeries ceasing in early 2019.

25.      Healthcare Marketing Services, LLC ("Healthcare Marketing") was also formed by the Company in 2015 for the original purpose of providing marketing services to CVI.  Eventually, the Company also utilized Healthcare Marketing to contract with marketing vendors for its other brands.  With the closure of CVI, however, Healthcare Marketing was no longer being utilized by the Company and the entity was phased out of operation in 2018.  As such, Healthcare Marketing is not an active part of the Company's operations, and CVI's operations are quite limited.

9

### III.   THE DEBTORS' PREPETITION INDEBTEDNESS

#### A.   The Prepetition Secured Term Loan Facility

26.     As part of the March 2019 Ownership Transaction, the Company amended and restated its existing term loan credit facility (the "Original Credit Facility") by executing that certain Second Amended and Restated Credit Agreement, dated as of March 1, 2019 (as amended, supplemented, or modified from time to time, the "Prepetition Credit Agreement," and the facility extended thereby, the "Prepetition Credit Facility") by and among, LVI and TLC Vision Holdings, as borrowers, LBC Credit Partners III, L.P., as administrative agent, sole lead arranger and sole bookrunner (the "Prepetition Agent"), and the lenders party thereto (the "Prepetition Lenders").

27.     The Prepetition Credit Agreement, among other things, waived the Debtors' non-compliance with certain covenants of the Original Credit Facility and established new financial restrictive covenants, including, *inter alia*, minimum EBITDA target and minimum cash balances to be kept on hand through the duration of the agreement.  As with the Original Credit Facility, under the Prepetition Credit Facility the borrowers could elect to borrow or convert their borrowings to either "Base Rate" or "LIBOR Rate" term loans (each as defined in the Prepetition Credit Agreement).  The Prepetition Credit Agreement provided for, *inter alia*, quarterly principal payments of $358,440 and was to mature on March 31, 2022.  As of the closing of the transaction, the Debtors' outstanding principal indebtedness under the Prepetition Credit Facility, after giving effect to the equity infusion from the March 2019 Ownership Transaction, was $143,376,000.77, which amount was inclusive of $267,966.50 in accrued PIK interest under the terms of the original facility ("Term Loan A" or "Term A Loan").  The Prepetition Lenders had no obligation to fund additional amounts under the facility.

28.     To secure the borrowers' obligations under the Prepetition Credit Facility, LVI and TLC Vision Holdings, as borrowers, and each of the Debtors, as guarantors, executed that certain

60987/0001-20508146v4

Reaffirmation of Collateral Documents and Amendment No. 1 to Guarantee and Collateral Agreement, dated as of March 1, 2019 (the "Guarantee and Collateral Agreement Reaffirmation"), which, *inter alia*, amended, acknowledged, reaffirmed and continued their obligations under that certain Guarantee and Collateral Agreement, dated as of October 16, 2014 (as amended, supplemented, or modified from time to time, the "Guarantee and Collateral Agreement") and the other collateral documents executed in connection with the Original Credit Facility (collectively with the Guarantee and Collateral Agreement, the "Collateral Documents"). By virtue of the Collateral Documents and Guarantee and Collateral Agreement Reaffirmation, the Debtors' obligations under the Prepetition Credit Facility are secured by substantially all of their assets.

29.     After the March 2019 restructuring, it became apparent to the Company that the Debtors would require additional capital to meet their financial obligations under the Prepetition Credit Agreement and return the business to profitability. By summer of 2019, the Debtors were in default under the Prepetition Credit Agreement. On August 15, 2019, the Debtors and the Prepetition Agent and Prepetition Lenders entered into a forbearance agreement and first amendment to the Prepetition Credit Agreement (the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, among other things, the Prepetition Lenders made $13,345,539 available under the Prepetition Credit Facility. This funding provided the Debtors with enough liquidity to continue certain operational and financial restructuring initiatives, while pursuing potential out-of-court restructuring with the Prepetition Agent and Prepetition Lenders.

30.     Despite the Company's best efforts, the liquidity situation worsened, and the Company required additional financing in order to continue its pursuit of out-of-court initiatives. Understanding management's ongoing efforts to change the Debtors' business and go-forward plans and with a willingness to see the Company continue as a going concern, on

11

November 19, 2019, the Prepetition Agent, the Prepetition Lenders and Debtors entered into a Protective Advances Agreement under which the Prepetition Agent and Prepetition Lenders agreed to provide additional liquidity not to exceed $10 million.

31.     As of the Petition Date, the Debtors calculate that the total indebtedness owing to the Prepetition Agent and Prepetition Lenders under the Prepetition Credit Facility is not less than in excess of $160 million.[6]

### B.     Capital Leases

32.     One of the Company's most important partnerships is with Alcon Laboratories, Inc. ("Alcon").   The Company and Alcon are parties to that certain Equipment Capital Lease Agreement, dated as of March 27, 2015 (the "Alcon Master Lease Agreement"), pursuant to which, *inter alia*, Alcon leases EX500 and FS200 lasers to the Company.   Under this arrangement, the Company purchases treatment cards that are needed to utilize the lasers from Alcon.   The agreement provides for minimum annual purchase quantities of the laser treatment cards.   If the Company purchases quantities in excess of the minimum, the Company is eligible for more favorable pricing and a volume rebate.   Upon completion of payment for the agreed "lease amount" over a term of years, the Company obtains ownership of the equipment, but the requirement to purchase the treatment cards from Alcon continues.   Although the Alcon arrangement is styled as a lease, Alcon has filed financing statements to "perfect" protective security interests in the lasers. The Debtors owe a significant sum of funds to Alcon as of the Petition Date - approximately $6 million (approximately $2 million of capital lease obligations and another approximately $4 million for cards/cones for procedures).

---

[6] TLC Vision (Canada) Corp. holds an intercompany secured claim, which is subordinated to the Prepetition Lenders under the terms of a subordination agreement dated as of March 1, 2019.

C.    **Unsecured Debt**

33.    The Debtors also have unsecured obligations to various other creditors, including (i) ordinary trade creditors, (ii) landlords, (iii) former executives, and (iv) contingent and disputed litigation claimants.  The Debtors estimate their unsecured debt is at least $16 million, exclusive of any deficiency claim by the Prepetition Lenders, amounts owed to Alcon, and disputed litigation claims.

IV.    **EVENTS LEADING TO CHAPTER 11**

34.    As described above, in 2015 and 2016, the Company incurred significant debt to fund the acquisition of numerous general ophthalmology practices that the Company struggled to successfully integrate and maintain the levels of profitability at acquisition.  While one of those acquisitions remains a profitable practice, the remainder of those general ophthalmology practices have performed poorly.

35.    During the 2015-2017 timeframe, the Company invested in piloting a national cataract surgery brand "Cataract Vision Institute" and simultaneously began an expansion of its LVI footprint into numerous smaller markets.  The new cataract brand brought unanticipated regulatory and operational challenges, and the proof of concept was not realized. As a result, the new brand ceased operations in 2018.  Meanwhile, the LVI expansion strategy proved problematic as the centers struggled to perform in the smaller markets, and the Company subsequently began closing some of these locations in 2018 and 2019.

36.    In 2018, the Company amended its credit agreement with LBC.  and experienced departure of many of its senior executive team members, including a longstanding CEO, and CFO, CMO and several other senior executives.  Beginning in June of 2018, extensive due diligence began for the proposed sale of Audax's interest in the Company to their minority Canadian investors. The change in ownership dragged on for several months, and the parties did not close

13

the transaction until March of 2019. At that time, due to prior liquidity issues, and a downward turn of the industry, substantial capital was needed, however the promised capital was never delivered post the March 2019 investment by 959 Canada.

37.     Moreover, one of the key marketing strategies utilized for years prior to 2020 by the LVI brand was the implementation of Groupon as a primary lead channel. Prior management believed the more eyes, irrespective of discount, would sustain overhead. Unfortunately, Groupon cost the Debtors significantly as they lost money on each Groupon patient, which comprised of a significant percentage of the LVI patient population (~20-25%).

38.     At the very end of 2018, a well-known meteorologist committed suicide post a SMILE procedure. Although SMILE is not a procedure offered by the Company, the nationally run story negatively impacted the entire refractive market and sparked an industry-wide downturn of approx. 8% that impacted all of 2019. As the Company is the leader in the refractive space, the industry downward turn had a deeper impact on the Company resulting in 15% fewer procedures and 14% lower revenues in 2019 vs. 2018. In addition, the Groupon percentage of LVI procedures grew to nearly 35%, causing a detrimental impact on profitability.

39.     While 2019 was a devastating year for the refractive industry generally, and specifically for the Debtors, 2020 was off to a good start pre-COVID. Among other marketing and operating initiatives, the Groupon program was modified to keep profit levels on those eyes consistent with the other lead channels. Even though February's total volumes were down 3%, the Company's management team drove several improved pricing initiatives resulting in increased revenues by 7% YOY. We are confident that, had the Company not shut down from the COVID pandemic, it would have had a very strong year as evidenced by the $2.9M of PF EBITDA through February.

40.     Of course, COVID-19 changed all of that, which brings us to the need for Chapter 11.  Namely, as many companies before us and more surely to follow, the Company files the Chapter 11 Cases today amid an unprecedented health crisis which resulted in a temporary and devastating shutdown of the Debtors' operations.  Prior to the COVID-19 global pandemic, between its two LASIK brands, the Company operated approximately 120 LASIK centers located across 38 states.  Similar to virtually every other elective surgery provider, however, the national response to the COVID-19 pandemic resulted in an extended shutdown of all the Company's LASIK centers.  Existing liquidity constraints, which had already placed stress on the business, accelerated by the COVID-19 pandemic and the attendant government stay-at-home orders and edicts forbidding non-essential medical services and elective surgeries, precipitated the Debtors' difficult decision to terminate approximately 833 employees and furlough another 19 employees. Today, the Debtors employ approximately 410 employees in aggregate.

41.     The Company is hopeful that this situation is temporary, however, and that these bankruptcy proceedings will provide the liquidity to reopen most of our locations and pave the way to a successful sale of the Company's assets to a buyer consisting of lenders in our current secured lending group, or another strategic or financial buyer that our proposed investment banker will assist us in securing through this process.  Although there remains considerable uncertainty as to when federal, state and local governments will lift restrictions on "non-essential" business operations throughout the country, the Company hopes to be in a position to return as many furloughed and terminated employees to work as possible.  Over the past few weeks, as governments have been phasing-out stay-at-home restrictions, the Company has already reopened approximately 26 center locations and has plans to fully reopen with a leaner footprint of approximately 93  centers.  The Company is hopeful that the post-petition loan we are seeking will

provide us with sufficient liquidity to execute the reopening plan, right size the footprint to the more profitable locations, and allow for a "free and clear" bankruptcy sale of the business to a buyer with sufficient funding to operate it post-bankruptcy.

## Part II

42.     To enable the Debtors to minimize the adverse effects of these cases, the Debtors are requesting various types of relief in their First Day Pleadings. Generally, the First Day Pleadings are designed to meet the Debtors' goals of (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible, (b) maintaining the confidence and support of their customers, employees, vendors, suppliers, and service providers during the Debtors' reorganization process, and (c) establishing procedures for the smooth and efficient administration of the Chapter 11 Cases.

43.     I have reviewed each of the First Day Pleadings and believe the facts set forth therein are true and correct. I believe that the relief sought in each of the First Day Pleadings is narrowly tailored to meet the goals described above and, ultimately, will enhance the Debtors' ability to achieve a successful reorganization. Furthermore, I believe that with respect to those First Day Pleadings requesting the authority to pay discrete prepetition claims or to continue selected prepetition programs, the relief requested is essential to the Debtors' reorganization and granting the relief within the first twenty-one days of the chapter 11 cases is necessary to avoid immediate and irreparable harm to the Debtors and their employees, customers, vendors, and creditors.

## A.     Administrative and Procedural First Day Pleadings

### i.     Joint Administration Motion

46.     The Debtors are requesting that the Chapter 11 Cases be jointly administered for procedural purposes only.  As set forth above, each of the Debtors is affiliated with the others.

16

Joint administration of the cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other papers and related notices that otherwise would need to be filed in all of the cases absent joint administration.  Moreover, joint administration will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files and will ease the burden on the U.S. Trustee in supervising these cases.  Accordingly, joint administration will save considerable time and expense for all parties in interest and this Court.

ii.      *Creditor Matrix and Consolidated Top 30 Motion*

46.      The Debtors seek entry of an order authorizing the filing of a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor.  I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be burdensome and result in duplicate mailings.

47.      The Debtors also seek entry of an order authorizing the filing of a consolidated list of the Debtors' thirty (30) largest unsecured creditors in lieu of each Debtor submitting a separate list of its largest top twenty (20) unsecured creditors.  Because the top twenty (20) lists of several of the Debtors could overlap, and certain other Debtors may have fewer than twenty (20) identifiable unsecured creditors, I believe that filing separate top twenty (20) lists for each Debtor would be of limited utility.  In addition, the exercise of compiling separate top twenty (20) lists for each individual Debtor could consume an excessive amount of the management's limited time and resources and could constitute a distraction of management's attention otherwise needed on operations at the start of the Chapter 11 Cases.  Finally, I believe a single, consolidated list of the

17

Debtors' thirty (30) largest unsecured, non-insider creditors will aid the office of the United States Trustee in its efforts to communicate with these creditors.

48. Furthermore, the list of creditors may include personally identifiable information of (a) the Debtors' former employees, (b) the Debtors' current employees, (c) the former doctors, surgeons, optometrists, and/or ophthalmologists who served as independent contractors to the Debtors, and (d) the current doctors, surgeons, optometrists, and/or ophthalmologists serving as independent contractors to the Debtors (collectively, the "Confidential Persons"), which could be used to perpetrate identity theft, locate survivors of domestic violence or stalking, or threaten, harass, or harm the Confidential Persons if disclosed publicly. This risk is not merely speculative. Below are examples of such risks the Confidential Persons are or have been exposed to:

- Within the last week on a check-in call a customer's partner threatened physical harm to a team member;

- Within the last month a team member received threatening text messages from a customer;

- In 2019 (i) a partner of a patient threatened to do physical harm to center staff because he alleged his girlfriend was not prescribed strong enough postoperative pain medication, (ii) a patient threatened violence towards a doctor and an optometrist, and (iii) a patient in Texas became hostile toward a surgeon and when the patient left the facility the patient damaged a car in the parking lot believing it to belong to an employee; and

- Other recent incidents include (i) a patient in Florida threatening an optometrist. The Debtors were required to secure a new doctor for the patient; (ii) a patient zip-tied himself to the front door of a facility in Florida because he wanted to confront facility staff when they arrived for work; (iii) a patient protesting outside of a center and threatening physical harm to team members; (iv) a patient going into a center and threatening physical harm to team members; (v) a patient going to a team member's home with a film crew and demanding the team member participate in the customer's video; and (vi) a patient in Missouri threatening his surgeon.

49. These incidents are not infrequent and are primarily addressed by the Debtors' risk management team members. To prevent potential harm to the Confidential Persons by disclosure

of personal identifiable information, I believe the Debtors should be authorized to avoid disclosure of otherwise private information of such Confidential Persons in the creditor matrix.

### iii.    *Patient Noticing and HIPPA Motion*

50.    The Debtors seek authority to (a) limit the notice the Debtors are required to provide to current or former patients of the Debtors' facilities (collectively, "<u>Patients</u>") to include only those patients who have either asserted a claim against the Debtors or who the Debtors determine, after reasonable inquiry, may be owed money from the Debtors (the "<u>Creditor Patients</u>") and authorizing the Debtors to exclude from their list of creditors all other patients (the "<u>Non-Creditor Patients</u>") and (B) establishing certain procedures to protect the confidentiality of patient information as required by the Health Insurance Portability and Accountability Act of 1996 ("<u>HIPAA</u>"), while providing required disclosure in these Chapter 11 Cases (the "<u>HIPAA Motion</u>").

51.    Given the sheer number of Patients, over a million, the Debtors cannot practically identify and provide notice of the Chapter 11 Cases to all Patients. The Debtors collectively have facilitated, through their independently contracted surgeons and medical doctors, LASIK or other refractive procedures and/or ophthalmic services to over a million of patients across their various locations throughout the United States.  There are, thus, over a million Patients who have used the Debtors' facilities.  The Debtors do not, in the ordinary course of their businesses, maintain a centralized database of patient records, many of which may exist only in hard copy at their various center locations.  The Debtors lack a centralized system or ability to compile a list of all Patients. While, in theory, Patients without direct claims could be contingent creditors either because (i) they have claims that they have not yet been asserted, or (ii) they are part of a lifetime program we are seeking to honor post-bankruptcy that may or may not be honored by a buyer, these potential claims are tangential and speculative.  Accordingly, I believe the relief regarding patient-

19

noticing the Debtors seek in the HIPAA Motion is critical, necessary, and justified under the circumstances of these cases.

52.     Accordingly, I believe the relief sought in the HIPAA Motion is appropriate and necessary and in the best interests of the Debtors' estates and their creditors.

### iv.     Donlin Recano & Company Retention Application

53.     The Debtors seek authority to retain Donlin, Recano & Company, Inc. ("Donlin Recano") as claims and noticing agent in the Chapter 11 Cases.  I understand that requesting such appointment is required by the rules of this Court given that the Debtors have more than 200 creditors and/or parties in interest listed on their creditor matrix.  I believe that Donlin Recano's retention is the most effective and efficient manner of noticing creditors and parties in interest of filings and other developments in the Chapter 11 Cases.  In addition, Donlin Recano will transmit, receive, docket and maintain proofs of claim filed in connection with the Chapter 11 Cases. Accordingly, I believe that retention of Donlin Recano, an independent third party with significant experience in this role, to act as an agent of this Court, is in the best interests of the Debtors and their estates and their creditors.

### B.     Operational First Day Pleadings

### i.     DIP Financing and Cash Collateral Motion

54.     Prior to COVID-19, the Debtors entered into discussions with their Prepetition Lenders regarding a non-bankruptcy solution to the Company's liquidity problem, including a contemplated Article 9 transaction in which certain of the Prepetition Lenders would acquire the stock of the Companies.  The parties were unable to get to terms on the contemplated Article 9 transaction, and following that period, COVID-19 caused a complete shutdown of the business. Due to the Company's already existing liquidity issues, the cessation of cash flow resulted in the Debtors' inability to pay its secured lenders, Alcon, its landlords and other vendors, and led to

massive workforce reductions, some temporary and others permanent. The Debtors were placed in a situation in which reopening on a large scale would be impossible without a liquidity infusion.

55.     In discussions with the Prepetition Lenders, the Company was able to negotiate the terms of a DIP loan to provide over $11 million of new money to the business over a 13-week period, on the conditions of a budget, a Chapter 11 bankruptcy filing and a marketing and sale process. Initially, it was anticipated that the Prepetition Lenders would submit a pre-bankruptcy stalking horse bid to acquire the Debtors, subject to higher and better offers. However, in the days leading to the filing, certain Prepetition Lenders expressed a desire to fund a DIP loan, but were no longer willing to enter into a pre-bankruptcy asset purchase agreement to purchase the Company. The Prepetition Lenders were unwilling to consent to what has been explained to me as a "priming" DIP loan, and thus, our only potential option to avoid liquidation in the coming weeks was to accept a loan from the Prepetition Lenders and enter bankruptcy without a stalking horse bid, in the hope that one or more qualifying bids could be obtained. Because the Prepetition Lenders would not consent to a priming DIP, this was effectively the Debtors' only option to liquidation. While the Company understood that no reasonable lender would agree to a non-priming DIP, we instructed our proposed investment banker, Raymond James, to canvass the market for a potential non-priming DIP loan. That process is support by a separate declaration in support of the DIP motion.

56.     After extensive discussions with the Prepetition Agent and Prepetition Lenders, the Debtors requested, and the Prepetition Lenders delivered, proposals that together would provide sufficient liquidity to permit the Debtors and their advisors to administer a value-maximizing chapter 11 case (the "DIP Financing, and the facility entered in connection therewith, "DIP Facility"). As part of the First Day Pleadings, the Debtors have filed a motion to approve their

entry into the DIP Facility with the Postpetition Agent and Postpetition Lenders. The proposed DIP Financing is the product of extensive and good faith arms' length negotiations between the Debtors and the Prepetition Agent and Prepetition Lenders. I believe that the DIP Facility is the best financing available to the Debtors under the circumstances. I believe, based on my discussions with the Company's professionals and advisors, including Raymond James, that the proposed DIP Facility is fair and reasonable and generally consistent with postpetition financing received by debtors that are in similar circumstances.

### ii. *Cash Management Motion*

57.     I have reviewed the motion seeking approval to maintain our current cash management system and other relief, and I believe the relief in that motion is critical to operating our business post-bankruptcy without interruption. Most importantly, our finance team must have the ability to continue to use our current cash management system and bank accounts to direct customer receipts from Debtor and non-Debtor deposit accounts into Debtor accounts for purposes of disbursements, including payroll. Because the Debtors' business involves managing medical practices owned by doctors under management agreement, among other things, the Debtors cannot operate without being authorized to transfer funds from accounts held by non-Debtors to Debtors. I have been made aware that the pre-petition practice of transferring funds from Debtors to non-Debtors cannot continue, and we will put protocols in place ensure that transfers between Debtor and non-Debtor accounts are limited to transfer from non-Debtor accounts to Debtor accounts, and not visa versa. My team worked together with our professionals to prepare the schematic exhibit attached to the cash management motion, and that exhibit is an accurate illustration of the movement of cash in our organization. I believe that it is critical to the Company's post-

bankruptcy success to be permitted to continue the pre-bankruptcy cash management practices during the bankruptcy period.

58.     I believe that the other relief sought in the cash management motion is also appropriate and in the best interest of the Debtors.

### iii.     Wages and Contractor Motion

59.     I believe that it is critically important that the Debtors continue to honor a number of prepetition obligations to their employees in order to minimize the personal hardship that the Debtors' employees will suffer if those obligations are not honored, as well as to prevent the harm that could occur to the Debtors if they do not maintain employee morale.

60.     Prior to the Petition Date, the Debtors made the difficult decision to terminate approximately 833 employees.  In addition, on or about March 19, 2020, the Debtors made the decision to furlough 19 employees (the "Furloughed Employees").  The Debtors believe that this situation is temporary.  Although there remains considerable uncertainty as to when federal, state and local governments will lift restrictions on "non-essential" business operations throughout the country, the Debtors hope to be in a position to return as many Furloughed Employees and terminated employees to work as possible.  Based on information currently available, the Debtors hope that many of the Furloughed Employees will be able to return to work in their respective states once business returns to a normal state, and subject to governments lifting restrictions on non-essential businesses (the "Furlough Period").  In the short term, the Debtors have retained approximately 410 employees (the "Retained Employees") to maintain the Debtors' limited business operations during this global crisis.

60987/0001-20508146v4

61.     Because the Debtors believe that they will eventually re-hire employees when they re-operationalize their locations, the relief sought by the Wages and Contractor Motion is with respect to both the Furloughed and Retained Employees (collectively, the "Employees").

62.     The Debtors believe that the skills and experience of their Employees, as well as their relationships with customers, contractors, and vendors, and institutional knowledge are essential to the Debtors' ability to effectively operate their businesses.  In order to maintain morale and ensure that the Furloughed Employees return to work for the Debtors after the Furlough Period, the Debtors request authority to pay and honor certain prepetition claims and obligations to all of their Employees. In particular, I believe it is necessary for the Debtors to:

A.      pay and/or perform, as applicable, prepetition obligations to current employees, including accrued prepetition wages, salaries, commissions, processing services related thereto and other cash and other non-cash compensation claims, except as otherwise set forth herein (collectively, the "Employee Claims");

B.      pay obligations to or on account of third-party contractors (collectively, the "Contractor Claims");

C.      honor and continue in the ordinary course of business, until further notice, and pay (but not assume) the prepetition amounts associated with, the Debtors' holiday, vacation and sick time policies (collectively, "PTO");

D.      honor and continue in the ordinary course of business, until further notice, and pay (but not assume) the prepetition amounts associated with employee benefit plans, 401(k) plans, and programs and workers' compensation plans and programs (collectively, and together with PTO, the "Employee Benefit Programs"), the most significant of which are described below, and to pay all fees and costs in connection therewith, except as otherwise set forth herein (collectively, the "Employee Benefit Obligations");

E.      reimburse Employees for prepetition reimbursable expenses ("Reimbursable Expenses"), consisting of out-of-pocket expenses incurred in the ordinary course of business; and

F.      pay over to the appropriate parties all prepetition withholdings from Employees and employer payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "Employee Withholdings" and, together with the Employee Claims, the Contractor Claims, the Employee Benefit Obligations and the Reimbursable Expenses, the "Prepetition Employee Obligations").

24

63.     As noted above, as of the Petition Date, the Debtors work force had been reduced to 410 full-time Retained Employees, of which 353 are full-time employees and 57 are part-time employees.  The Debtors pay salaries to 145 of their Employees and pay hourly wages to 265 of their Employees. The Debtors intend to continue to pay and/or honor the Employee Claims, Reimbursable Expenses, PTO, Employee Benefit Programs, and Employee Benefit Obligations for the Retained Employees, as well as to fund certain Employee Benefit Programs and Employee Benefit Obligations for the Furloughed Employees (as explained in the Wages and Contractor Motion) during the Furlough Period.

64.     Many of the Debtors' Employees rely on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses the Employees may suffer substantial personal hardship and, in some cases, be unable to meet their basic needs. In order to avoid Employee resignations and to maintain Employee morale, it is critical that the Debtors be authorized to pay each of their Employees all compensation amounts that have been earned under the Debtors' prepetition contractual obligations or practices, subject to the limitations described in the Wage and Contractor Motion.

65.     In addition, the Debtors maintain workers' compensation insurance as required by statute in each of the states in which they operate (the "Workers' Compensation Programs").  The Debtors seek authority to maintain their prepetition Workers' Compensation Programs, including the authority to make any and all payments required in connection therewith.

66.     The Debtors also routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties. Examples include Social Security, FICA, federal and state income taxes, garnishments, charitable donations, health care payments, other insurance payments and certain other voluntary payroll deductions. The Debtors believe that such withheld

25

funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and therefore are not property of the Debtors' bankruptcy estates.

67.    Further, the Debtors also currently have active direct or indirect relationships with approximately 695 laser eye surgeons, optometrists, and/or ophthalmologists who are engaged through various agreements or arrangements as independent contractors (collectively, the "Contractors").  Approximately 396 of the Contractors have agreements directly or indirectly with LVI, 283 directly or indirectly with TLC, and 16 directly or indirectly with TVI.  The Contractors provide necessary and essential services to the Debtors' core businesses, including performance of LASIK and other refractive surgical procedures.  The Debtors' revenues are principally derived from their Contractor agreements, thus making payment of obligations to the Contractors critical to the Debtors' reorganization efforts.

68.    I believe that failing to honor obligations to the Employees and Contractors would severely hamper the Debtors' ability to operate their businesses during these Chapter 11 Cases and, thus, endanger the Debtors' reorganization. The Debtors' Employees possess knowledge unique to the Debtors' businesses and operations. Replacing the Employees' institutional knowledge would require the Debtors and their remaining Employees to expend significant time, capital and effort, all of which, I believe, would distract the Debtors from the task at hand in these Chapter 11 Cases. Thus, the loss of valuable Employees would diminish the Debtors' ability to execute their value maximizing strategy and would harm the Debtors' stakeholders. Similarly, the Debtors cannot operate without their relationships with the Contractors whom perform the necessary services to generate income for the Debtors' businesses.  I, therefore, believe that authorization to pay the Prepetition Employee Obligations is critical to maximize the value of the Debtors' estates for all creditors and stakeholders.

60987/0001-20508146v4

### iv.     Insurance Motion

69.     In the ordinary course of business, the Debtors maintain approximately eighteen (18) insurance policies (each an "Insurance Policy" and together, the "Insurance Policies") for, among other things, real property liability, professional liability, business automobile liability, errors & omissions liability, workers' compensation liability, general commercial liability, cyber liability, crime liability, foreign liability, and directors and officers liability.

70.     The aggregate annual premium amount for the Insurance Policies is approximately $2,037,731.60.  The premium payment terms vary by Insurance Policy.  The Debtors pay the premiums in full at inception for the Debtors' five (5) directors and officers Insurance Policies.

71.     The Debtors pay premiums on a monthly basis to its insurance broker, USI Insurance Services, LLC ("USI"), for three (3) Insurance Policies, including their U.S. general liability Insurance Policy, U.S. general liability umbrella coverage Insurance Policy, and workers' compensation Insurance Policy.  The monthly payment to USI for the USI Policies totals $25,999, and the next payment is due on June 10, 2020.  As of the Petition Date, the Debtors are current on payments to USI for amounts due related to these Insurance Policies.

72.     Finally, the Debtors finance the premiums for ten (10) Insurance Policies through two (2) financing agreements (the "PFAs") with AFCO Credit Corporation (the "Finance Company").  The Debtors do not believe that any prepetition amounts are owed under the PFAs.

73.     Nine of the Insurance Policies are under one PFA with the Finance Company (the "First AFCO PFA"), including, Foreign liability insurance, Billings Errors & Omissions insurance, Crime liability insurance, Cyber liability insurance, Excess Cyber liability insurance, U.S.

Professional Malpractice liability insurance, Canada Professional Malpractice liability insurance,[7]

First Excess Professional Malpractice liability insurance and Second Excess Professional

Malpractice liability insurance. The Finance Company pays the annual premium at the start of

these policies and the Debtors make an initial down payment and monthly payments to the Finance

Company under the First AFCO PFA. Prior to the Petition Date, starting December 18, 2019, the

Debtors made average monthly payments of approximately $113,853.53 on account of the First

AFCO PFA, in addition to a one-time annual down payment of $333,671.92. The Debtors estimate

that approximately $341,560.59 remains due under the First AFCO PFA, of which $113,853.53 is

due on June 18, 2020. As of the Petition Date, the Debtors estimate that approximately $15,930.86

is owed to the Finance Company under the First AFCO PFA.

74.     In addition, the premiums for the Debtors' Real and Personal Property Insurance

Policy is also financed with the Finance Company (the "Second AFCO PFA"). The Finance

Company pays the annual premium at the start of this policy and the Debtors make an initial down

payment and monthly payments to the Finance Company under the Second AFCO PFA. Prior to

the Petition Date, starting May 1, 2020, the Debtors made average monthly payments of

approximately $14,125 on account of the Second AFCO PFA, in addition to a one-time annual

down payment of $42,770.73. The Debtors estimate that approximately $113,000.00 remains due

under the Second AFCO PFA, of which $14,125 is due on June 1, 2020.

75.     The Debtors believe that the coverage types, levels and premiums for these

Insurance Policies are typical for comparably-sized companies in the Debtors' industry. If the

Debtors are unable to make any payments that may be owed on account of the Insurance Policies,

---

[7] This is the only foreign subsidiary policy paid for by the Debtors. The payments for this policy are recorded as an intercompany transaction, and the foreign subsidiaries are required to reimburse the Debtors for the amounts paid.

including on account of premium adjustments, the unpaid Insurance carriers or Finance Company, as applicable, may seek relief from the automatic stay to terminate such Insurance Policies. The Debtors would then be required to obtain replacement insurance on an expedited basis and at a significant cost. Even if these Insurance carriers were not permitted to terminate the agreements, I believe that any interruption of payment would have an adverse effect on the Debtors' ability to obtain future policies at reasonable rates.

76.     Additionally, The Insurance Policies are essential to the preservation of the value of the Debtors' businesses, property and assets. Not only are some of the Insurance Policies required by various regulations, laws and contracts that govern the Debtors' commercial activities, but I am informed by counsel that failure to maintain insurance could result in conversion or dismissal of the Chapter 11 Cases or a failure to comply with applicable U.S. Trustee Guidelines.

77.     In light of the importance of maintaining insurance coverage with respect to their business activities, the Debtors believe it is in the best interest of their estates to receive Court approval to honor their obligations under the Insurance Policies.

### v.     *Tax Motion*

78.     In the ordinary course of business, the Debtors incur, collect and/or pay income taxes, sales and use taxes,  franchise taxes, limited liability company taxes, withholding taxes, gross receipts taxes, personal property taxes, and certain state specific taxes (collectively, the "Taxes") to various taxing, licensing and regulatory authorities (collectively, the "Authorities"). The Debtors also incur and pay certain business license, permits and fees, and other assessments (collectively, and as further described below, the "Business Fees") to the Authorities.

79.     As of the Petition Date, the Debtors estimate that approximately $1,644,754 in unpaid sales and use taxes are due.  These outstanding amounts were recently discovered by current

60987/0001-20508146v4

management, and since learning of the issue, the Debtors have worked diligently to arrange for the appropriate filings and fees to be paid. Given the Debtors' unrelated liquidity issues that led to this filing, and the vast number of states involved, this reconciliation and payment process straddles the Petition Date. Included in the aggregate amount are interest and penalties totaling $384,227 owed to various state taxing Authorities in connection with late payments, un-timely filed returns, and un-filed returns. The Debtors were hopeful that, as part of the Article 9 transaction that was contemplated prior to bankruptcy, the Prepetition Lenders would assume those obligations as part of the agreement – but that deal fell apart. Thereafter, during the course of planning these Chapter 11 Cases, the Debtors hired Grant Thornton to file the appropriate returns or amended returns with the states for outstanding sales and use taxes. Through pre-bankruptcy negotiations with the DIP lenders, the Debtors have obtained consent to fund from the DIP loan the amounts accrued during the most recent time period (2019-present), up to $515,000.

80.    As of the Petition Date, the Debtors estimate that the following amounts are also owed to the applicable Authorities, (a) $1,170 in gross receipts taxes, (b) $38,992 in personal property taxes,[8] and (c) $1,403 in Business Fees.[9]

81.    I have been advised that certain of the Taxes constitute so-called trust fund obligations that the Debtors are required to collect from third parties and held in trust for payment to the taxing and regulatory authorities. I understand that the funds that would be used to pay the trust fund Taxes are not property of the Debtors' estates.

---

[8] Checks totaling $33,317.43 were sent to certain Authorities on May 28 and May 29 in payment of certain past due amounts which would reduce the amount due for Personal Property Taxes to $5,674.57. Those checks have not yet cleared the Debtors' accounts.

[9] Checks totaling $846 were sent to certain Authorities on May 28 in payment of certain past due amounts which would reduce the amounts due for Business Fees to $557. Those checks have not yet cleared the Debtors' accounts.

60987/0001-20508146v4

82.     I have also been advised that the nonpayment of certain of the Taxes that constitute trust fund obligations and are not property of the Debtors' estates may result in personal liability for the Debtors' officer and directors.  Efforts by Authorities to collect such trust fund amounts would unnecessarily divert the Debtors' officer and directors from tasks relating to the restructuring and ongoing management of the Debtors' businesses.

83.     Additionally, the Authorities may cause the Debtors to be audited if the Taxes are not paid.  Such audits will unnecessarily divert the Debtors' attention away from the reorganization process. In all cases, the Debtors' failure to pay Taxes could have an adverse impact on their ability to operate in the ordinary course of business.

84.     In addition, the Debtors are in the process of filing for extensions in connection with their franchise tax filing obligations, income tax filing obligations, withholding tax filing obligations, and limited liability company tax filing obligations.  To process the extension filings, the Debtors are required to pay the applicable Authorities $171,315.[10]  The extension payments to these Authorities are necessary to avoid penalties and interest associated with the untimely filing of tax forms for the franchise taxes, income taxes, withholding taxes, and limited liability company taxes.

### vi.     Utilities Motion

85.     In connection with the operation of their businesses, the Debtors receive electricity, telephone, and internet, and similar utility products and services (the "Utility Services") from various utility companies (the "Utility Companies").  The Debtors have filed a motion requesting that this Court approve the Debtors' proposed form of adequate assurance of postpetition payment

---

[10] Checks totaling $27,855 were sent to certain Authorities on May 28 and May 29 in payment of certain past due amounts which would reduce the amounts due for Extension Payments to $143,460.  Those checks have not yet cleared the Debtors' accounts.

(the "<u>Proposed Adequate Assurance</u>") to the Utility Companies, as that term is used in section 366 of the Bankruptcy Code, approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance, and prohibiting the Utility Companies from altering, refusing or discontinuing service to, or discriminating against, the Debtors.

86.     In particular, the Debtors have proposed for the Utility Companies the establishment of a newly created, interest-bearing segregated account in which the Debtors will place a deposit equal to approximately two weeks of Utility Services (the "<u>Utility Deposit Account</u>"). I believe that creation of the Utility Deposit Account and the additional procedures set forth in the motion adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend. The Debtors estimate the aggregate of all the Utility Deposits will be approximately $129,050.00.

87.     I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations.  Such a result could potentially jeopardize the Debtors' ability to perform under their customer contracts and impair the Debtors' reorganization efforts and, ultimately, the value of the Debtors' business.  In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases.

### vii.     *Customer Programs Motion*

88.     Prior to the Petition Date, and in the ordinary course of their business, the Debtors provided a variety of incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships ("<u>Customer Programs</u>").  Maintaining the loyalty, support, and goodwill of customers is critical to the Debtors' reorganization efforts.

89.     The Customer Programs generally relate to the Debtors' programs in which they offer coupons, discounts, referral bonuses, and lifetime commitments to retain customers. The Debtors seek to honor the Customer Programs because the Debtors believe that their ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to maintain their reputation for reliability, meet competitive market pressures, and ensure customer satisfaction, in order to retain current customers, attract new ones, and, ultimately, enhance revenue and profitability for the benefit of all the Debtors' stakeholders.

90.     Continuing the Customer Programs, without interruption will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors and their creditors.   If the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating customers (who might then initiate business relationships with the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects for reorganization and/or maximizing the value of their estate.  The Debtors' Customer Programs are also essential marketing strategies for attracting new customers.

91.     The Debtors accept the following methods of payment from customers at in-store and online points of sale: Visa, MasterCard, Discover, and American Express credit cards (the "Non-Cash Payments").   To process Non-Cash Payments, the Debtors are party to certain agreements (the "Payment Processing Agreements") with Elavon, Inc. and Total System Services, Inc. (the "Payment Processing Companies").

92.     In addition to cash and the Payment Processing Arrangements, the Debtors have entered into arrangements with two companies to provide finance arrangements (the "Financing Arrangements") for their customers as another method of payment for services rendered by the

Debtors: CareCredit and Universal Account Servicing, LLC ("UGA" and together, with CareCredit, the "Financing Companies").

93.     The Debtors' continued acceptance of Non-Cash Payments and the Financing Arrangements is essential to the operation of the Debtors' business because the majority of the Debtors' sales are made using Non-Cash Payments and the Financing Arrangements.  Declining to accept Non-Cash Payments or the Financing Arrangements would have a severe negative effect on the on the Debtors' ongoing operations and effectively eliminate the Debtors' ability to continue operating, the cost of which would be borne by their estates.  To avoid disrupting these vital payment processing services, the Debtors (a) seek authority to continue paying the Processing Obligations and CareCredit Processing Fees in the ordinary course of business, (b) request that the Court authorize the Payment Processing Company and CareCredit to continue to offset the Processing Obligations and CareCredit Processing Obligations against amounts remitted to the Debtors, in each case in the ordinary course, whether arising before or after the Petition Date; and (c) seek authority to continue entering into Credit Contracts with customers and permitting the sale of the Credit Contracts to UGA, in each case in the ordinary course.

*[The remainder of this page is intentionally blank]*

34

## **CONCLUSION**

For all the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: May 29, 2020

/s/ Lisa Melamed (May 29, 2020 14:59 EDT)

Lisa Melamed
Interim Chief Executive Officer and President


**Signature:** Lisa Melamed (May 29, 2020 14:59 EDT)

**Email:** lmelamed@vgroupholdings.com

**Title:** Interim CEO

**Company:** Vision Group Holdings

35

**EXHIBIT A**

**CORPORATE ORGANIZATIONAL CHART**



THE LASIK VISION INSTITUTE
Organizational Chart

(as of May 28, 2020)

Green – Debtors
Red – Non Debtors
Blue – Non Debtor Guarantors

Corporation

Limited Liability Company

Falcon Strategic Partners IV, LP
37-1700706
**8% Ownership**

9597930 Canada, Inc.
**84% Ownership**

Macquarie Sierra Investment Holdings, Inc.
**8% Ownership**

34,000 Preferred stock

36,000 Preferred stock

**LVI Super Intermediate Holdings, Inc.**
(Delaware)
81-4431388

**LVI HoldCo, LLC.**
(Delaware)
[TBD]

**LVI Intermediate Holdings, Inc.**
(Delaware)
51-0487674

**The LASIK Vision Institute, LLC**
SEE SLIDE 3

**Cataract Vision Institute, LLC**
(Delaware)
47-4787697

**LVI Intermediate Holdings II, LLC**
(Delaware)

**Sunglasses Intermediate Blocker, Inc.**
(Delaware)
20-3153129

**Healthcare Marketing Services, LLC**
(Delaware)
47-4789982

**Total Vision Institute, LLC**
(Delaware)
47-5037571

**Cataract Vision Institute Florida, LLC** (Florida)
82-0803423

23.089965%

76.910035%

**QualSight, LLC**
(Delaware)
47-5383866

TLC Vision Center Holdings, LLC and Subsidiaries
(SEE SLIDE 2)





The LASIK Vision Institute, LLC Subsidiaries