## Exhibit A

## Revised Proposed Order

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LVI INTERMEDIATE HOLDINGS, INC., *et al.*,<br><br>          Debtors.[1] | Chapter 11<br><br>Case No. 20-11413 (KBO)<br><br>(Jointly Administered)<br><br>**Re: D.I. 74** |

## ORDER GRANTING DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF RAYMOND JAMES & ASSOCIATES, INC. AS INVESTMENT BANKER FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE, (II) WAIVING CERTAIN REPORTING REQUIREMENTS PURSUANT TO LOCAL RULE 2016-2, AND (III) GRANTING RELATED RELIEF

Upon the application (the "Application")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 Cases for entry of an order appointing Raymond James as investment banker, effective as of the Petition Date, as more fully set forth in the Application; and upon consideration of the Richards Declaration and the First Day Declaration; and this Court having jurisdiction to consider the Application pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and venue of these Chapter 11 Cases and the Application in this district being proper pursuant to 28 U.S.C. §§ 1408

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: LVI Intermediate Holdings, Inc., (7674); Total Vision Institute, LLC (7571); QualSight, LLC (3866); The LASIK Vision Institute, LLC (7564); Cataract Vision Institute, LLC (7697); Healthcare Marketing Services, LLC (9982); LVI Missouri, LLC (7088); Cataract Vision Institute Florida, LLC (3423); TLC Vision Center Holdings, LLC (5400); TLC Whitten Laser Eye Associates, LLC (0182); TLC Vision Centers, LLC (8271); TruVision, LLC (3399); TruVision Contacts, LLC (3399); Laser Eye Surgery, LLC (3448); TLC Laser Eye Centers (Refractive I), LLC (2702); TLC The Laser Center (Pittsburgh) L.L.C. (2881); TLC The Laser Center (Indiana) LLC (8456); and TLC The Laser Center (Institute), LLC (0959).   The Debtors' executive headquarters are located at 1555 Palm Beach Lakes Blvd., Suite 600, West Palm Beach, Florida 33401.

[2]    Capitalized terms not defined in this Order shall have the meanings ascribed to them in the Application.

and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court finding that the terms and conditions of Raymond James's employment, including, but not limited to, the Fee Structure set forth in the Engagement Letter and summarized in the Application, are reasonable as required by section 328(a) of the Bankruptcy Code; and this Court finding that Raymond James does not hold or represent interests materially adverse to the Debtors' estates and is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code; and it appearing that the employment of Raymond James is in the best interests of the Debtors and their estates and creditors; and this Court having found that the Debtors' notice of the Application and opportunity for a hearing on the Application were appropriate under the circumstances and no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Application is granted as modified and as set forth herein.

2.      The Debtors' engagement, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, effective as of the Petition Date, of Raymond James as their investment banker in accordance with the terms and conditions set forth in the Application and the Engagement Letter is approved, subject to the terms of this Order.

3.      The Engagement Letter is approved pursuant to section 328(a) of the Bankruptcy Code, and Raymond James shall be compensated and reimbursed pursuant to section 328(a) of the Bankruptcy Code in accordance with the terms of, and at the time specified in, the Engagement Letter, as modified by this Order.

4.      Notwithstanding anything to the contrary in this Order, the Application, the Retention Agreement or the Richards Declaration, no amounts shall be paid to Raymond James absent an order of this Court approving a fee application filed on notice to parties in interest in these cases, or as otherwise allowed under any order establishing procedures for interim compensation and reimbursement of expenses of professionals (the "Interim Compensation Order") entered in these cases, except that the Debtors are authorized and directed to pay a seventy-five thousand United States Dollars ($75,000.00) up front monthly fee to Raymond James each month without the requirement of a prior fee application, provided, however, that Raymond James shall file monthly fee statements with time entries as provided for in this Order and requests for reimbursement that comply with Rule 2016-2 of the Local Rules of this Court, pursuant to the deadlines and other procedures set forth in the Interim Compensation Order for monthly fee statements, and shall also file interim and final fee applications in accordance with the requirements of the Interim Compensation Order.  All fees paid to Raymond James are subject to disgorgement unless and until they are approved by the Court on a final basis, after submission of Raymond James's final fee application.  No Break-Up Fee shall be payable to Raymond James.

5.      At or before the closing of any Transaction(s), the Debtors shall cause to be segregated and placed in a separate escrow account for payment to Raymond James the amount(s) of the Transaction Fee(s) due to Raymond James, with payment to Raymond James pending the Court's approval of Raymond James's fee applications and upon approval of any Raymond James fee application by the Court Raymond James shall be paid from the funds held in the escrow account.

6.      Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy

Rules, the Local Rules, any order of this Court, or any guidelines established by the United States Trustee for the District of Delaware (the "U.S. Trustee") regarding submission and approval of fee applications, Raymond James shall be excused from: (a) the requirement to maintain or provide detailed time records for services rendered postpetition in accordance with Local Rule 2016-2, and (b) providing or conforming to any schedule of hourly rates. Instead, notwithstanding that Raymond James does not charge for its services on an hourly basis, Raymond James will maintain time records in half-hour (0.5) increments, setting forth, in a summary format, a description of the services rendered and the professional rendering such services on behalf of the Debtors.

7.      Despite anything contained in the Application to the contrary, Raymond James shall file interim and final fee applications for the allowance of compensation and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures and orders of the Court; provided, however, that Raymond James shall be compensated and reimbursed pursuant to section 328(a) of the Bankruptcy Code and that Raymond James's fees and expenses shall not be evaluated under the reasonableness standard set forth in section 330 of the Bankruptcy Code. Notwithstanding any provision to the contrary in this Order, the U.S. Trustee shall have the right to object to Raymond James's request(s) for interim and final compensation and reimbursement based on the reasonableness standard provided in section 330 of the Bankruptcy Code, not section 328(a) of the Bankruptcy Code; provided, however, that "reasonableness" shall be evaluated by comparing (among other things) the fees payable in these Chapter 11 Cases to fees paid to comparable investment banking firms with similar experience and reputation offering comparable services in other chapter 11 cases and shall not be evaluated primarily on an hourly

US_Active\114991072\V-2

or length-of-case based criteria. This Order and the record relating to the Court's consideration of the Application shall not prejudice or otherwise affect the rights of the U.S. Trustee to challenge the reasonableness of Raymond James's fees under the standard set forth in the preceding sentence. Accordingly, nothing in this Order or the record shall constitute a finding of fact or conclusion of law binding the U.S. Trustee, on appeal or otherwise, with respect to the reasonableness of Raymond James's fees.

8.    The Indemnification Provisions set forth in the Engagement Letter are approved, subject during the pendency of these Chapter 11 Cases to the following:

a.    Subject to the provisions of subparagraphs (b) and (c) below, the Debtors are authorized to indemnify, contribute, or reimburse, and shall indemnify, contribute, or reimburse Raymond James for any claims arising from, related to, or in connection with services to be provided by Raymond James as specified in the Application, but not for any claim arising from, related to, or in connection with Raymond James's postpetition performance of any other services other than those in connection with the engagement, unless such postpetition services and the indemnification, contribution, or reimbursement therefor are approved by this Court;

b.    The Debtors shall have no obligation to indemnify Raymond James, or provide contribution or reimbursement to Raymond James, for any claim or expense that is either: (i) judicially determined (the determination having become final and non-appealable) to have arisen from Raymond James's gross negligence, willful misconduct, breach of fiduciary duty, if any, bad faith, or self-dealing; (ii) for a contractual dispute in which the Debtors allege the breach of Raymond James's contractual obligations, unless this Court determines that indemnification, contribution, or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to subparagraph (c) below, to be a claim or expense for which Raymond James should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Letter as modified by this Order; and

c.    If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these Chapter 11 Cases (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing these Chapter 11 Cases, Raymond James believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors'

5

indemnification, contribution, or reimbursement obligations under the Engagement Letter (as modified by this Order), including, without limitation, the advancement of defense costs, Raymond James must file an application in this Court, and the Debtors may not pay any such amounts to Raymond James before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which this Court shall have jurisdiction over any request for fees and expenses by Raymond James for indemnification, contribution, or reimbursement, and is not a provision limiting the duration of the Debtors' obligation to indemnify Raymond James. All parties in interest shall retain the right to object to any demand by Raymond James for indemnification, contribution, or reimbursement.

9.      In the event that during the pendency of these Chapter 11 Cases, Raymond James requests reimbursement for any attorneys' fees or expenses, the invoices and supporting time records from such attorneys shall be included in Raymond James's fee applications, and such invoices and time records shall be paid in compliance with the Local Rules, the guidelines of the U.S. Trustee, and standards of sections 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy section 330(a)(3)(C) of the Bankruptcy Code. Notwithstanding the foregoing, Raymond James shall be reimbursed for legal fees incurred in connection with these Chapter 11 Cases only to the extent permitted under applicable law and the decisions of this Court.

10.     Notwithstanding any provision in the Engagement Letter to the contrary, the contribution obligations of the Indemnified Parties (as such term is defined in the Engagement Letter) shall not be limited to the amount of fees actually received by Raymond James from the Debtors pursuant to the Engagement Letter, this Order, or subsequent orders of this Court.

11.     Notwithstanding anything in the Application to the contrary, Raymond James shall (i) to the extent that Raymond James uses the services of independent contractors or subcontractors (collectively, the "Contractors") in these cases, pass through the cost of such

6

Contractors to the Debtors at the same rate that Raymond James pays the Contractors; (ii) seek reimbursement for actual costs only; (iii) ensure that the Contractors are subject to the same conflicts checks as required for Raymond James; and (iv) file with this Court such disclosures required by Bankruptcy Rule 2014.

12.     Notwithstanding any provision in the Engagement Letter to the contrary, Raymond James' postpetition Transaction Fees shall not exceed one million, four hundred and fifty thousand United States Dollars ($1,450,000.00) in the event the Transaction Value of a consummated Business Combination Transaction is less than seventy million United States Dollars ($70,000,000.00).

13.     Notwithstanding any provision in the Bankruptcy Rules to the contrary, this Order shall be immediately effective and enforceable upon its entry.

14.     In the event of any inconsistency between the Engagement Letter, the Application, and this Order, this Order shall govern.

US_Active\114991072\V-2

## **EXHIBIT 1**

**Engagement Letter**

US_Active\114991072\V-2

# **RAYMOND JAMES®**

**CONFIDENTIAL**

August 8, 2019

LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
1555 Palm Beach Lakes Blvd., Suite 200
West Palm Beach, FL 33401
Attention: Markus Hockenson, President and Chief Executive Officer

Ladies and Gentlemen:

This letter agreement (this "Agreement") will confirm the terms pursuant to which LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings (as further defined below, the "Company") has retained Raymond James & Associates, Inc. (as further defined below, "Raymond James," "we" or "us," and together with the Company, each a "Party" and collectively, the "Parties") to provide the Company with certain investment banking advisory services outlined in Section 1(a) below, relating to a Transaction (as defined in this Agreement), including the terms of any such services provided by Raymond James before the date of this Agreement.

For purposes of this Agreement:

(a) "Company" means, each and collectively, LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings, and, if applicable, any affiliate and/or any special purpose entity involved in or formed or used by LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings, to effect or facilitate any Transaction, and shall also include any successor to or assignee of all or a portion of its or any such subsidiary's or entity's assets and/or businesses.

(b) "Raymond James" means Raymond James & Associates, Inc. and any non-U.S. affiliate of Raymond James & Associates, Inc. that may assist in the provision of Services (as defined below) under this Agreement.

(c) "Financing Transaction" means any transactions, arrangements or undertakings (however effectuated) involving the issuance of debt, securities exchangeable or convertible into common or preferred stock, or equity or equity-linked securities (including royalties, profit sharing and other similar financing transactions) for or on behalf of the Company or securing loans or credit facilities for the Company (whether to raise funds, refinance outstanding securities or exchange securities or any combination thereof, provided that any such transaction involves the receipt by the Company of new consideration in the form of cash, loans and/or credit as opposed to the restructuring, renegotiation, forgiveness, or exchange with or by the holder of any outstanding debt obligations or equity securities of the Company ("New Money Proceeds"), which would constitute a Restructuring Transaction (as defined herein)) or such other financing of any type committed to complete any other Transaction.

(d) "Restructuring Transaction" means any recapitalization, reorganization, restructuring, sale or transfer (however effectuated) of all or a substantial portion of the Company's existing debt obligations (including, without limitation, bank debt, bond debt, trade claims, lease obligations (both on and off balance sheet), tax claims, litigation claims and other liabilities (collectively, "Existing Obligations") that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations, amendment or renegotiation of terms, conditions or covenants, rescheduling of maturities, change in interest rates, repurchase, settlement, cancellation or forgiveness of the Existing Obligations, conversion of the Existing Obligations into equity, an exchange offer involving new securities in exchange for the Existing Obligations, or other similar transaction or series of transactions.

(e) "Business Combination Transaction" means transaction or series of transactions that result in (i) the sale or transfer (however effectuated) of all or a substantial portion of the securities, business, operations or

assets (including the assignment of any executory contracts) of the Company to, the possible sale or transfer (however effectuated) of a majority voting or economic interest in the Company's securities or control of the Company to, or the merger of the Company with, one or more Interested Parties (including, without limitation, existing creditors, affiliates and/or security holders), or any other possible strategic transactions, joint ventures, combinations or undertakings between or involving the Company and one or more Interested Parties; and/or (ii) the acquisition, directly or indirectly by an Interested Party (as defined below) (or by one or more persons or entities acting together with an Interested Party pursuant to a written agreement or otherwise), in a single transaction or a series of transactions, of (A) all or a substantial portion of the assets or operations of the Company or (B) any outstanding or newly-issued shares of the Company's equity securities (or any securities convertible into, or options, warrants or other rights to acquire such equity securities) (such equity securities and such other securities, options, warrants and other rights being collectively referred to as "Company Securities") that results in holders of shares of the Company's equity securities immediately prior thereto owning less than a majority voting or economic interest in the Company's securities or control of the Company immediately thereafter.

(f) "Divestiture Transaction" means any transaction or series of transactions that result in the sale or transfer (however effectuated) of all or substantially all of the securities, business operations or assets (including the assignment of any executory contracts) composing: six (6) outpatient surgery centers. For the avoidance of doubt, the sale of the accounts receivable of not more than $12,000,000 in the aggregate currently being evaluated by the Company is not a Divestiture Transaction.

(g) "Transaction" means any Financing Transaction, Restructuring Transaction, Business Combination Transaction or Divestiture Transaction.

(h) "Transaction Fee" means any Financing Transaction Fee, Restructuring Transaction Fee, Business Combination Transaction Fee, Break-up Fee, and/or Divestiture Transaction Fee (as such terms are defined in Section 2 below).

(i) "Interested Party" means any financial and/or strategic institutional investors or other investors or third parties who may be interested in participating in the particular Transaction.

(j) "Associated Interested Party" means (i) those holders of capital stock of the Company or any securities or obligations of the Company directly or indirectly exercisable for, convertible into or exchangeable for capital stock of the Company, in each case, as of the date hereof and identified on Addendum C hereto or, (ii) any senior secured lender party (or majority controlled affiliate thereof) to the Second Amended and Restated Credit Agreement as of the date hereof and as identified on Addendum C hereto.

(k) "Associated Interested Party Transaction" means either (i) a Business Combination Transaction in which one or more Associated Interested Party(ies) directly or indirectly owns, controls or is the beneficial holder of at least two-thirds of the equity interests in the entity(ies) consummating such a transaction with the Company or (ii) a Restructuring Transaction in which one or more Associated Interested Party(ies) directly or indirectly owns, controls or is the beneficial holder of at least two-thirds of the face amount of indebtedness owed as of the date hereof under the Second Amended and Restated Credit Agreement dated as of March 1, 2019 among The Lasik Vision Institute, LLC and TLC Vision Center Holdings, LLC as borrowers, LBC Credit Partners III L.P. as Administrative Agent, Sole Lead Arranger and Sole Bookrunner and the Lenders party thereto.

(l) "Definitive Agreement" means the definitive written agreement regarding a Transaction.

1. **Investment Banking Advisory Services**



LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 3 of 21

(a)   The Company hereby engages Raymond James as its sole and exclusive investment banking advisor regarding a potential Transaction, and Raymond James will provide the following services to the extent requested by the Company (the "Services"):

    (i)    Assist the Company in reviewing and analyzing the Company's business, operations, properties, financial condition and Interested Parties;

    (ii)    Assist the Company in evaluating the Company's debt capacity, advise the Company generally as to available financing and assist in the determination of an appropriate capital structure;

    (iii)    Assist the Company in evaluating potential Transaction alternatives and strategies;

    (iv)    Assist the Company in preparing documentation within our area of expertise that is required in connection with a Transaction;

    (v)    Assist the Company in identifying Interested Parties regarding one or more particular Transactions;

    (vi)    On behalf of the Company and with prior written consent by the Company, contact Interested Parties which Raymond James, after consultation with the Company's management, believes meet certain industry, financial, and strategic criteria and assist the Company in negotiating and structuring a Transaction;

    (vii)    Advise the Company as to potential Business Combination Transactions;

    (viii)    Advise the Company on tactics and strategies for negotiating with holders of the Company's debt or other claims of the Company ("Stakeholders");

    (ix)    Provide the Company with valuation services and testimony in connection with any bankruptcy case filed by the Company;

    (x)    Advise the Company on the timing, nature and terms of any new securities, other considerations or other inducements to be offered to its Stakeholders in connection with any Restructuring Transaction; and

    (xi)    Participate in the Company's board of directors meetings as determined by the Company to be appropriate, and, upon request, provide periodic status reports and advice to the board with respect to matters falling within the scope of Raymond James' retention.

(b)   In the event the Company becomes a debtor in a case under the Bankruptcy Code, the Company shall file an application to retain Raymond James as one if its "first day" pleadings and to seek to cause such application to be considered on an expedited basis. Such application shall seek authorization from the bankruptcy court having jurisdiction over any Chapter 11 case commenced by the Company (the "Bankruptcy Court") to retain Raymond James pursuant to (and subject to the standard of review of) Section 328(a) of the Bankruptcy Code, *nunc pro tunc* to the date on which the Company files its bankruptcy case, in accordance with the terms hereof and Addendum A attached to this Agreement and not subject to any other standard or review under Section 330 of the Bankruptcy Code. To the



**RAYMOND JAMES®**

extent reasonably possible, the Company shall supply Raymond James with a draft of such application and any proposed order authorizing Raymond James' retention sufficiently in advance of their filing to enable Raymond James and its counsel to review and comment thereon. Services under this Agreement shall be subject to the entry of a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition (the "Retention Order") approving the retention of Raymond James and this Agreement under Section 328(a) of the Bankruptcy Code, and Raymond James shall not be required to perform any services in a Chapter 11 bankruptcy case pursuant to this Agreement until the entry of the Retention Order. In any event the Retention Order must be reasonably acceptable to Raymond James in all respects, and at a minimum shall approve the terms of this Agreement, including, without limitation, our agreement that: (i) none of the fees shall constitute a "bonus" under applicable law; and (ii) Raymond James shall not be required to maintain time records in less than quarter of an hour increments.

(c) Raymond James will not provide any legal, regulatory, accounting, leasing, claims administration, retail, appraisal, or tax advice, or develop any tax strategies, or provide any opinion, for the Company. If the Company requests that Raymond James provide any services other than those Services expressly set out in Section 1(a), the Company and Raymond James will enter into an additional agreement that will set forth the nature and scope of such services, appropriate compensation and other customary matters, as mutually agreed between the Company and Raymond James.

(d) The Company expressly acknowledges that Raymond James does not guarantee, warrant or otherwise provide assurance that the Company will be able to implement or consummate any Transaction or achieve any other result.

(e) Unless otherwise prohibited by a confidentiality agreement existing as of the date hereof, the Company shall promptly furnish to Raymond James the names and contact information of all third parties with which the Company or, to the Company's actual knowledge, any of its securityholders, directors, managers, affiliates or other advisors or representatives, had during the twelve month period before the date of this Agreement or is continuing to have, discussions or contacts concerning a potential Transaction involving the Company, including, to the extent available, copies of any proposed terms regarding a potential Transaction communicated by any such third party. During the term of this Agreement, the Company will proceed only through Raymond James and will not directly or through others negotiate any Transaction. If, during the term of this Agreement, the Company or, to the Company's actual knowledge, any of its securityholders, directors, managers, affiliates or other advisors or representatives, receives any inquiry or offer from any third party concerning a potential Transaction involving the Company, the Company will refer all such inquiries or offers to Raymond James and promptly provide Raymond James with the names and contact information of all inquirers or offerors. Notwithstanding the foregoing, nothing in this Agreement shall prohibit the securityholders, directors, managers, affiliates or other advisors or representatives from engaging in discussions concerning a Potential Transaction.

(f) In connection with Raymond James rendering the Services under this Agreement, the Company will, as Raymond James may reasonably request, (i) provide the necessary assistance, participation, and information reasonably required at all steps and shall cause management to be reasonably available, and (ii) furnish, and cause management to furnish, Raymond James such information, data and cooperation relating to the Company and any potential or actual Transaction as Raymond James may reasonably request, including, but not limited to, providing assistance, participation and cooperation in disseminating descriptive materials and participation in conference calls, meetings and other communications with Interested Parties and their advisors and representatives.

**RAYMOND JAMES**®

(g) <u>Anti-Money Laundering (AML) and Customer Due Diligence (CDD) Compliance</u>: U.S. federal laws and regulations, including, but not limited to, Section 326 of the USA PATRIOT Act of 2001, as amended, and regulations promulgated thereunder, require Raymond James to collect certain identification elements and perform certain subsequent screening (the "<u>AML/CDD Search Process</u>") before engaging in investment banking engagements with the Company. Accordingly, upon the Company's execution and delivery of this Agreement, the Company shall deliver to Raymond James a completed and signed form, as set forth in <u>Addendum B</u> attached to this Agreement (the "<u>AML/CDD Form</u>"), together with all applicable supporting documentation called for under the AML/CDD Form. After conducting the AML/CDD Search Process, Raymond James shall promptly notify the Company in writing if Raymond James determines in its sole discretion that it cannot provide the Services contemplated under this Agreement. In such event, this Agreement and our engagement with the Company shall be void and of no force or effect <i>ab initio</i>. The Parties acknowledge and agree that (i) the effectiveness of this Agreement is contingent upon Raymond James's receipt of the AML/CDD Form and Raymond James's satisfactory completion in its reasonable determination of the AML/CDD Search Process and (ii) Raymond James shall not be responsible for any losses or damages (including, but not limited to, lost opportunities) that may result if this Agreement and our engagement hereunder are terminated for the Company's or its beneficial owners' failure to provide aforementioned AML/CDD Form or other required or information documentation upon request.

2. **Fees** – In consideration of Raymond James's agreement to provide the Services as described in Section 1(a), the Company shall pay Raymond James as set forth in this Section 2, by wire transfer of immediately available funds via wire transfer instructions set forth in Raymond James's invoice for such amounts to the Company:

(a) <u>Monthly Advisory Fee and Database Expense Amount</u> –The Company will pay Raymond James a non-refundable cash retainer (the "<u>Advisory Fee</u>") of $75,000 upon the Company's receipt of Raymond James's invoice for the Advisory Fee following the execution of this Agreement and $75,000 on the first business day of every month during the term of this Agreement including August 2019 (the "<u>Monthly Fee</u>"); provided that if a bankruptcy case is commenced, such payments shall only be made in accordance with the Retention Order, and 50% of the Monthly Fees payable hereunder beginning with the Monthly Fee due and payable on November 1, 2019 shall be credited against any Transaction Fee. Additionally, the Company will pay Raymond James a flat expense charge of $1,000 for Raymond James's access to electronic financial databases pertinent to this engagement, upon the Company's signing of this Agreement.

(b) <u>Financing Transaction Fee</u> –

(i) If the Company consummates a Financing Transaction, whether on a stand-alone basis or to consummate any other Transaction (excluding a Business Combination Transaction) and regardless of whether Raymond James actually procured the agreement regarding the Financing Transaction, the Company shall pay Raymond James immediately and directly out of the proceeds of the placement, at closing, of each Financing Transaction as a cost of sale of each Financing Transaction, a cash transaction fee (the "<u>Financing Transaction Fee</u>") equal to the greater of (A) $1,000,000 (the "Minimum Fee") and (B) the sum of (1) three percent (3.0%) of the Proceeds (as defined below) of all first lien senior secured notes, bank debt, second lien or junior debt capital raised, and (2) six percent (6.0%) of equity or equity-linked securities raised; provided, however, that to the extent the Financing Transaction includes an uncommitted accordion or similar credit feature, the Financing Transaction Fee for such accordion or similar feature shall be payable only upon the commitment of such credit facility or its funding; provided, further, that if the Financing Transaction is consummated with Associated Interested Parties, the Minimum Fee shall not apply

**RAYMOND JAMES®**

to such Financing Transaction. Notwithstanding the foregoing, Raymond James shall not earn a Financing Transaction Fee with respect to the sale of no more than $12,000,000, in the aggregate of accounts receivable currently being evaluated by the Company.

(ii) For the purposes of this Agreement:

    (A) A "commitment" shall occur if the Interested Party(ies) is contractually obligated to provide funds in connection with a Financing Transaction.

    (B) "Proceeds" means the gross consideration, before the deduction of any fees (including any Financing Transaction Fee), expenses (including any Expenses, as defined below) or other costs, received by, contributed to or invested in the Company, or the amounts of binding commitments (not based on the amount actually drawn or available at close) received for such Financing Transaction in which the Company receives New Money Proceeds, in any form (including, but not limited to, cash or securities of any other party to such Financing Transaction, including the exercise price of any options or warrants received by or contributed to the Company); provided, that Proceeds shall not include (i) any issuance of "take back paper" and (ii) a roll-up of funded pre-petition secured indebtedness into a post-petition credit facility by the same or a subset of the same secured creditor. If such consideration is not in the form of cash then for the purpose of calculating the Proceeds, such consideration shall be valued at its then fair market value. For the avoidance of doubt, "Proceeds" shall include any subsequent increase in Proceeds received by or committed to the Company in an initial or secondary Financing Transaction, during the term of this Agreement and the Tail Period (as defined below), whether pursuant to an amendment and/or any accordion, a replacement credit facility, or otherwise, in which any Interested Party participates.

(c) Restructuring Transaction Fee – In conjunction with any Restructuring Transaction, regardless of whether Raymond James actually procured the agreement regarding the Restructuring Transaction, the Company shall pay Raymond James a cash transaction fee of $1,500,000 (the "Restructuring Transaction Fee"). The Company shall pay the Restructuring Transaction Fee, as a cost of the Restructuring Transaction to Raymond James upon the earlier of (i) the closing of each Restructuring Transaction or (ii) the date on which any amendment to or other changes in the instruments or terms pursuant to which any Existing Obligations were issued or entered into became effective.

(d) Business Combination Transaction Fee –

    (i) If the Company consummates a Business Combination Transaction, regardless of whether Raymond James actually procured the agreement regarding the Business Combination Transaction, the Company shall pay Raymond James immediately and directly out of the proceeds at the closing, as a cost of sale of such Transaction, a cash transaction fee (the "Business Combination Transaction Fee") equal to (A) $1,500,000 plus (B) two percent (2.0%) of any Transaction Value (as defined below) in excess of $70,000,000.

    (ii) As used in this Agreement, "Transaction Value" means the total gross consideration paid, payable or received directly or indirectly, in connection with a Business Combination Transaction, regardless of the form of consideration or how any consideration is allocated or distributed in connection with a Business Combination Transaction, including, without limitation or duplication: (A) cash, notes, and debt; (B) equity securities or other non-cash consideration, including any warrants and convertible securities, as well as options or stock


**RAYMOND JAMES**®

appreciation rights, whether or not vested, which have the value determined in accordance with Section 2(d)(iv) below; (C) the total amount of any indebtedness for borrowed money or similar non-trade debt-like liabilities (including preferred securities, pension liabilities, guarantees, capitalized leases and the like) as well as past due trade or accounts payable of the Company repaid, retired, extinguished, discounted, redeemed, refinanced, credit-bid, or assumed in connection with a Business Combination Transaction, or which otherwise remain outstanding as of the closing (other than such liabilities that are not assumed by the Interested Party in an asset sale Business Combination Transaction); and (D) any Future Contingent Payments or Fixed Deferred Payments, as such terms are defined below.

(iii)    Transaction Value shall also include, without duplication: (A) amounts paid to the Company's equity holders in connection with a Business Combination Transaction, but not in the ordinary course of business or pursuant to which the Company was otherwise obligated to pay, in the form of dividends, capital distributions, or partial or liquidating distributions; (B) any extraordinary payments made in connection with a Business Combination Transaction to management executives and/or other employees of the Company (regardless of whether they are holders of equity interests), including but not limited to bonuses (including "stay" bonuses), non-compete payments or similar payments made in in connection to the Business Combination Transaction payable upon the closing of such Business Combination Transaction; and (C) any payments made to the Company or its affiliates under a transition services agreement or licensing agreement entered into in connection with the Business Combination Transaction payable upon the closing of such Business Combination Transaction.

(iv)    For the purpose of calculating Transaction Value, any securities (other than a promissory note) will be valued as follows (without regard to any restrictions on transferability): (A) if such securities are traded on a securities exchange, the securities will be valued at the greater of (x) the fair market value of such securities as of the date on which the Definitive Agreement is executed by all parties to the Definitive Agreement and (y) the average last sale or closing price for the 20 trading days immediately before the closing of the Business Combination Transaction; (B) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a 20 trading-day period immediately before the closing of the Business Combination Transaction; and (C) if such securities have not been traded before the closing of the Business Combination Transaction, the securities will be valued at the fair market value thereof as of the day before the closing of the Business Combination Transaction, as such fair market value shall be mutually agreed by Raymond James and the Company acting in good faith. The value of any purchase money or other promissory notes, installment sales contracts or other deferred non-contingent consideration shall be mutually agreed by Raymond James and the Company acting in good faith, and shall be included as part of the Transaction Value for the purpose of determining the Business Combination Transaction Fee. Any other non-cash consideration shall be valued at the fair market value thereof as of the day before the closing of the Business Combination Transaction, as such fair market value shall be mutually agreed by Raymond James and the Company acting in good faith.

(v)    Transaction Value shall also include any payments made in connection with any separate but related transaction or transactions with or affecting any securityholder or another business entity or any of its assets or securities (e.g., a purchase or lease of any real estate or other assets), but in the case of a lease of any real estate or other assets, Transaction Value shall include only sums in excess of current rentals paid to unrelated or unaffiliated third-parties.



**RAYMOND JAMES®**

LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 8 of 21

(vi) Transaction Value shall include any positive or negative adjustment in the purchase price based upon the Company's fee paid to Raymond James upon closing of the transaction, net worth, excess cash, net assets, net working capital, book value, or similar measure at Closing (as applicable, a "Purchase Price Adjustment"), based upon the estimated Purchase Price Adjustment at the closing as contemplated by the Definitive Agreement or, if the Definitive Agreement does not contemplate an estimated Purchase Price Adjustment at the closing, based upon the estimated Purchase Price Adjustment, as reasonably agreed-upon by the Parties at the Closing.

(vii) If a Business Combination Transaction is effected as a merger between the Company and the Interested Party, Transaction Value shall refer only to the Company and not to the combined entity.

(viii) If any portion of the Transaction Value consists of contingent payments, including earnouts, payments based upon future contingencies (but not including any Fixed Deferred Payments (as defined in this Agreement) not contingent on future performance) or promissory notes contingent on future events (as applicable, "Future Contingent Payments"), then that portion of the Business Combination Transaction Fee attributable to the Future Contingent Payments shall be payable (A) at the closing, based on the fair market value of such Future Contingent Payments if mutually agreed upon in writing by the Company and Raymond James, or (B) if the parties cannot mutually agree on such fair market value, then when and if such Future Contingent Payments are received by the securityholders of the Company (or by the Company in an asset sale Business Combination Transaction).

(ix) The Business Combination Transaction Fee attributable to any Transaction Value fixed at the closing, including any Transaction Value placed or held in escrow, payable under an installment sale arrangement, or represented by the principal amount of any promissory notes issued at the closing ("Fixed Deferred Payments"), shall be paid to Raymond James at the closing.

(x) Transaction Value shall be based on Transaction Value taking into account payment of any expenses related to the Business Combination Transaction, including payment of the Business Combination Transaction Fee and any out of pocket transaction expenses incurred by the Company in connection with such Business Combination Transaction, any costs described in Section 3(b) below, but excluding any transaction fees, management fees or similar remuneration contracted for or paid to any financial sponsor of the Interested Party at or in anticipation of the Closing.

(xi) If an Interested Party acquires in a Business Combination Transaction, however effected, less than one hundred percent (100%) of the aggregate value of Company's securities (including preferred securities and debt), business, or assets (including, for example, in the case of a portion of the securities held by the Company's securityholders retained or "rolled over" into the Interested Party's or its affiliate's securities), the Business Combination Transaction Fee shall be calculated based upon the total implied Transaction Value, as if all of the aggregate value of Company's assets or securities had been acquired or sold, including the value of any retained or "rolled over" securities.

(xii) Break-up Fee - Additionally, if the Company or its securityholders enters into a Definitive Agreement regarding a Business Combination Transaction that is subsequently terminated, and the Company or its securityholders receives a "break-up", "termination", or similar fee or payment including, without limitation, any judgment for damages or amount in settlement of



> any dispute as a result of such termination (but in all cases excluding any amount paid or payable for reimbursement of expenses), the Company shall pay Raymond James a cash fee (the "Break-up Fee") equal to twenty-five percent (25.0%) of all such amounts, net of any costs and expenses incurred by the Company or its securityholders in connection with the Transaction, the termination of any agreement with respect to such Transaction, and the recovery of such amounts, such as legal and accounting fees and expenses, in each case which were not reimbursed or otherwise recouped by the Company or its securityholders; provided, however, that in no event shall the Break-up Fee be greater than the Business Combination Transaction Fee applicable to the Business Combination Transaction had the Business Combination Transaction closed.

(e) Divestiture Transaction Fee – If the Company consummates a transaction or series of transactions that meet the definition of Divestiture Transaction, regardless of whether Raymond James actually procured the agreement(s) regarding the Divestiture Transaction, the Company shall pay Raymond James immediately at the closing of such Divestiture Transaction, as a cost of sale of such Transaction, a cash transaction fee equal to $100,000 (the "Divestiture Transaction Fee"). To the extent any Business Combination Transaction Fee is subsequently payable, the aggregate amount of any Divestiture Transaction Fees that have been received by Raymond James will be deducted from and credited against any such Business Combination Transaction Fee. The aggregate amount of Divestiture Transaction Fees paid to Raymond James shall not exceed $400,000.

(f) Associated Interested Party Transaction Fee – If an Associated Interested Party Transaction is agreed to in principle, as evidenced by a written letter of intent, memorandum of understanding or definitive agreement executed by the Company and all of the Associated Interested Parties (the "Written Agreement in Principle") and the Company terminates this Agreement on or before September 30, 2019, then as a condition to such termination, Raymond James shall be paid a cash transaction fee of $500,000 (the "September Associated Interested Party Transaction Fee") on or before September 30, 2019. If Raymond James has not been terminated and has not received the September Associated Interested Party Transaction Fee on or before September 30, 2019, and an Associated Interested Party Transaction is consummated substantially in accordance with the terms and conditions of the Written Agreement in Principle prior to the earlier of (i) November 12, 2019 or (ii) the commencement of a proceeding under Chapter 11 of the Bankruptcy Code, then Raymond James shall be paid a cash transaction fee equal to $750,000 (the "November Associated Interested Party Transaction Fee"). To the extent any Business Combination Transaction or Restructuring Transaction is consummated following the consummation of an Associated Interested Party Transaction described in the preceding sentences in this Section 2(f), 50% of any Associated Interested Party Transaction Fees that have been received by Raymond James will be deducted from and credited once against any such Business Combination Transaction Fee or Restructuring Transaction Fee.

(g) The Company shall obtain the written consent of its secured lenders to the payment of Raymond James's Advisory Fee and any Transaction Fee under this Agreement within ten (10) business days following the date of this Agreement. If such consent is not timely obtained, Raymond James may agree to extend the ten (10)-business day period or may terminate this Agreement.

(h) Notwithstanding anything herein to the contrary, if a Transaction qualifies as more than one of a Financing Transaction, Business Combination Transaction, or Restructuring Transaction, Raymond James shall be paid the greater of the Restructuring Transaction Fee, a Financing Transaction Fee or a Business Combination Transaction Fee applicable to such Transaction and Raymond James shall not be entitled to receive any other Transaction Fee in connection with such Transaction.



**RAYMOND JAMES®**

LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 10 of 21

3.    **Reimbursement of Expenses and Company Professional Fees** –

(a)    Regardless of whether a Transaction is consummated, the Company shall reimburse Raymond James, upon the earlier of (i) thirty (30) days of its receipt of an invoice from Raymond James or (ii) the closing of any Transaction, by wire transfer of immediately available funds via wire transfer instructions set forth in Raymond James's invoice for such amounts to the Company, for all reasonable expenses (including, without limitation, the fees and disbursements of its outside legal counsel) incurred by Raymond James in connection with entering into and performing the Services pursuant to this Agreement ("Expenses") in an aggregate amount not to exceed $150,000.

(b)    The Company shall also bear all of its own costs it incurs in connection with any Transaction, including, without limitation, the Company's legal and accounting fees and disbursements, the costs of reproducing any descriptive materials, and any due diligence data room fees or charges.

4.    **Term** - The term of this Agreement shall commence on the date of this Agreement and shall continue until terminated by either Party upon ten (10) business days' prior written notice to the other Party. Notwithstanding any termination of this Agreement: (a) Sections 2, 3, 4, 5 and 6 of this Agreement, and Addendum A attached to this Agreement shall survive any termination of this Agreement, along with any other provisions that expressly or by implication survive termination; and (b) regardless of whether Raymond James actually procured the agreement regarding the Transaction, Raymond James shall be compensated pursuant to Section 2 above if a Transaction is agreed upon or closes within twelve (12) months after any termination of this Agreement (the "Tail Period"); provided, that (x) the Tail Period shall terminate in conjunction with the termination of this Agreement so long as a Restructuring Transaction or Business Combination Transaction has been consummated and Raymond James has received payment in cash of fees under this engagement letter of at least $1,500,000 (excluding any Monthly Fees) following such transaction(s) and (y) no Tail Period shall apply in the event that this Agreement is terminated by the Company due to the gross negligence or willful misconduct of Raymond James in each case as finally determined by a court of competent jurisdiction.

5.    **Indemnification** - In consideration of Raymond James signing this Agreement and agreeing to perform Services pursuant to this Agreement, the Company shall indemnify, defend and hold harmless Raymond James and each of its directors, officers, agents, employees, affiliates and controlling persons (within the meaning of the U.S. Securities Act of 1933, as amended, and the U.S. Securities Exchange Act of 1934, as amended), to the extent and as provided in Addendum A attached to this Agreement and incorporated by reference into this Agreement.

6.    **General Terms**

(a)    Following the closing of a Transaction or public announcement or disclosure thereof (i) in any initial press release or other similar announcement by the Company regarding such Transaction, the Company shall include in such press release or announcement a reference to Raymond James's role as investment banking advisor to the Company with respect to such Transaction, which reference shall be subject to Raymond James's prior written approval (email sufficing), which approval shall not be unreasonably withheld, conditioned or delayed, and (ii) Raymond James may, at its own option and expense, disseminate announcements (such as customary "tombstone" announcements or other advertisements in financial and other newspapers and journals and marketing materials) describing Raymond James's Services under this Agreement, and may use the Company's logos or other identifying marks in any such announcement, provided that the form and substance of any such announcement shall be subject to the Company's prior written approval (email sufficing, and an

**RAYMOND JAMES®**

announcement once approved by the Company may be used from time to time without obtaining approval each time), which approval shall not be unreasonably withheld, conditioned or delayed.

(b)  The Company may not publish, refer to, describe or characterize Raymond James's engagement under this Agreement, or the advice provided to the Company by Raymond James, without the prior written approval of Raymond James in each instance (email sufficing), which approval shall not be unreasonably withheld, conditioned or delayed. However, the Company may, to the extent necessary or appropriate, disclose any such information or advice and this Agreement to its officers, directors, affiliates, advisors and legal counsel with a need to know such information or advice or this Agreement, on a confidential basis. Additionally, Raymond James's role as investment banking advisor and this Agreement and any fee payable under this Agreement may be disclosed to an Interested Party in connection with the Transaction.

(c)  The Company recognizes and confirms that Raymond James, in the performance of its Services under this Agreement: (i) may rely upon such information received from the Company, Interested Parties or their respective advisors, without independent verification by Raymond James; and (ii) does not assume responsibility for the accuracy or completeness of such information received from the Company, Interested Parties or their respective advisors, whether or not Raymond James makes an independent verification of such information.

(d)  In connection with this Agreement, the term "Confidential Information" means (i) confidential business or technical information or data of the Company that is competitively and commercially valuable to the Company and not generally known, or available by legal means, to the competitors of the Company or (ii) material nonpublic information about the Company. Raymond James agrees that during the term of this Agreement, unless the Company has consented, or unless required by law (including any applicable securities exchange listing rules), a court or agency of the government or a self-regulatory organization (e.g., Financial Industry Regulatory Authority), Raymond James will not reveal or disclose any such Confidential Information to any third-party, without the prior written consent of the Company. Following the termination of this Agreement and this engagement, at the Company's written request, all such Confidential Information in Raymond James's possession will be promptly returned to the Company or, at Raymond James's option, destroyed, provided that Raymond James may retain a copy of such Confidential Information to the extent required for legal, regulatory and/or internal compliance purposes, provided further that such Confidential Information shall remain subject to the confidentiality and non-disclosure provisions of this Agreement.

Neither the previous paragraph nor any restriction, non-disclosure or use limitation or other obligation contained in this Agreement shall apply to any information, data or item of any kind that is: (i) in the public domain, through no action of Raymond James; (ii) known by Raymond James from a third party not known by Raymond James to be under an obligation of confidentiality to the Company; or (iii) independently developed or derived by Raymond James.

(e)  The Company is a sophisticated business enterprise with competent internal financial advisors and legal counsel, and the Company has retained Raymond James for the limited purposes set forth in this Agreement. The Parties acknowledge and agree that (i) Raymond James has been engaged solely as an investment banking advisor to the Company and (ii) the Company's engagement of Raymond James is as an independent contractor and that the Parties' respective rights and obligations as set forth in this Agreement are contractual in nature. Accordingly, the Company disclaims any intention to impose any fiduciary or agency obligations on Raymond James by virtue of the engagement contemplated by this Agreement, and Raymond James shall not be deemed to have any fiduciary or agency duties or obligations to the Company, any Interested Party, any other person or entity, or their



respective officers, directors, securityholders, affiliates or creditors, as a result of this Agreement or the Services to be provided under this Agreement. The Definitive Agreement shall contain customary language that reflects that the other parties to the Transaction relied solely upon their own independent investigation and counsel before deciding to enter into the contemplated Transaction.

(f)    This Agreement may be executed in one or more counterparts, each of which shall be an original but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement, by facsimile, electronic mail in portable document format (.pdf) or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, has the same effect as delivery of an executed original of this Agreement for all purposes.

(g)    The Services provided by Raymond James under this Agreement are solely for the benefit of the Company and are not intended to, nor shall they be deemed or construed to, create any duty toward or confer any rights upon any persons or entities not a Party (including, without limitation, securityholders (in their capacities as such), employees or creditors of the Company or any Interested Party) as against Raymond James or its affiliates or their respective directors, officers, agents and employees.

(h)    Each Party to this Agreement represents and warrants to the other Parties that this Agreement has been duly authorized, executed and delivered by it; and assuming due execution by the other Party, that this Agreement constitutes a legal, valid and binding agreement, enforceable against it (as the case may be) in accordance with its terms.

(i)    All amounts payable under this Agreement (including reimbursable Expenses under Section 3 of this Agreement) shall be paid in immediately available funds in U.S. dollars, without set-off and without deduction for any withholding, value-added or other similar taxes, charges, fees or assessments.

(j)    The Company acknowledges and agrees that:

(i)    Raymond James and its parent company and affiliated entities (collectively, the "RJ Group") is a comprehensive, international financial services firm involved in a wide range of commercial banking, investment banking and other activities (including investment management, corporate finance and securities issuing, trading and research). As a result, the RJ Group may have previously provided services, may be currently engaged to provide, or may have solicited to provide investment banking, lending, financial advisory or other services, and may solicit or provide services in the future, to other companies in the Company's industry and related industries or other third parties, including Interested Parties, from which conflicting interests or duties may arise. In addition, during the term of this Agreement, the RJ Group may solicit or provide investment banking, lending, financial advisory or other services unrelated to a Transaction to other companies in the Company's industry or related industries or other third parties, including Interested Parties. The Company agrees that the RJ Group may do so without any duty to notify the Company or to disclose to the Company information that Raymond James may obtain about such companies in the course of any business relationship. However, during the term of this Agreement, Raymond James shall not provide investment banking services to any Interested Party in connection with a Transaction involving the Company, provided, however, that nothing in this Agreement shall prohibit the facilitation or provision of services regarding Transaction-related financing by RJ Group personnel who are not assigned to render Services to the Company under this Agreement.



LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 13 of 21

      (ii)    Information which is held elsewhere within the RJ Group, but which none of the individuals in Raymond James's Investment Banking Department involved in providing the Services under this Agreement actually has (or without breach of internal procedures can properly obtain) knowledge, will not for any purpose be taken into account in determining Raymond James's responsibilities to the Company under this Agreement. In the ordinary course of business, one or more members of the RJ Group may, from time to time, make a market in, have a long or short position in, buy and sell or otherwise effect transactions for customer accounts and for its own accounts in the securities of, or perform other services for institutional investors or other Interested Parties that Raymond James may be contacting on behalf of the Company, and/or any other entities who may be the subject of the engagement contemplated by this Agreement (including the Company), and the Company agrees that, subject to the first paragraph of this Section 6(j), none of those activities will conflict with the duties of Raymond James under this Agreement or shall be disclosable to the Company as a result of this Agreement.

      (iii)    Raymond James and other members of the RJ Group may have business relationships with the Company and may be creditors of the Company and may act as financial advisors to clients as to which the Company is a creditor, securityholder or have other business relationships in connection with such clients' borrowings or other obligations to the Company. The Company waives any conflict of interest the RJ Group may have in connection with such business relationships. Raymond James believes that it has the requisite independence to perform the Services contemplated by this Agreement and affirms that the personnel assigned to this engagement will be subject to policies and procedures intended to prevent the unauthorized disclosure of confidential or non-public information to employees responsible for managing Raymond James's own creditor positions in relation to the Company and any third parties.

(k)    All notices, requests, consents, claims, demands, waivers and other communications under this Agreement shall be in writing and shall be deemed to have been given (i) when delivered by hand (with written confirmation of receipt); (ii) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (iii) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day (in the jurisdiction in which the recipient is located) if sent after normal business hours of the recipient; or (iv) on the third (3rd) day after the date mailed, by certified or registered mail (in each case, return receipt requested, postage pre-paid). Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 6(k)):

      If to the Company:  LVI Intermediate Holdings, Inc., d/b/a Vision Group Holdings
                            1555 Palm Beach Lakes Blvd., Suite 200
                            West Palm Beach, FL  33401
                            E-mail: mhockenson@vgroupholdings.com
                            Attention: Markus Hockenson, President and Chief Executive Officer

**RAYMOND JAMES®**

| If to Raymond | Raymond James & Associates, Inc. |
|---|---|
| James: | 880 Carillon Parkway |
| | St. Petersburg, FL 33716 |
| | E-mail: tom.donegan@raymondjames.com |
| | Attention: Thomas Donegan, General Counsel, Investment Banking – |
| | Global Equities & Investment Banking |

(l)  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to conflicts of laws principles thereof or of any other jurisdiction that would require the application of the laws of another jurisdiction. All claims arising out of the interpretation, application or enforcement, or otherwise relating to the subject matter, of this Agreement, including, without limitation, any breach of this Agreement, shall be settled by final and binding arbitration in New York, New York, in accordance with the commercial rules then prevailing of the American Arbitration Association by a panel of three (3) arbitrators appointed by the American Arbitration Association. The decision of the arbitrators shall be binding on Raymond James and the Company and may be entered and enforced in any court of competent jurisdiction by either Party. The arbitration shall be pursued and brought to conclusion as rapidly as is possible. TO THE EXTENT PERMITTED BY LAW, EACH OF RAYMOND JAMES AND THE COMPANY VOLUNTARILY AND IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THIS AGREEMENT, THE ENGAGEMENT OF RAYMOND JAMES PURSUANT TO, OR THE PERFORMANCE BY RAYMOND JAMES OF, THE SERVICES CONTEMPLATED BY THIS AGREEMENT. Provided that Raymond James acknowledges and agrees that in the event a bankruptcy case is commenced, any proceeding arising out of this Agreement shall be heard exclusively by the United States Bankruptcy Court in which such bankruptcy case has been commenced and is pending, to the extent within the jurisdiction of such court.

(m)  This Agreement (and any addenda or schedules attached to this Agreement) constitute the entire agreement between the Parties regarding the subject matter of this Agreement and supersede any prior agreements or understandings, written or oral, between them. No representations, arrangements, understandings or agreements, written or oral, relating to the subject matter of this Agreement exist between the Parties except as expressed in this Agreement. No modification or amendment of this Agreement shall be binding unless in writing and signed by the Parties.

(n)  If any provision of this Agreement is determined by a court or arbitration panel having jurisdiction to be unenforceable to any extent, the rest of that provision (if applicable) and the balance of this Agreement shall remain enforceable to the fullest extent permitted by law.

(o)  This Agreement (including any addenda or schedules attached to this Agreement) is binding upon and inures to the benefit of the Parties and their respective successors and assigns. Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person or corporation, other than the Parties hereto and their respective successors and assigns and the controlling persons, officers and directors and counsel referred to in this Agreement, any legal or equitable right, remedy or claim under or in respect to this Agreement or any provision of this Agreement.

(p)  This Agreement has been reviewed by each of the Parties and their respective counsel. There shall be no construction of any provision against Raymond James because this Agreement was drafted by Raymond James or its counsel, and the Parties waive any statute or rule of law to such effect.



LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 15 of 21

(q)    If either Party does not seek compensation for breach or insist upon strict performance of any covenant or condition of this Agreement, that Party is not prevented from seeking compensation or insisting upon strict performance for a future breach of the same or other provision.

**[Signature Page Follows]**

**RAYMOND JAMES®**

LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 16 of 21

If this Agreement conforms to your understanding of the terms of our engagement, please sign and return this Agreement to us.

Very truly yours,

**RAYMOND JAMES & ASSOCIATES, INC.**

By: _____

Geoffrey Richards, Managing Director and
Head of Private Capital Solutions, Recapitalization &
Restructuring Investment Banking

8/12/19

Signature Date

**AGREED AND ACCEPTED:**

**LVI INTERMEDIATE HOLDINGS, INC.,
D/B/A VISION GROUP HOLDINGS**

By: _____

Markus Hockenson, President and Chief Executive Officer

8/8/19

Signature Date

Attachments

**RAYMOND JAMES®**

LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 17 of 21

### ADDENDUM A

*Pursuant to the foregoing letter agreement dated August 8, 2019 (the "Agreement"), LVI Intermediate Holdings, Inc., d/b/a Vision Group Holdings (as further described in the Agreement, the "Company"), shall indemnify, defend and hold harmless Raymond James & Associates, Inc. and Raymond James Financial, Inc. (collectively, "Raymond James") and their respective affiliates, together with their and their affiliates' respective officers, directors, managers, members, partners, securityholders, employees and agents, and each Person (as defined below), if any, who controls Raymond James or any of its affiliates within the meaning of the U.S. Securities Act of 1933, as amended, or the U.S. Securities Exchange Act of 1934, as amended (all of the foregoing are referred to collectively as "Indemnified Parties" and individually as an "Indemnified Party"), from and against any and all (a) claims, actions (including securityholder claims or actions, derivative or otherwise), demands, investigations and proceedings of any kind or nature (collectively, "Proceedings") threatened, brought or established against any Indemnified Party by any natural or non-natural person, association, governmental agency or regulatory body, including any securityholder of the Company ("Person"), and (b) losses, claims, judgments, penalties, fines, charges, costs (including professional or legal fees and other costs of litigation or other proceedings), damages, taxes, liabilities of any kind or nature, whether joint or several (collectively, "Losses"), which such Indemnified Party may suffer or incur under any statute, common law, contract, tort or otherwise (including, without limitation, all such Losses suffered or incurred in considering, preparing for, responding to, disputing, or otherwise dealing with any actual or potential Proceedings, including any Proceeding brought in connection with any Indemnified Party's right to be indemnified pursuant to this Addendum A), directly or indirectly arising out of, relating to or in connection with (i) the Agreement, the services provided in connection with the Agreement, or the exercise of Raymond James's rights under the Agreement (including this Addendum A), or (ii) any transaction referred to in the Agreement or any transaction arising out of the transactions contemplated by the Agreement (each an "Indemnified Claim"), except solely to the extent that any such Indemnified Claim is found, in a final, unappealable judgment by a court of competent jurisdiction, to have resulted solely and exclusively and as a direct and proximate cause from said Indemnified Party's willful misconduct or gross negligence (other than an action or failure to act undertaken or refrained from being undertaken at the written or express request of or with the written or express consent of the Company) (an "Excluded Act").*

*No Proceeding will be brought against any Indemnified Party to recover any Losses that the Company, its securityholders, officers, directors/managers or creditors, or any other Person in connection with any Indemnified Claim, may suffer or incur by reason of or in connection with any Indemnified Claim, and no Indemnified Party shall have any liability to the Company, its securityholders, officers, directors/managers or creditors, or any other Person by reason of or in connection with any Indemnified Claim, whether such Loss arises under any statute, common law, contract, tort or otherwise, except solely to the extent that any such Losses or liability is found, in a final, unappealable judgment by a court of competent jurisdiction, to have resulted solely and exclusively and as a direct and proximate cause from said Indemnified Party's Excluded Act. Nothing in the Agreement (including this Addendum A) shall be construed as rendering Raymond James or any other Indemnified Party liable, under any circumstances and under any theory of law, to the Company, the Company's securityholders, officers, directors/managers or creditors, or any other Person in respect of any indirect, incidental, special, consequential or punitive damages even if Raymond James or any other Indemnified Party have been advised as to the possibility thereof. The aggregate liability of all Indemnified Parties to the Company, the Company's securityholders, officers, directors/managers or creditors, and any other Person, under any statute, common law, contract, tort or otherwise, for any Loss suffered by such party arising from or in connection with the services provided under the Agreement, however the Loss is caused, shall be limited to the Transaction Fee actually received by Raymond James.*

*Raymond James or the applicable Indemnified Party will promptly notify the Company in writing if an Indemnified Party receives written notice of the commencement of any Proceeding or other Indemnified Claim*



*against such Indemnified Party (provided, that no failure or delay by Raymond James or such Indemnified Party to so notify the Company shall relieve the Company from its obligations under this Addendum, except as and to the extent it is found, in a final, unappealable judgment by a court of competent jurisdiction, that such failure or delay actually and materially prejudiced the Company), and the Company shall immediately assume the full defense of such Proceeding or other Indemnified Claim (including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and expenses of such counsel), other than any Proceeding or other Indemnified Claim brought by the Company. In any such event the Indemnified Party may employ its own counsel and participate in the defense of such Proceeding or other Indemnified Claim, provided, that the Company shall be required to pay the fees and expenses of such counsel of the Indemnified Party only if the Company has failed to assume the defense and promptly defend such Proceeding or other Indemnified Claim using counsel reasonably satisfactory to the Indemnified Party, or such Indemnified Party is advised by counsel that a conflict of interest exists or may exist which makes representation by counsel chosen by the Company not advisable or that representation of both Parties by common counsel would be inappropriate due to actual or potential differing interests between them.*

*If for any reason (other than as specifically provided in this Addendum A) the foregoing indemnity is unavailable to an Indemnified Party or is insufficient to fully hold any Indemnified Party harmless, the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of such unavailability or insufficiency in such proportion as is appropriate to reflect the relative benefits received by and fault of the Company on the one hand, and the relative benefits received by and fault of the Indemnified Party on the other hand, as well as any relevant equitable considerations. The relative benefits to the Company on the one hand and an Indemnified Party on the other hand shall be deemed to be in the same proportion as the total value paid or received or contemplated to be paid or received by the Company and its securityholders, as the case may be, whether or not the transaction contemplated by the Agreement closes, bears to the fees actually received by Raymond James pursuant to the Agreement, and the relative fault of the Company on the one hand and an Indemnified Party on the other hand shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or incorrect opinion or conclusion or the omission or alleged omission to state a material fact related to information supplied by the Company or its agents, advisors or affiliates on the one hand or by the Indemnified Party on the other hand, as well as the Parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement, opinion, conclusion or omission. Notwithstanding anything in this Addendum A to the contrary the aggregate contribution of all of the Indemnified Parties for all Indemnified Claims shall be limited to 50% of the amount of the Transaction Fee actually received by Raymond James.*

*The Company shall reimburse each Indemnified Party for all reasonable costs and expenses (including, without limitation, fees and expenses of outside counsel) incurred by the Indemnified Parties (including all such costs and expenses incurred to enforce the terms of this Addendum A) as they are incurred in connection with investigating, preparing, defending or settling or otherwise relating to any threatened or pending Proceeding for which indemnification or contribution has or could be sought by the Indemnified Party, whether or not in connection with a Proceeding in which any Indemnified Party is a named party; provided, that, if any such reimbursement is for expenses relating to a Loss that is found, in a final, unappealable judgment by a court of competent jurisdiction, to have resulted solely and exclusively and as a direct and proximate cause from said Indemnified Party's Excluded Act, such Indemnified Party shall promptly repay such amount to the Company.*

*The indemnity, contribution and expense reimbursement agreements and obligations set forth in this Addendum shall be in addition to any other rights, remedies or indemnification as to which any Indemnified Party may have or be entitled at common law or otherwise, shall survive any termination of the Agreement or completion of services under the Agreement, shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Indemnified Party.*



LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 19 of 21

*The Company shall offer and provide such indemnification and expense advance and reimbursement as it is permitted to offer or provide pursuant to its Bylaws, Charter, Articles of Incorporation, or insurance, in each case to the fullest extent permitted by applicable law. The Company further agrees that the indemnification and expense advance and reimbursement obligations set forth in this Addendum A shall apply whether or not Raymond James or any other Indemnified Party is a formal party in any such Indemnified Claim.*

*The Company shall not settle, compromise or consent to judgment with respect to any Indemnified Claim without the prior consent of Raymond James or any Indemnified Party involved in such Indemnified Claim if any admission of wrongdoing, negligence or improper activity of any kind of or by Raymond James or such Indemnified Party is a part of such settlement, compromise or consent. The Company shall not settle, compromise or consent to judgment with respect to any pending or threatened action, suit or proceeding in respect of which indemnity could have been or could be sought under this Addendum A by any Indemnified Party, unless such settlement, compromise or consent includes an unconditional release of all Indemnified Parties from all liability on claims that are the subject matter of or arise out of such Proceeding.*

*This Addendum A shall survive any termination or completion of the engagement provided by the Agreement.*

**RAYMOND JAMES**®

LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 20 of 21

## ADDENDUM B

## AML/CDD FORM

## [PLEASE SEE ATTACHED]

LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings
August 8, 2019
Page 21 of 21

## ADDENDUM C

### ASSOCIATED INTERESTED PARTIES

**EQUITY HOLDERS:**
*9597930 Canada Inc.*
*Falcon Strategic Partners IV, LP*
*Macquarie Sierra Investment Holdings Inc.*

**SENIOR SECURED LENDERS:**
*LBC III KB FUNDING, LLC*
*AUDAX SENIOR LOAN FUND SPV, LLC*
*AUDAX CREDIT OPPORTUNITIES OFFSHORE LTD.*
*AUDAX CREDIT OPPORTUNITIES (SBA), LLC*
*AUDAX CREDIT STRATEGIES (SCS) SPV, LLC*
*AUDAX SENIOR LOAN INSURANCE FUND SPV, LLC*
*TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA*
*TIAA CHURCHILL MIDDLE MARKET CLO I LTD*
*CHURCHILL MMSLF FUNDING 1, LLC*
*CHURCHILL MMSLF GT 1*
*JFIN FUND III LLC*
*JFIN MM CLO 2014 LTD*
*JEFFRIES FINANCE LLC*
*METROPOLITAN LIFE INSURANCE COMPANY*
*MARANON LOAN FUNDING 2015-1, LTD*
*MARANON LOAN FUNDING 2016-1, LTD*

**RAYMOND JAMES®**