**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| LVI INTERMEDIATE HOLDINGS, INC., *et al.*, | Case No. 20-11413 (KBO) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF OMNI COMBINED W.E., LLC TO NOTICE OF (I) POTENTIAL ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) FIXING OF CURE AMOUNTS, AND (III) DEADLINE TO OBJECT THERETO**

NOW COMES Omni Combined W.E., LLC ("Omni"), by and through its undersigned counsel, and hereby objects to the Notice of (I) Potential Assumption of Executory Contracts and Unexpired Leases, (II) Fixing of Cure Amounts, and (III) Deadline to Object Thereto filed by Debtors in the above-entitled matter on July 1, 2020 and designated on the Court docket as Document 267 (the "Notice").  As grounds therefore, Omni states as follows:

**Background**

1.	Omni, as landlord, and The LASIK Vision Institute, LLC ("LASIK), as tenant, are parties to that certain Lease dated September 29, 2014 concerning the real property located at 298 West Exchange Street, Suite 100, Providence, Rhode Island 02903 (the "Premises") as amended and extended by that certain First Amended Lease Data Exhibit and that certain First Amendment to Lease each dated August 30, 2019 (the "Lease")[1].

2.	The Lease term expires on  December 31, 2022.

3.	Pursuant to the Lease, LASIK shall pay, among other things, Base Rent, Additional Rent, and its Pro Rata Share of real estate taxes and assessments, common area

---

[1] A copy of the Lease is attached hereto as Exhibit 1.

maintenance charges (including utilities), and landlord's insurance (as each term and phrase is defined or described in the Lease).

4.      Pursuant to the Lease, if any amount due under the Lease is not paid within five (5) days of the date upon which the same is due, LASIK shall pay a late payment charge equal to ten (10%) of the amount outstanding.

5.      In the event of default by tenant under the Lease, LASIK shall pay to landlord reasonable attorneys' fees, costs, and expenses incurred by landlord in connection with enforcement of its rights and remedies under the Lease.

6.      LASIK failed and refused to pay in full amounts due under the Lease for the months of March 2020, April 2020, and May 2020.

## PLEADINGS

7.      On May 29, 2020, Debtors, including LASIK, filed a voluntary petition for bankruptcy which petition is designated as Document 1 on the Court docket.

8.      On July 1, 2020, Debtors filed the Notice along with an Exhibit A thereto designated as Document 267-1 on the Court docket ("Exhibit A").

9.      Exhibit A does not identify Omni as an unexpired lease counterparty, but does identify The Omni Group as a counterparty and assigns a cure amount of $18,831.00.

10.     Upon consultation with counsel for Debtors, counsel for Omni was advised that The Omni Group is Omni.

## OBJECTION

11.     Omni objects to the cure amount of $18,831.00 as such amount does not reflect all amounts due and owing under the Lease.

12.    Section 365(b)(1)(A) of the United States Bankruptcy Code (the "Code") provides in part that if there has been a default under an unexpired lease, the lease may not be assumed unless, at the time of assumption of the unexpired lease, the trustee cures such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property.

13.    "The purpose of § 365(b)(1) is "to restore the 'debtor-creditor relationship . . . to pre-default conditions . . .'" *In re DBSI, Inc.*, 405 B.R. 698, 704 (Bankr. D. Del. 2009) citing *In re U.S. Wireless Data, Inc*., 547 F.3d 484, 489 (2d Cir. 2008) (quoting *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982) and citing 3 *Collier on Bankruptcy* § 365.05[3], 365-54 (15th ed. rev. 2008)).

14.    Omni is entitled to be compensated for its actual pecuniary losses as a result of default under the Lease.

15.    The obligation to cure defaults includes the payment of any late or similar charges that are due under the contract or lease.  *In re Crown Books Corp.*, 269 B.R. 12, 15 (Bankr. D. Del. 2001).

16.    Attached hereto as <u>Exhibit 2</u> is a statement of account reflecting charges under the Lease for March 2020, April 2020, and May 2020 resulting in a correct cure amount totaling $21,753.93.

17.    To recover attorneys' fees as part of a cure claim, landlords must establish several facts, *i.e.*, the subject lease allows attorneys' fees, the landlord incurred fees in connection with enforcement of its rights under the lease in accordance with the Code, and the fees are reasonable *Id*.

18.     In the instant matter, attorneys' fees are collectable because: (A) the Lease provides for the same, (B) Omni is seeking to enforce its rights under the Lease in accordance with the Code, not contesting Debtors' rights under the Code, and (C) the fees are reasonable.  *In re BAB Enters., Inc.*, 100 B.R. 982, 984 (Bankr. W.D. Tenn. 1989)(establishing factors for determining whether attorneys' fees are collectable and permitting an award).

19.     Should the within Objection be granted and/or further action be required with respect to the within Objection, Omni requests that its attorneys fees and costs be awarded to Omni and included as part of the cure amount.

20.     Omni reserves the right to modify, supplement, and/or amend this Objection.

## CONCLUSION

21.     Omni requests that this Court condition any assumption and assignment of the Lease as set forth herein.

Respectfully Submitted,
Omni Combined W.E., LLC,

By and through their Attorneys,

 /s/   Robert D. Wieck, Esq.
Robert D. Wieck, Esq.
Christine L. Baglioni, Esq.
Wieck DeLuca & Gemma Incorporated
One Turks Head Place, Suite 1300
Providence, Rhode Island 02903
Tel. (401) 454-8702
Fax (401) 454-8755
rwieck@wdglaw.com
cbaglioni@wdglaw.com
DATED:  July 15, 2020

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that the filing of the foregoing document will cause it to be served electronically in the CM/ECF system of the United States Bankruptcy Court for the District of Delaware which will send notification of such filing to all the parties involved in this matter who are registered parties of interest.

In addition, the undersigned has caused the following parties to be served via email, so as to be received no later than 4:00 p.m. prevailing Eastern Time on July 15, 2020:

(i)     Counsel to the DIP Agent and Prepetition Senior Agent, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, DE 19899-1347, Attn:  Robert J. Dehney, e-mail: rdehney@mnat.com; and

(ii)    Proposed counsel to the Committee, Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019, Attn: Todd M. Goren, Mark A. Lightner and Andrew Kissner, e-mail: tgoren@mofo.com, mlightner@mofo.com, and akissner@mofo.com.

                                                              /s/  Michelle B. Daugherty

G:\Omni Combined W. E., LLC\Lasik\Bankruptcy\Pleading\Cure objection (FINAL).docx

# Exhibit 1

*West Exchange Center*

## LEASE DATA EXHIBIT

Execution Date: 9/29/14

Landlord: Omni Combined W.E., LLC
P.O. Box 856
East Greenwich, RI 02818

Tenant: The LASIK Vision Institute, LLC
2000 Palm Beach Lakes Blvd., Suite 800
West Palm Beach, FL 33409

Leased Premises: 298 West Exchange Street, Suite 100, Providence, RI 02903
Rentable Sq. Ft.: 3,650
Lease Term: 5 years
Commencement Date: January 1, 2015, or upon substantial completion of Landlord's Improvements, in accordance with Addenda A & B. Landlord and Tenant each hereby agree to execute and deliver a Commencement Date Certificate.
Expiration Date: December 31, 2019, or the fifth (5th) anniversary of the Commencement Date as specified in the Commencement Date Certificate
Renewal Option: One (1) Five Year option (see Paragraph 1.3 within)
Parking: Tenant will have the use of up to ten (10) unassigned parking spaces (see Paragraph 4.11 within)
Pro Rata Share: 3.65%
Base Year: 2014
Utilities: Tenant Pays (see paragraph 4.3 within)
Broker(s) Andrew Galvin (CBRE/New England)
Use: The operation of a LASIK vision correction medical practice and related clinic, medical, and general office purposes, other elective or non-elective outpatient optical surgical procedures related to the Tenant's core practice, including but not limited to cataract surgery, the retail sale of eyeglasses and eyeglass products and all uses necessary and related thereto.
Improvements: See Addenda A & B
Security Deposit: $7,189.00 (see Paragraph 1.7 within)

| | From: | To: | Total Rent | Monthly Rent |
|---|---|---|---|---|
| **Base Rent:** | | | | |
| Year One | 1/1/15 | 12/31/15 | $76,656.00 | $6,388.00 |
| Year Two | 1/1/16 | 12/31/16 | $78,960.00 | $6,580.00 |
| Year Three | 1/1/17 | 12/31/17 | $81,324.00 | $6,777.00 |
| Year Four | 1/1/18 | 12/31/18 | $83,760.00 | $6,980.00 |
| Year Five | 1/1/19 | 12/31/19 | $86,268.00 | $7,189.00 |

Omni Combined W.E., LLC                    The LASIK Vision Institute, LLC

By:                                         By: _____, CEO
William L. DiStefano Jr., Manager          Ben L. Cook, CEO

THIS LEASE is hereby made as of (the "Execution Date") referred to in the Lease Data Exhibit attached to the front of this Lease and made a part hereof, by and between (the "Landlord") and (the "Tenant") named in said Lease Data Exhibit. The obligations of the Tenant hereunder, if the Tenant shall be more than one person and/or entity, shall be joint and several.

## ARTICLE 1. GRANT, TERM AND RENT

1.1.    Leased Premises. In consideration of the rents, covenants, and agreements hereinafter reserved and contained herein on the part of Tenant to be observed and performed, Landlord leases to Tenant, and Tenant leases from Landlord, (the "Leased Premises") as identified on the Lease Data Exhibit. Tenant shall have, as appurtenant to the Leased Premises, the non-exclusive right to use, and permit its employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees to use, in common with others, those exterior and interior common areas of the land and building of which the Leased Premises are a part only as necessary for access to, and enjoyment of, the Leased Premises.

1.2.    Term. The term of this Lease (the "Lease Term") is outlined in the Lease Data Exhibit. The Lease Term shall begin on the date specified on the Lease Data Exhibit (the "Commencement Date") and end on the date specified on the Lease Data Exhibit (the "Expiration Date"). Landlord and Tenant agree to sign a Commencement Date Certificate prior to occupancy to evidence both parties assent to Substantial Completion of improvements, and to document the Commencement Date. Substantial Completion shall be defined as Tenant's commercially reasonable ability to perform the essential functions of it business as of the date the Premises is presented as Substantially Complete.

1.3.    Renewal Options. The renewal option is outlined in the Lease Data Exhibit. The additional term (hereinafter called a "Renewal Term") shall be subject to all the same terms and conditions as herein contained (except there shall be no right of further renewal), and further provided that, Tenant shall not at any time during the Term of this Lease become in default of any material provision of this Lease, and; Tenant shall give Landlord written notice, not less than 270 days prior to the expiration of the then current Lease Term, of Tenant's intention to exercise said Renewal Option, which notice once given shall be irrevocable.    Upon the commencement of any Renewal Term, all references in this Lease to the Lease Term shall be deemed to include such Renewal Term. The rental rate during the term of the extension shall be as follows:

| 1/1/20 – 12/31/20 | $7,405.00 per month. | ($88,860.00 per year) |
| 1/1/21 – 12/31/21 | $7,627.00 per month. | ($91,524.00 per year) |
| 1/1/22 – 12/31/22 | $7,856.00 per month. | ($94,272.00 per year) |
| 1/1/23 – 12/31/23 | $8,092.00 per month. | ($97,104.00 per year) |
| 1/1/24 – 12/31/24 | $8,335.00 per month. | ($100,020.00 per year) |

1.4.    Base Rent, Additional Rent and Other Charges. Tenant agrees to pay to Landlord, at the address of Landlord set forth in the Lease Data Exhibit, or at such other place designated by Landlord in writing to Tenant, without any prior demand therefore and without deduction or set-off whatsoever, (the "Base Rent") as identified on the Lease Data Exhibit, payable in equal

monthly installments, in advance, on the first day of each calendar month during the term hereof. In addition, Tenant shall pay to Landlord throughout the term of this Lease, Additional Rent and other payments due from Tenant, as provided for herein, to Landlord (all of which shall be deemed to be Rent), free of any charges, assessments, imposition or deductions of any kind and without abatement, deduction or set-off.

1.5.     Quiet Enjoyment. Tenant, upon paying the rent and other costs, expenses and/or charges herein specified and observing Tenant's covenants and agreements herein, shall and may peaceably, quietly and without interference to other tenants, have, hold, and enjoy the Leased Premises during the Lease Term, unless and until terminated as herein provided, except that interference therewith due to any fire, casualty, taking by eminent domain, action by any governmental authority or cause beyond the control of Landlord shall not be deemed to be a breach of this covenant.

1.6.     Past Due Rent. If Tenant shall fail to pay within five (5) days of the date same shall be due and payable any rent or additional rent or other charges payable to Landlord under this Lease, Tenant shall pay a late charge equal to ten percent (10%) of the total unpaid amounts.

1.7.     Security Deposit.

(a)     Tenant has, upon the execution of this Lease, paid to Landlord a sum as set forth on the Lease Data Exhibit to be held by Landlord as a Security Deposit.

(b)     In the event there is an increase in the monthly installment of rent, or in the event Landlord (without prejudice to any other remedy Landlord may have on account thereof) shall apply such Security Deposit, or any part thereof, to cure any default of Tenant, Tenant shall deliver to Landlord those monies so that at all times Landlord shall hold a Security Deposit at least equal to the then current monthly installment of rent.

(c)     Within thirty (30) days after the expiration of the Lease Term (the "Expiration Date"), Landlord shall return the Security Deposit to Tenant, after subtracting such sums as may be required to complete any obligations of Tenant then outstanding, including but not limited to, such amounts as may be required to repair any damages to the Leased Premises, other than ordinary wear and tear, caused by Tenant, whether or not said damage may be covered by insurance provided that such portion of insurance proceeds shall be assigned to Tenant such that Landlord will not receive double compensation for such damage.

(d)     Nothing herein shall be construed to negate Tenant's obligation to pay to Landlord the "last month's rent" when the same shall be due and payable.

(e)     While Landlord holds such Security Deposit, Landlord shall have no obligation to pay interest on the same and shall have the right to commingle the Security Deposit with Landlord's other funds.

(f)     If Landlord conveys Landlord's interest under this Lease, the Security Deposit, or any part thereof not previously applied, shall be turned over by Landlord to Landlord's grantee, and if so turned over, Tenant agrees to look solely to such grantee for the Security Deposit. It is understood and agreed that in such case, Landlord shall notify Tenant in writing of such.

Page 3 of 19

## ARTICLE 2. TAXES AND ASSESSMENTS

2.1.    Property Taxes. Tenant shall, as additional rent hereunder, pay to Landlord (its "Pro Rata Share"), as set forth on the Lease Data Exhibit, of any and all increase in taxes, charges, assessments and such other duties, charges or payments, ordinary or extraordinary, imposed by any governmental or public authority, as shall during the Lease Term be imposed, assessed, levied or become a lien upon the property and the parking lots of which the Leased Premises is a part, or any part thereof, or anything appurtenant thereto, as the same shall become due (collectively "Taxes"), including reasonable costs of Landlord in seeking abatement of any such taxes, though Landlord shall not be obligated to seek abatement of taxes, over the Taxes due and payable in (the "Base Year") set forth on the Lease Data Exhibit. Upon receipt of the Tax bill for the year following the Base Year and each year thereafter during the Term of the Lease, Landlord shall provide Tenant with the amount required to be paid by Tenant on account of Taxes for that year, such amount to be adjusted and paid current as of the first day of the month following Landlord's issuance of an invoice, and the balance monthly thereafter for the remainder of the year. On January 1 of each subsequent year Tenant shall continue to pay such monthly installment as called for in the prior year at the time and in the fashion herein provided for the payment of Rent. Upon receipt of the actual tax bill for said year, Landlord shall promptly advise Tenant of the amount thereof and the computation of Tenant's actual liability on account thereof. If the estimated payments already made by Tenant for the year exceed the required payments on account thereof for such year, Landlord shall credit the amount of overpayment against subsequent obligations of Tenant on account of Taxes (or refund such overpayment if the Term of this Lease has ended and Tenant has no further obligation to Landlord, until such time as Tenant has satisfied such obligation whereupon Landlord shall refund such overpayment). If the estimated payments already made by Tenant for the year are less than the required payments on account thereof for such year, Tenant shall make payment to Landlord such adjusted amount so as to bring the account current as of that date, within thirty (30) days notice thereof, and the balance monthly thereafter for the remainder of the year. Tenant shall pay its proportionate share of any increase in Taxes for the calendar year in which the Lease commences or terminates in proportion to that part of the calendar year during which the Tenant has possession of the Leased Premises.

2.2.    Taxes Not Covered. Nothing in this Lease shall be construed so as to require Tenant to pay any inheritance, estate, succession, transfer, franchise, gift, corporation tax or surtax, income, profits, personal property (other than taxes on its own personal property) revenue or excess profits taxes, or capital levy, assessment or charge imposed upon Landlord except to the extent that any taxing authority may levy, assess or impose any tax, excise or assessment (other than an income or franchise tax) upon or against the rentals payable by Tenant to Landlord by way of substitution for or in addition to any existing form of tax on the Leased Premises or penalties due to Landlord's failure to pay taxes or file any tax or informational returns.

2.3.    Tenant's Taxes. Tenant shall pay when due all taxes, assessments and other governmental charges levied on the personal property of Tenant located on the Leased Premises.

## ARTICLE 3. INSURANCE, INDEMNIFICATION AND SUBROGATION

3.1.   Landlord's Insurance. Landlord shall, during the Lease Term, keep the land and buildings of which the Leased Premises is a part (not including Tenant's personal property and improvements) insured against loss or damage by fire and against other risks now or hereafter covered by standard all-risk insurance, which insurance shall be payable to Landlord. Tenant shall reimburse their Pro-Rata Share of the cost of such insurance. Tenant hereby acknowledges that this paragraph specifically excludes from coverage under Landlord's Insurance any and all persons and property within Tenant's Leased Premises. Tenant must provide insurance coverage as called for below, or bear all risk of casualty or loss to persons or property within Tenant's Leased Premises.

3.2.   Tenant's Insurance. Tenant shall, during the Lease Term, keep in full force and effect, at Tenant's expense, a policy or policies of general liability and property insurance with respect to the Leased Premises in which the limits of public liability shall not be less than $2,000,000 combined single limit and in which property damage coverage shall not be less than the full replacement value of the Tenant's property at the Leased Premises and the leasehold improvements effected by Tenant under Section 4.4 hereof. The policy or policies as to public liability shall name Landlord as an additional insured, as its interest may appear, and shall contain a provision that the insurer will not cancel or change the insurance without first giving the Landlord thirty (30) days prior written notice. The insurance coverage required under this Section shall be by insurer(s) satisfactory to Landlord, which approval shall not be unreasonably withheld, and a copy of the policy or policies or a certificate of insurance shall be delivered to Landlord: (a) prior to the Commencement Date of the Lease Term; and (b) at any other time upon written request of Landlord. Tenant may provide such insurance as an endorsement of its blanket policies of insurance coverage.

3.3.   Tenant Indemnification. Tenant does hereby indemnify and agree to hold harmless Landlord from and against any loss, cost, damage, liens, and expenses occasioned by or arising out of: (i) the use, maintenance, control, or occupancy of the Leased Premises by Tenant; and (ii) any breach or default in the performance by Tenant under this Lease specifically excluding from the provisions hereof any loss, cost, damage or injury caused by the gross negligence intentional acts or omissions of the Landlord, its agents or employees, for which Landlord shall indemnify and hold harmless Tenant from any and all expenses occasioned by or arising out of the same. For purposes of this Section, the term "Tenant" shall refer to Tenant or any person or persons occupying, holding, or claiming by, through, or under Tenant, including without limitation, Tenant's employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees.

3.4.   Landlord Indemnification. Based upon the insurance to be maintained by Landlord hereunder, and only to the extent covered by such insurance and to the extent permitted by its insurance carrier(s), Landlord hereby indemnifies and agrees to hold harmless Tenant from liability for any and all loss and damage occasioned by or arising out of (i) the use, maintenance, control, or occupancy of the building by Landlord to the extent covered by the insurance required

to be carried by Landlord hereunder; and (ii) specifically excluding from the provisions hereof any loss, cost, damage or injury caused by the gross negligence, intentional acts or omissions of the Tenant, its agents or employees, for which Tenant shall indemnify and hold harmless Landlord from any and all expenses occasioned by or arising out of the same. For purposes of this Section, the term "Landlord" shall refer to Landlord or any person or persons occupying, holding, or claiming by, through, or under Landlord, including without limitation, Landlord's employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees.

3.5    Subrogation. Landlord and Tenant mutually covenant and agree that each party, in connection with insurance policies required to be furnished in accordance with the terms and conditions of this Lease, or in connection with insurance policies which they obtain insuring such insurable interest as Landlord or Tenant may have in their own properties, whether personal or real, shall expressly waive any right of subrogation on the part of the insurer against the Landlord or Tenant as the same may be applicable, which right to the extent not prohibited or violative of any such policy is hereby expressly waived, and Landlord and Tenant each mutually waive all right of recovery against each other, their agents, or employees for any loss, damage or injury of any nature whatsoever to its property, whether real or personal.

## ARTICLE 4. MAINTENANCE, UTILITIES, IMPROVEMENTS AND OPERATIONS

4.1.    Maintenance by Tenant. Except as otherwise set forth herein, Tenant shall, at Tenant's expense, perform any and all maintenance and shall make or cause to be made any and all repairs and replacements necessary to keep the Leased Premises in the same order and repair, including, without limitation, maintenance of the Leased Premises in as clean, neat, sanitary and attractive as they are at the Commencement Date or may be put in thereafter, reasonable wear and tear and damage by insured casualty excepted. Tenant shall not store or permit to accumulate any trash, debris, garbage, or any other material in or around the premises. All repairs and replacements undertaken by Tenant shall be at least equal in quality and class to the original work. If Tenant shall fail to proceed with reasonable diligence to make any repairs required to be made hereunder by Tenant, Landlord may after ten (10) days' written notice to Tenant and failure to cure within 10 days, make any such repairs and the cost of making such repairs shall be payable to Landlord on demand as additional rent.

4.2(a). Maintenance by Landlord. Subject to the limitations herein provided, Landlord shall be responsible for maintaining, repairing and, if not repairable, replacement of the heating, ventilation and air conditioning equipment, roof, piping, and other equipment outside of the Leased Premises and the imbedded pipes and wiring and the life safety systems (including the sprinkler and fire alarm system) located inside the Leased Premises, and shall be responsible for the repair of leaks through, from or in the ceiling of the leased premises (other than those items or equipment installed by or on behalf of Tenant, for which Tenant agrees to maintain). Except as expressly set forth herein, in no event shall Landlord be responsible for maintaining the Leased Premises, including, but not limited to, those items for which Tenant is responsible pursuant to Section 4.1.

4.2(b). Common Area Maintenance. Landlord shall, during normal business hours, be responsible for providing reasonable landscaping, snowplowing and common area maintenance,

and to keep the walks, walkways, parking areas and driveways surrounding the Leased Premises reasonably well lighted, in reasonably good order and repair, and reasonably free of obstructions.

4.2(c). No Liability. Notwithstanding the foregoing, Landlord shall not under any circumstances be liable to make any repairs whatsoever to the extent caused directly by any act or omission of Tenant and/or its employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees. In no event shall Landlord be liable to Tenant, its employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees as a result of Landlord's inability to act due to circumstances beyond the reasonable control of Landlord, including, without limitation, any strike or other labor trouble, fire or other casualty not caused by Landlord's acts or omissions or its employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees, government preemption of priorities or other control in connection with a national emergency, or shortages of, or inability to obtain, fuel, supplies, materials, or labor.

4.3. Utilities and Other Charges. In addition to the rent and other charges set forth herein, Tenant agrees to pay for all utilities used and consumed by Tenant, and for its Pro-Rata share of all common area utilities, as additional rent to Landlord based on its Pro Rata Share as set forth in the Lease Data Exhibit, or directly to the utility company, as the case may be, the following:

a.   Sewer charges
b.   Water charges
c.   Gas charges
d.   Electricity charges

Any other utilities or services used or consumed by Tenant, or such other charges as Tenant is responsible for under this Lease.

All utilities that are separately metered shall be billed directly to Tenant. In the event that utility services are not separately metered, Landlord will charge Tenant its Pro Rata Share, as set forth on the Lease Data Exhibit, of the total utility bills for the property (including common areas). Beginning with the first month under this Lease, Tenant shall pay, together with all other rent due, a monthly installment toward Additional Rent charges when applicable (Monthly charges shall be based on Tenant's Pro Rata Share of the total cost of all utilities for the prior year, plus a reasonable anticipated increase, divided by twelve (12)). On, or about, February 1 of each subsequent year, Landlord shall adjust Tenant's utility account based on the total actual charges for the prior year, and shall advise Tenant of any balance due on said account, or in the event of overpayment said amount shall be promptly refunded or credited to Tenant's accounts for the current year at Landlords option. Any amount due by Tenant under this provision shall be due and payable within 20 days from the date billed to Tenant. In addition, Landlord may, at Landlord's sole reasonable discretion, adjust the monthly installment amount for the current year, based on the actual utility costs for the prior year. Landlord reserves the right at its sole cost and expense, to meter or sub-meter Tenant's space, and if so, Tenant agrees to pay directly to the utility company if separately metered or to Landlord based on the usage as determined by the sub-meter. Reasonable Heat or Air conditioning will be provided between the hours of 8:00am and 6:00pm Monday through Friday, excluding holidays.

After hours HVAC service shall be made available by Landlord upon Tenant's request. The cost for such afterhours service shall be at an initial rate of six dollars $ 6.00 per hour. Said cost shall be reviewable annually and may be increased at a rate not to exceed 15% per year based on utility rate increases incurred within the Complex of which the Leased Premises is a part.

Tenant agrees to use the dumpster to be provided by Landlord. Tenant may not use or obtain the services of another waste removal company without the written consent of the Landlord. However, Tenant covenants that the dumpster provided for herein shall be used solely for non-hazardous waste generated in the normal course of office operation.     Tenant acknowledges that in no event shall large items such as furniture, manufacturing debris or waste generated outside of Tenant's Leased Premises be discarded in the dumpster. Tenant further acknowledges that, under no circumstances will Tenant cause, or permit any hazardous substance to be placed, discarded, stored or otherwise deposited in the dumpster, and Tenant acknowledges that Tenant bears all risk and cost associated with improper disposal of any such items and/or hazardous material. Tenant also agrees to reimburse Landlord their Pro-Rata Share of the cost of rubbish removal.

Notwithstanding the foregoing, Tenant shall be required to contract with medical waste removal companies to comply with all applicable laws, ordinances and regulations regarding the disposal of de minimis amounts of inflammable, combustible or explosive fluids, materials, chemicals or hazardous substances that are customarily used in connection with Tenant's permitted use of the Premises. Tenant shall in any and all events indemnify and hold Landlord harmless from any and all claims arising from use, storage and/or disposal of medical waste as called for under this section.

4.4. <u>Tenant's Improvements</u>. Any changes, alterations, or improvements (collectively The "Improvements") to the Leased Premises of any kind or nature whatsoever desired by Tenant, following the Substantial Completion of the Landlord's Improvements detailed on Addenda A and B attached hereto, may be installed by Tenant at its own cost and expense only if Tenant shall notify Landlord in writing and shall use only those vendors and tradesmen expressly approved by Landlord in writing. Any such leasehold improvements shall become a part of the Leased Premises and shall not be removed by Tenant upon termination of this Lease, unless Landlord provides written notice to Tenant at the time of Landlord's assent to said Improvements that Tenant shall remove the same or any portion thereof upon termination of the Lease. All repairs and replacements undertaken by Tenant shall be at least equal in quality and class to the original work. Tenant shall promptly pay all amounts owing to Tenant's contractors and materialmen, so as to avoid the possibility of a lien attaching to the property of which the Leased Premises is a part, and should any such claim of lien be made or filed, Tenant shall bond against or discharge the same within ten (10) days after written request by Landlord.

4.5.     <u>Removal Upon Termination; Surrender of Leased Premises</u>. At the expiration or earlier termination of this Lease, Tenant shall remove Tenant's equipment, supplies, furniture, goods and effects, together with all changes, alterations, or improvements (hereinafter collectively "Improvements") in the Leased Premises which Tenant is required to remove under the terms of this Lease, and peaceably yield up the Leased Premises and all leasehold Improvements in as good order, repair and condition as the same were at Tenant's

Page **8** of **19**

commencement of occupancy of the Leased Premises or had been put in thereafter, reasonable wear and tear and damage by insured casualty excepted. In the event Tenant fails to remove its Improvements in the Leased Premises, which Tenant is required to remove under the terms of this Lease, as provided herein, Tenant authorizes the Landlord to: (1) store in any public warehouse or elsewhere in the name and at the risk and expense of Tenant any Improvements on the Leased Premises, not removed pursuant to the provisions of this Section; (2) sell at public or private sale any or all of the Improvements on the Leased Premises not so removed, and to apply the net proceeds of such sale to the payment of any sums due by Tenant to Landlord; or (3) destroy such Improvements on the Leased Premises, provided, however, that Landlord shall give Tenant ten (10) days' prior written notice of its intent to take any of the above-listed actions and a ten (10) day opportunity to cure. However, during any period of occupancy Tenant shall be deemed to be Holding Over as called for under Paragraph 7.5 of this Lease. The notice required to be provided by Landlord may be given prior to early termination of this Lease. Tenant may remove the Improvements on the Leased Premises which are the subject of the above notice requirement within the time specified after such notice.

4.6.    Compliance with Law. Tenant shall not injure or deface the Leased Premises or remainder of Landlord's Property, or permit on the same any nuisance or the emission therefrom of any objectionable dust, noise or odor, pollutant or noxious fume and, except as otherwise provided for herein, shall observe, comply with, be responsible for, and shall bear all the expenses relating to the observance and compliance with all present and future statutes, laws, ordinances, rules, orders, regulations and/or requirements relative to Tenant's specific manner of use of the Leased Premises (as opposed to laws having general applicability to office use, which shall be Landlord's responsibility to comply with) as authorized by Section 4.10 and the appurtenances to the Leased Premises, including, but not limited to, all the requirements of present or future laws applicable to the building thereon, and to the protection of the environment and public health and to the handling, storage and disposal of petroleum products and hazardous materials. Tenant shall be liable and indemnify and save Landlord harmless from any liens incurred other than by Landlord, or any penalty, claim or damage imposed, made or recovered by reason of the failure of Tenant to observe said statutes, laws, ordinances, rules, orders, regulations and/or requirements, or to do as aforesaid. Tenant shall procure any licenses or permits required by any use by Tenant of the Leased Premises or remainder of Landlord's Property, or for any equipment or materials placed by Tenant on the Leased Premises. It is expressly understood and agreed that, should Tenant fail or neglect to comply with any such statutes, laws, ordinances, rules, orders, regulations and/or requirements aforesaid within twenty (20) days from receipt of written notice of such failure or neglect given to Tenant, then Landlord shall have the right, at its option and without prejudice to any rights granted to Landlord hereunder, to comply therewith. Tenant hereby agrees to pay all the expenses incurred in executing and/or complying therewith, which expenses shall be deemed additional rent and be payable within twenty (20) days of demand.

4.7.    Access by Landlord. At all reasonable times and upon reasonable notice (except in the case of emergency), Tenant shall allow Landlord, its agents, servants, and representatives to enter upon the Leased Premises for the purpose of inspecting, viewing and/or repairing the same. Landlord shall make commercially reasonable effort to conduct such inspections, viewing and repairs in a manner that does not materially interfere with Tenant's Use of the Premises.

Page **9** of **19**

4.8.    Keys/Prox Cards. Tenant will be given, at no charge, upon the commencement of the Lease, one (1) key to the Leased Premises, which is part of the master key system, and one (1) Prox Card to the building (unless the Premises is not accessed through a common entrance), which is part of the access control system, for each person employed by Tenant at the Leased Premises as of the Lease Commencement. In the event that Tenant desires to change the locks of the Leased Premises, or add any interior locks, during the Term of the Lease, Tenant will, at Tenant's expense, use the locksmith and master lock system designated by the Landlord, and agrees to provide Landlord with any new key to any lock securing the Leased Premises or any space within the Leased Premises. In the event the Leased Premises has a security system Tenant will provide an access code to Landlord. Tenant further agrees to pay the cost of any charges associated with use of the master key system and to pay all reasonable costs associated with any lost, stolen or destroyed keys and prox cards. In addition, Tenant shall have access to the Premises, twenty four (24) hours per day, seven (7) days per week, fifty two (52) weeks per year.

4.9.    Signs – Interior and Exterior. Tenant shall have the right, at Tenant's sole cost and expense, but subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, and subject to Landlord's terms and conditions with respect thereto, to install a sign, similar in size and design to signs generally maintained by others in the Complex in which the Leased Premises is located, within the area designated for signage by Landlord. It is expressly acknowledged that signs may only be placed within the area designated by Landlord whether inside or outside the building. Said signs must be approved by Landlord in advance, and all signs so placed must conform to the signage specifications which may be promulgated by Landlord from time to time. Such signs must conform to all laws and municipal regulations as it deems necessary and proper in the conduct of its business. Tenant shall be obligated to remove any such signage at the conclusion of the Lease at Tenant's sole cost and expense. Landlord will be responsible for unit placards with regards to the Building Directory in the lobby, when applicable.

Tenant will not place or suffer to be placed or maintained on the interior common area or exterior of the premises or anywhere within or outside the building, any signs, advertising matter, or any other thing of any kind, and will not place or maintain any decoration, lettering, or advertising matter on the glass of any window or door of the premises without first obtaining Landlord's written approval. Tenant further agrees to maintain any such approved sign, decoration, lettering, advertising matter, or other thing, in good condition and repair at all times.

4.10.   Use of Leased Premises. During the Lease Term, and any renewal or extension thereof, or holdover, wrongful or otherwise, the Leased Premises shall solely be used for the purpose as set forth on the Lease Data Exhibit (the "Use") and for no other purpose except upon the prior written consent of Landlord, which consent shall not be unreasonably withheld.

4.11.   Parking. Tenant shall have, as appurtenant to the Leased Premises, the right to use, and permit its employees to use, in common with others, the number of parking spaces (the "Parking") provided for in the Lease Data Exhibit (only one employee shall be designated per space). In addition, Tenant may, from time to time, have reasonable rights of access to the Visitor Parking area, to the extent available, subject to use regulations, for guests, customers, clients and invitees of Tenant. The use of such parking area shall be subject to reasonable rules and regulations from time to time established by Landlord and to the right of Landlord to

Page 10 of 19

designate and change from time to time the parking areas and means of access to be used. In the event that any parking rule or regulation currently in effect or adopted in the future conflicts with any provision of this Lease, this Lease shall control. Landlord may at any time close any common area to make repairs or changes or to discourage improper and/or unauthorized parking, and may do such other acts in and to the common areas as in its judgment may be desirable to improve the convenience thereof. Landlord shall use commercially reasonable effort to ensure that such changes or acts relating to Tenant parking only, as described above do not materially interfere with Tenant's Use of the Premises. Tenant shall, upon request, furnish to Landlord the registration information of the vehicles utilizing said parking area. In no event shall Landlord be liable for, and Tenant agrees to indemnify and hold Landlord harmless from and against, any loss, cost, theft, damage, and expenses occasioned by or arising out of the use of the parking area by Tenant, its employees, agents, servants, guests, customers, clients, representatives, invitees and licensees. Under no circumstance shall any vehicle be parked in the parking lots overnight. Any vehicle that is towed will be at the vehicle owner's sole expense.

4.12. Rules and Regulations. Tenant shall abide by reasonable rules and regulations from time to time established by Landlord and to use its best efforts to cause its employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees to conform thereto, it being agreed that such rules and regulations will be established and applied in a non-discriminatory fashion, such that all rules and regulations shall be generally applicable to the other tenants of the property of which the Leased Premises are a part. Tenant shall abide by such rules with all modifications adopted by Landlord from time to time; provided, however, that the modifications shall not financially or monetarily increase Tenant's obligations or decrease Tenant's rights, or use of the Leased Premises under this Lease. In the event that any rule or regulation currently in effect or adopted in the future conflicts with any provision of this Lease, this Lease shall control. Landlord agrees to use reasonable efforts to insure that any such rules and regulations are uniformly enforced, but Landlord shall not be liable to Tenant or any other person for violation of the same by any other tenant or occupant of the property. In addition Tenant agrees that Landlord has the right to waive enforcement of any rule or regulation for the benefit of one tenant, and that such waiver shall not entitle another Tenant to waiver of such rule or regulation, on account of any such prior condition of waiver granted to others by Landlord.

## ARTICLE 5. CONDEMNATION AND DESTRUCTION

### 5.1. Condemnation.

(a) If, during the Lease Term, any part of the Leased Premises shall be taken by any public or other authority by the exercise of any power of eminent domain or condemnation as to render the remainder of the Leased Premises unusable for the purposes for which the Leased Premises were leased, then this Lease shall terminate at the election of either the Landlord or Tenant as of the date such possession is taken. In the event neither party elects to terminate, or in the event that such taking is not sufficient to entitle either party to terminate, a just proportion of the rent according to the extent of the percentage of Leased Premises area taken shall be abated for the remainder of the term hereof. Provided however, that in the event that said condemnation renders the Leased Premises such that Tenant is unable to perform surgery procedures altogether, due solely to the condemnation, then the Leased Premises shall be

Page 11 of 19

considered one hundred percent (100%) unusable even if the part of the Leased Premises is usable by Tenant.

(b) Landlord reserves and excepts all rights and damages to the Leased Premises (and any leasehold improvements thereon), and the leasehold hereby created, now accrued or hereafter accruing by reason of any such taking, and by way of confirmation Tenant hereby grants Landlord all the Tenant's rights to such damages, and covenants to execute and deliver such further instruments of assignment thereof as Landlord may from time to time request. Notwithstanding the foregoing, Tenant shall be entitled to retain any award for damages separately made and identified as compensation for business interruption, moving expenses, or for furniture, furnishings and/or trade fixtures to the extent that the same do not, in any way, compromise Landlords rights of compensation or amount of compensation under any such award.

(c) Landlord and Tenant shall each give the other notice in writing within twenty (20) days of either obtaining or acquiring information and/or notice thereof of any proposal for a taking by the exercise of eminent domain or otherwise of any portion of the Leased Premises by public authority.

5.2.    Destruction.

(a) If, during the Lease Term, any part of the Leased Premises shall be so damaged or destroyed so as to render the remainder of the Leased Premises unusable for the purposes for which the Leased Premises were leased, then this Lease shall terminate at the election of either the Landlord or Tenant upon thirty days prior written notice to the other. The remainder of the Leased Premises shall be deemed unusable only if one or more of the following shall occur: (i) the Leased Premises are unusable for the purposes for which the Leased Premises were leased, or (ii) the damage or destruction occurs during the last year of the Lease Term or Renewal Term, if any. In the event that during the Lease Term, or any extension or renewal thereof, the building of which the Leased Premises is a part is so destroyed by fire or other casualty as to be rendered untenantable and unfit for occupancy, neither Landlord nor Tenant shall have the right to terminate this Lease, and Landlord shall within one hundred eighty (180) days of such damage, except for matters beyond the reasonable control of Landlord, replace, restore or rebuild the destroyed portions of the Leased Premises to substantially the same condition as existing immediately prior to said destruction.  To the extent that the design or location of the restoration or rebuilding shall differ from that of the portion destroyed or damaged, the design and location of such replacement, restoration or rebuilding shall be selected by Landlord after consultation with Tenant, and, so far as Landlord, in its sole discretion, shall deem practicable, in accordance with the original plans and specifications therefore. In no event shall any obligation of Landlord to replace, restore or rebuild exceed in amount the sum of the insurance proceeds received by Landlord, less the costs of the collection thereof. Landlord's obligation with respect to replacement, restoration and rebuilding shall not include any property of Tenant or leasehold improvements effected by Tenant. In the event that Landlord is unable to complete such restoration work within the one-hundred eighty (180) day period, then Tenant shall have the right to terminate this Lease upon thirty (30) days prior written notice.

(b) In any event of destruction by fire or other casualty, a just portion of the rent according to the extent of the floor space rendered untenantable and unfit for occupancy shall be abated until such space shall have been restored to a tenantable and fit condition. Provided however, that in the event that said destruction renders the Leased Premises such that Tenant is unable to perform surgery procedures altogether, due solely to the destruction, then the Leased Premises shall be considered one hundred percent (100%) untenantable even if the part of the Leased Premises is usable by Tenant.

(c) Landlord reserves and excepts all rights to insurance proceeds or other compensation payable by reason of such destruction, and by way of confirmation Tenant hereby grants Landlord all the Tenant's rights to such proceeds and other compensation and Tenant covenants to execute and deliver such further instruments of assignment thereof as Landlord from time to time may request. All property installed on the Leased Premises by the Tenant and all removable property of any nature whatsoever at any time located on the Leased Premises shall be at the Tenant's sole risk and hazard.

## ARTICLE 6. DEFAULT

6.1(a). Default. If Tenant shall neglect or fail to pay when due any amount called for under the Lease (a "Payment Default") and such neglect or failure shall continue for more than ten (10) days, Landlord shall provide written notice, and a ten (10) day opportunity to cure, to Tenant of said failure one time only per year under the Lease, and Landlord shall not be required to provide written notice or opportunity to cure of such neglect or failure except as expressly provided for hereunder.

If (i) Tenant shall neglect or fail to perform or observe any term, covenant or condition by Tenant to be performed or observed hereunder other than a Payment Default, and such neglect or failure shall continue for more than thirty (30) days, after written notice to Tenant with respect to any other term, covenant, or condition, reasonable extension to cure to be granted for up to thirty (30) additional days provided that Tenant has initiated cure and requires additional time to perfect cure of said default; or (ii) if Tenant shall abandon or vacate the Leased Premises without continuing to pay Landlord all amounts due under this Lease; or if the leasehold hereby created shall be taken on execution, or by other process of law, or if any assignment shall be made of Tenant's property for the benefit of creditors; or (iii) if a permanent receiver, trustee in bankruptcy, or similar officer or custodian shall be appointed to take charge of all or any part of Tenant's property by a court of competent jurisdiction; or (iv) if Tenant becomes insolvent; or if a petition is filed by Tenant under any bankruptcy, receivership, or other insolvency law; or if a petition is filed against Tenant under any bankruptcy, receivership, or other insolvency law and the same shall not be dismissed within thirty (30) days from the date upon which it is filed; or (v) if Tenant shall be liquidated or dissolved or its existence be otherwise terminated without assumption of the Lease by a credit worthy successor reasonably acceptable to Lessor, then, and in any of said cases, Tenant shall be in default of this Lease.

6.1(b). Landlord's Remedies. If an Event of Default occurs and is not cured by Tenant as provided herein, then Landlord shall then, and at any time thereafter as long as the Event of Default continues and remains uncured, be entitled to immediate possession of the Leased Premises, to all arrearages in rent, to terminate this Lease, and to exercise any remedy legally

available to Landlord to enforce its rights by reason of Tenant's default. Without limiting the foregoing, Tenant shall at Landlord's option vacate the Leased Premises and remove Tenant's effects therefrom and, notwithstanding termination of the Lease, Landlord shall immediately be entitled to recover from Tenant, and Tenant shall forthwith pay Landlord as compensation, in addition to the amounts to be paid by Tenant under the preceding sentence, any unpaid rent, or other payments called for hereunder accrued to such date, a sum equal to the amount of all payments called for hereunder to be paid by Tenant for the remainder of the Lease Term. Should Tenant fail to vacate the Leased Premises as called for after Tenant's default, then in such event, Landlord shall be entitled to cause to be removed any and all property (whether or not owned by tenant) within the Leased Premises, and to cause such property to be placed in a secured storage facility. All costs associated with removal and storage of such property shall be the exclusive responsibility of Tenant. Tenant further agrees not to hold Landlord liable for any damages consequential to removal of such property, and to indemnify and hold Landlord harmless for any and all claims, damages or liability, whether to Tenant or any third party, occasioned by Landlord's removal of such property. In addition to the amounts to be paid by Tenant under the preceding sentence Tenant shall pay to Landlord as compensation all of Landlord's necessary expenses in connection with the reletting of the Leased Premises, including, without limitation, all repossession costs, brokerage commissions, fees for legal services and necessary expenses of preparing the Leased Premises for such reletting, it being agreed by Tenant that Landlord may (i) relet the Leased Premises or any part or parts thereof, for a term or terms which may at Landlord's option be equal to, less than, or exceed the period which would otherwise have constituted the balance of the Lease Term and may grant such concessions and free rent as Landlord in its sole judgment considers necessary to relet the same; and (ii) make such alterations, repairs and decorations in the Leased Premises as Landlord in its sole judgment considers necessary to relet the same, and no action of Landlord in accordance with the foregoing or failure to relet or to collect rent under reletting shall operate or be construed to release or reduce Tenant's liability as aforesaid.

6.1(c). No Prejudice. Nothing contained in this Lease shall limit or prejudice the right of Landlord to prove and obtain in proceedings for bankruptcy or insolvency, by reason of the termination of this Lease, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above.

6.1(d). Landlord Default. It shall be a "Landlord Default" under this Lease if Landlord shall default in the observance or performance of any material provision expressly required to be performed by Landlord under this Lease, and such default shall continue for thirty (30) days after Tenant shall have given written notice to Landlord specifying such default and demanding that the same be cured, unless such default cannot be cured by the payment of money and cannot, with due diligence, be wholly cured within such period of thirty (30) days, in which case Landlord shall have such longer period of up to thirty (30) additional days, provided that with the exercise of due diligence said default can be wholly cured within thirty (30) additional days, and if not Landlord shall be granted such longer period to cure as may reasonably be necessary to prosecute cure in the exercise of due diligence by landlord provided that Landlord prosecutes the

Page **14** of **19**

cure to completion with due diligence and advises Tenant from time to time, upon Tenant's request, of the actions which Landlord is taking.

6.2. No Waiver. No consent or waiver, express or implied, by Landlord or Tenant, to or of any breach of any term, covenant or condition hereunder shall be construed as a consent or waiver to or of any other breach of the same or any other term, covenant or condition, nor shall the acceptance by the affected party of any rental or other payment when due hereunder constitute a consent or waiver by the affected party to or of any breach of any term, covenant or condition hereunder.

6.3. Attorneys' Fees, Costs and Expenses. In the event of default by either party hereunder, the non-defaulting party shall be entitled to recover from the defaulting party the amount of any attorneys' fees, costs, and expenses reasonably incurred by the non-defaulting party in enforcing its rights and remedies hereunder.

6.4. Performance. If Tenant shall neglect or fail to perform or observe any term, covenant or condition by Tenant to be performed or observed hereunder, Landlord (in addition to Landlord's other options hereunder, including Landlord's options and remedies under Section 6.1 hereof), after giving ten (10) days' prior written notice of its intention, may, but shall not be obligated to, perform such term, covenant or condition and expend such sum as may be necessary to perform such term, covenant or condition and any and all such sums so expended by Landlord shall be repaid on demand, but no such expenditure by Landlord shall be deemed a waiver of said neglect or failure, nor shall it affect any other remedy of Landlord for said neglect or failure.

## ARTICLE 7. MISCELLANEOUS

7.1(a). Assignment and Subletting. Other than Permitted Transfers, as defined below, Tenant shall not assign, transfer, mortgage, pledge and/or otherwise encumber this Lease or the Leased Premises, nor shall Tenant sublet, underlet, or underlease the Leased Premises or any part thereof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. If consent is given, the same shall not be a waiver of this covenant and condition, except as to the particular act to which said consent related; and in such event, neither Tenant nor any guarantor hereof shall be relieved of any obligation hereunder but shall remain primarily liable for the payment of the rent herein reserved and for the performance of all the other terms of this Lease required to be performed by Tenant.

7.1(b). Permitted Transfers. Notwithstanding any contrary provision in this Article 7 but subject to all other terms and conditions herein, if Tenant is not in default, Tenant may, without Landlord's consent pursuant to Article 7.1(a), assign this Lease to: (a) an affiliate of Tenant (other than pursuant to a merger or consolidation), (b) a successor to Tenant by merger or consolidation of all Tenant's assets, (c) a successor to Tenant by purchase of all or substantially all of Tenant's assets, or (d) a Medical Provider, as defined below (each of the foregoing, a "Permitted Transfer"), provided that:

Page 15 of 19

    (i)    At least 15 business days before the Permitted Transfer, Tenant notifies Landlord of the Permitted Transfer in writing and delivers to Landlord any documents or information reasonably requested by Landlord relating thereto;

    (ii)    In the case of an assignment pursuant to clause (a), (c) or (d) above, the assignee executes and delivers to Landlord, at least 15 business days' before the assignment, a commercially reasonable instrument pursuant to which the assignee assumes, for Landlord's benefit, all of Tenant's obligations hereunder;

    (iii)    In the case of an assignment pursuant to clause (d) above but not pursuant to clause (a), (b) or (c) above, such assignment must be required by law in order for the assignment to take place and the Medical Provider to use the Demised Premises for its permitted Use, as such Use is set forth on the Lease Data Exhibit;

    (iv)    In the case of an assignment pursuant to clause (b) above: (X) the successor entity must have a net worth (as determined in accordance with GAAP, but excluding intellectual property and any other intangible assets (the "Net Worth")) immediately after the Permitted Transfer is consummated that is not less than Tenant's Net Worth immediately before the Permitted Transfer is consummated, and (Y) if Tenant is a closely held professional service firm, at least 75% of its equity owners existing during the 12 month period before the Permitted Transfer are also equity owners of the successor entity, and provided that said assignment does not in any way compromise Landlord's right or ability to receive Rent as called for under this Lease, and further provided that the use allowed under said assignment or sublet shall not be different from the use provided for in the Lease Data Exhibit; and

    (v)    Permitted Transfer is made for a good faith operating business purpose and not in order to evade the requirements of Article 7.1(a) of this Lease.

As used herein, "Medical Provider" shall mean a reputable, licensed medical doctor or optometrist in good standing with the State of Rhode Island, or a professional service firm that is organized under the laws of a state of the United States and authorized to do business in the State of Rhode Island, and is owned exclusively by one or more such persons. In no event shall a sublease under Article 7.1(b) trigger the Landlord's right to recapture.

    7.2.    Notices. Whenever notices shall be given by either party to the other pursuant to the provisions of this Lease, it shall be (i) hand delivered; (ii) sent by certified mail, return receipt requested; or (iii) sent by overnight delivery with proof of delivery. All notices shall be (i) addressed, if to the Landlord, as set forth on the Lease Data Exhibit, and if to the Tenant, as set forth on the Lease Data Exhibit or to such other address or addresses as the parties may direct in writing from time to time; and (ii) effective upon receipt.

    7.3.    Recording Notice. Tenant agrees that neither this Lease nor any notice of the Lease is to be recorded in the Land Evidence Records of the City of Providence, Rhode Island. If the Tenant shall violate the terms of this Paragraph Tenant may be deemed by the Landlord to be in default under this Lease.

7.4.    Recapture of Premises. In the event the Tenant during the Term of this Lease, or any renewal thereof, discontinues operation of its business, at the leased premises, for a period of thirty (30) days or more, Landlord shall have the right and option within ten (10) business days written notice to terminate this Lease and accelerate all rent and other charges due under this Lease.

7.5.    Holding Over. If Tenant shall hold possession of the Leased Premises beyond the Termination Date, in the absence of written agreement to the contrary, Tenant shall be deemed a tenant from month to month; provided, however, that the monthly rent to be paid by Tenant shall equal : (i) with respect to the first 30 days of holdover, 150% of the monthly rent due from Tenant for the month ending on the Termination Date, and (ii) thereafter, 200% of the monthly rent due from Tenant for the month ending on the Termination Date, and Tenant shall continue to pay the rent and other charges specified herein and shall be liable to Landlord for any and all lost rentals and other damages sustained by Landlord by virtue of such continued occupancy. Furthermore, nothing herein shall preclude Landlord from the exercise of any right of re-entry or other remedy under this Lease or under law, including Landlord's right to recover in enforcing Landlord's rights and remedies.

7.6.    Subordination. Tenant hereby subordinates this Lease to any mortgage or mortgages which Landlord may from time to time place upon the Leased Premises, provided that any such mortgage shall contain a provision to the effect that so long as this Lease is not in default, no foreclosure or other proceeding or exercise of rights under such mortgage shall disturb the possession of the Leased Premises by Tenant. Any such mortgage, whenever recorded, shall be superior and prior in lien to this Lease. This subordination shall be self-operative and no further instrument of subordination shall be required.    Tenant shall, nevertheless, execute and deliver, from time to time, such instruments and certificates affirming and confirming such subordination as Landlord may reasonably request.

7.7.    Estoppel and Attornment. In the event that a mortgagee, or any purchaser at foreclosure sale or judicial proceedings, shall succeed to the interest of the Landlord, this Lease, nevertheless, shall continue in full force and effect and the Tenant shall, and does hereby agree to, attorn to such mortgagee or purchaser and to recognize such mortgagee or purchaser as its Landlord. Upon request and with ten (10) business days prior written notice form Landlord or Landlord's mortgagee, Tenant shall execute, acknowledge and deliver a written statement certifying that this Lease is in full force and effect and that there is no uncured default on the part of Landlord, or specifying any such outstanding default. Any such statement may be relied upon by any third party claiming under this provision.

7.8.    Broker(s). Tenant warrants and represents that Tenant has dealt with no other Broker(s) in connection with this Lease except (the "Brokers") set forth on the Lease Data Exhibit, if any, and in the event of any brokerage claims against Landlord predicated upon prior dealings with Tenant, Tenant agrees to defend and indemnify Landlord against any such claim. Landlord shall pay the commissions due to the Brokers in connection with this Lease pursuant to a separate agreement between Landlord and the Brokers.

7.9.    Landlord's Liability. Tenant specifically agrees to look solely to Landlord's then equity interest in the property of which the Leased Premises is a part at the time owned, in

addition to any insurance coverage that may pertain for recovery of any judgment from Landlord; it being specifically agreed that the officers, employees, shareholders, owners, servants, agents and/or representatives of Landlord (original and successor) shall never be personally liable for any such judgment, or for the payment of any monetary obligation to Tenant. In no event shall either party be liable to the other for any indirect or consequential damages arising out of a breach of this Lease. Notwithstanding anything in this Lease to the contrary, Landlord (original or successor) shall not under any circumstances be liable to make any repairs whatsoever, and Tenant does hereby indemnify and agree to hold harmless Landlord, from and against any loss, cost, damage, liens, and expenses occasioned, arising out of or caused directly by any act or omission of Tenant, its employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees; and in no event will Landlord be liable to Tenant, its employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees as a result of Landlord's inability to act due to circumstances beyond the reasonable control of Landlord, including, without limitation, any strike or other labor trouble, fire or other casualty not caused by Landlord's acts or omissions or its employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees, government preemption of priorities or other control in connection with a national emergency, or shortages of, or inability to obtain, fuel, supplies, materials, or labor.

7.10.   Animals. Notwithstanding animals required by disabled, handicapped, physically and/or mentally impaired persons, no animals are allowed on Landlord's property, including, but not limited to the buildings, parking areas, common areas and Tenant's Leased Premises. All animals found on the property shall be presumed to be strays and will be referred to the proper animal control authority. Under no circumstances is Landlord liable to Tenant, its employees, agents, servants, guests, customers, clients, representatives, invitees, or licensees for any action taken with respect to the removal of any animal found on the property in violation of this Section 7.10. Any animal on the property without the express written consent of the Landlord shall be a complete and material breach of this Lease Agreement.

7.11.   Smoking. Smoking is completely prohibited anywhere in the building, including within Tenant's Leased Premises, and within 50' of any entrance to a building. Tenant shall be responsible for the actions of Tenant's employees, agents, servants, guests, customers, clients, representatives, invitees, and licensees with respect to this prohibition. Any smoking in the building by Tenant or its employees, agents, servants, guests, customers, clients, representatives, invitees, or licensees shall be a complete and material breach of this Lease Agreement. Tenant shall be liable for any and all direct and consequential damages arising under a breach of this Section 7.11 by any occupant or invitee of Tenant.

7.12.   Binding Effect. The terms, covenants and conditions contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and any person or persons, natural or corporate, claiming through or under them, or any of them; provided, however, that as used herein "Landlord" shall mean the owner for the time being of the Landlord's estate and property in the Leased Premises. If such estate and property shall be sold or transferred, the seller or transferor shall thereupon be relieved of all obligations and liabilities arising or occurring under this Lease, and the purchaser or transferee shall thereupon be deemed to have assumed and agreed to perform and observe all obligations and

liabilities arising or occurring under this Lease, or based upon occurrences or situations arising or occurring under this Lease.

7.13. No Representations By Landlord. No representations or promises with respect to the Premises or the Building or the grounds adjacent thereto, except as herein expressly set forth, have been made by the Landlord or any other party on the Landlord's behalf (including any real estate broker), and the Tenant agrees that it has examined the Premises and takes the same in their present condition and state of repair, except for the Landlord's Improvements to be performed therein in accordance with Addenda A and B attached hereto.   The taking of possession of the Premises by the Tenant shall be conclusive evidence against the Tenant that the Premises were in satisfactory condition at the time such possession was so or is taken, excepting any Punch List items listed with the Commencement Date Certificate.

Landlord agrees that it will not lease space in the building of which the leased premises is a part to any direct competitor of Tenant. A direct competitor will be defined only as any medical provider that offers refractive laser surgery consultations, and/or services to patients.

7.14. Entire Agreement. The parties hereto acknowledge that they have read the terms of this Agreement and hereby agree that no statement, agreement, or understanding, oral or written, not contained herein, will be recognized or enforced.

7.15. Governing Law.  This Lease shall be governed by and construed in accordance with the laws of the State of Rhode Island.

7.16. Headings. It is agreed and understood that the headings of the various paragraphs herein are for reference only and not to be construed as part of this Lease.

IN WITNESS WHEREOF the parties hereto have caused their signatures to be set forth below as of the date set forth on the Lease Data Exhibit (the "Execution Date"):

Landlord:                                                Tenant:
Omni Combined W.E., LLC                    The LASIK Vision Institute, LLC

By:                                                          By:
William L. DiStefano, Jr.                       Ben L. Cook

Manager                                                CEO

Page **19** of **19**

# West Exchange Center
IN HISTORIC FEDERAL HILL

## FIRST AMENDED LEASE DATA EXHIBIT

Execution Date: &/3 o/19

Landlord: Omni Combined W.E., LLC
P.O. Box 856
East Greenwich, RI 02818

Tenant: THE LASIK VISION INSTITUTE, LLC
1555 Palm Beach Lakes Blvd., Suite # 600
West Palm Beach, FL 33401

Leased Premises: 298 West Exchange Street, Suite 100, Providence, RI 02903
Rentable Sq. Ft.: 3,650
Lease Term: 3 Years
Commencement Date: January 1, 2020
Expiration Date: December 31, 2022
Renewal Options: N/A
Parking: Tenant will have the use of up to ten (10) unassigned parking spaces
(see Paragraph 4.11 within)
Pro Rata Share: 3.65%
Base Year: 2014
Utilities: Tenant Pays (see Paragraph 4.3 within)
Broker(s): John Cregan (CBRE, Inc.)
Use: The operation of a LASIK vision correction medical practice and
related clinic, medical, and general office purposes, other elective
or non-elective outpatient optical surgical procedures related to the
Tenant's core practice, including but not limited to cataract surgery,
the retail sale of eyeglasses and eyeglass products and all uses
necessary and related thereto.
Improvements: Tenant accepts the Leased Premises in "As Is" condition
Security Deposit: $7,189.00, On-Account (see Paragraph 1.7 within)

| Base Rent: | From: | To: | Total Rent | Monthly Rent |
|---|---|---|---|---|
| Year One | 1/1/20 | 12/31/20 | $88,872.00 | $7,406.00 |
| Year Two | 1/1/21 | 12/31/21 | $91,536.00 | $7,628.00 |
| Year Three | 1/1/22 | 12/31/22 | $94,284.00 | $7,857.00 |

Omni Combined W.E., LLC

By: 
William L. DiStefano, Jr.
Managing Partner

THE LASIK VISION INSTITUTE, LLC

By: 
Markus A. Hockenson
President & CEO

## FIRST AMENDMENT TO LEASE

This **FIRST AMENDMENT TO LEASE** ("First Amendment") is made as of the ⟋S𝒰𝑡ℎ day of August, 2019 by and between **OMNI COMBINED W.E., LLC**, a Rhode Island limited liability company ("Landlord") and **THE LASIK VISION INSTITUTE, LLC**, a Delaware limited liability company ("Tenant").

Pursuant to a Lease dated September 29, 2014 ("Lease"), by and between Landlord and Tenant, Tenant wishes to amend said Lease to add an additional term to the Lease under the following terms and conditions:

**NOW, THEREFORE**, for valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.     The existing Lease Term shall proceed until December 31, 2019 ("Current Lease Expiration Date") by the express terms set forth therein, and upon conclusion of said existing Lease Term, the Lease shall be amended as follows:

A. The Lease Data Exhibit of the above referenced Lease shall be, upon the Current Lease Expiration Date, stricken in its entirety and amended in accordance with the attached First Amended Lease Data Exhibit, which shall be executed herewith and incorporated in said Lease by expressed reference.

B. Paragraph 1.2 of the Lease shall remain in effect as per the Lease, except the sentence "Landlord and Tenant agree to sign a Commencement Date Certificate prior to occupancy to evidence both parties assent to Substantial Completion of improvements, and to document the Commencement Date. Substantial Completion shall be defined as Tenant's commercially reasonable ability to perform the essential functions of it business as of the date the Premises is presented as Substantially Complete." shall be stricken in its entirety.

C. Paragraph 1.3 of the Lease shall be stricken in its entirety.

D. The following shall be inserted in Paragraph 1.7 of the Lease: "(g) Landlord shall refund the $7,189.00 Security Deposit currently on file, no later than January 31, 2020, so long as (i) Tenant has paid all January 2020 Rent due, no later than January 5, 2020, and (ii) Tenant is not in Default under the Lease (as amended by this First Amendment to Lease) beyond any applicable notice and/or cure period. In the event Tenant is in Default as defined herein, Tenant's right to an early Security Deposit refund shall be extinguished."

E. Paragraph 4.4 of the Lease shall remain in effect as per the Lease, except the phrase "following the Substantial Completion of the Landlord's Improvements detailed on Addenda A and B attached hereto" shall be stricken in its entirety.

F. Paragraph 4.8 of the Lease shall remain in effect as per the Lease, except the sentence "Tenant will be given, at no charge, upon the commencement of the Lease, one (1) key to the Leased Premises, which is part of the master key system, and one (1) Prox Card to the building (unless the Premises is not accessed through a common entrance), which is part of the access control system, for each person employed by Tenant at the Leased Premises as of the Lease Commencement." shall be stricken in its entirety and replaced with "Tenant is currently in possession of all keys and Prox Cards for access to the Leased Premises and Building."

G. Paragraph 7.2 of the Lease shall remain in effect as per the Lease, except the sentence "All notices shall be (i) addressed, if to the Landlord, as set forth on the Lease Data Exhibit, and if to the Tenant, as set forth on the Lease Data Exhibit or to such other address or addresses as the parties may direct in writing from

time to time; and (ii) effective upon receipt." shall be stricken in its entirety and replaced with "All notices shall be (i) addressed, if to the Landlord, as set forth on the Lease Data Exhibit, and if to the Tenant, as set forth below:

**Tenant's Notice Address:**
The Lasik Vision Institute, LLC
1555 Palm Beach Lakes Boulevard, Suite 600
West Palm Beach, Florida 33401
Attn: Markus A. Hockenson, President and Chief Executive Officer
Facsimile: (561) 684-7754
Telephone: (561) 965-9110

**Tenant's Notice Copy Address:**
Nelson Mullins Broad and Cassel
One North Clematis Street
Suite 500
West Palm Beach, Florida 33401
Attention: Carl V. Romano, Esq.
Facsimile: (561) 655-1109
Telephone: (561) 832-3300

, or to such other address or addresses as the parties may direct in writing from time to time; and (ii) effective upon receipt."

H. Paragraph 7.13 of the Lease shall remain in effect as per the Lease, except the phrase ", except for the Landlord's Improvements to be performed therein in accordance with Addenda A and B attached hereto." shall be stricken in its entirety.

2. Except as expressly set forth herein, all of the terms and conditions of the Lease shall remain in full force and effect and shall apply to this First Amendment to Lease, except whereas amended herein.

3. This First Amendment to Lease may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Any executed counterpart of this First Amendment to Lease delivered by facsimile or other electronic transmission to a party hereto shall constitute an original counterpart of this First Amendment to Lease, provided that, upon request, any party returning a signature page electronically or via facsimile also transmit a hardcopy original of the signature page to the requesting party.

**IN WITNESS WHEREOF,** the undersigned have executed this **First Amendment to Lease** as of the date first written above.

**LANDLORD**
Omni Combined W.E., LLC

By: _____
William L. DiStefano, Jr
Managing Partner

**TENANT**
THE LASIK VISION INSTITUTE, LLC

By: _____
Markus A. Hockenson,
President & CEO

Exhibit 2

# Omni Combined W.E., LLC

# Statement

1 West Exchange Center
Providence, RI 02903
401-781-6000

| Billing Period | Statement Date |
|---|---|
| 03/01/20 - 05/30/20 | 07/14/20 |

TO:

Lasik Vision Institute, LLC
1555 Palm Beach Lakes Blvd. Ste 600
West Palm Beach, FL 33401

| Property | Unit | Type | Acc # |
|---|---|---|---|
| WEC | 298-100 | Office Suite | 77 |

| Previous Balance | Current Charges | Current Credits | Balance Due |
|---|---|---|---|
| 0.00 | 31,131.93 | 9,378.00 | 21,753.93 |

| Last Payment | Amount Enclosed |
|---|---|
| 3/2/20  $9,378.00  ACH | |



PLEASE RETURN TOP PORTION WITH YOUR REMITTANCE

| Date | Reference | Description | | Amount |
|---|---|---|---|---|
| | | Previous Balance | | 0.00 |
| 03/01/20 | | Electric | Add'l Rent - Electric | 472.00 |
| 03/01/20 | | Gas | Add'l Rent - Gas | 109.00 |
| 03/01/20 | | Insurance | Add'l Rent - Insurance | 86.00 |
| 03/01/20 | | Sewer | Add'l Rent - Sewer | 44.00 |
| 03/01/20 | | Taxes | Add'l Rent - Taxes | 69.00 |
| 03/01/20 | | Trash | Add'l Rent - Trash | 29.00 |
| 03/01/20 | | Water | Add'l Rent - Water | 28.00 |
| 03/01/20 | | Janitorial Charge | Monthly Janitorial Charge | 541.00 |
| 03/01/20 | | Additional Utility Charge | Additional monthly utility charge | 234.00 |
| 03/01/20 | | Rent Charge | First Amended Lease - Year 1 | 7,406.00 |
| 03/01/20 | | Parking | $120 per space | 360.00 |
| 03/02/20 | ACH | Payment Received | March 2020 Rent Payment | -9,378.00 |
| 03/16/20 | IV# 1028 | Janitorial Charge | additional cleaning visit (approved by Sara) 3.16.2020 | 75.00 |
| 04/01/20 | | Electric | Add'l Rent - Electric | 472.00 |
| 04/01/20 | | Gas | Add'l Rent - Gas | 109.00 |
| 04/01/20 | | Insurance | Add'l Rent - Insurance | 86.00 |
| 04/01/20 | | Sewer | Add'l Rent - Sewer | 44.00 |
| 04/01/20 | | Taxes | Add'l Rent - Taxes | 69.00 |
| 04/01/20 | | Trash | Add'l Rent - Trash | 29.00 |
| 04/01/20 | | Water | Add'l Rent - Water | 28.00 |
| 04/01/20 | | Janitorial Charge | Monthly Janitorial Charge | 541.00 |
| 04/01/20 | | Additional Utility Charge | Additional monthly utility charge | 234.00 |
| 04/01/20 | | Rent Charge | First Amended Lease - Year 1 | 7,406.00 |
| 04/01/20 | | Parking | $120 per space | 360.00 |
| 04/06/20 | | Late Charge | Late Fee | 945.30 |
| 05/01/20 | | Rent Charge | First Amended Lease - Year 1 | 7,406.00 |
| 05/01/20 | | Electric | Add'l Rent - Electric | 472.00 |
| 05/01/20 | | Gas | Add'l Rent - Gas | 109.00 |
| 05/01/20 | | Insurance | Add'l Rent - Insurance | 86.00 |

## Omni Combined W.E., LLC

# Statement

1 West Exchange Center
Providence, RI 02903
401-781-6000

| Billing Period | Statement Date |
|---|---|
| 03/01/20 - 05/30/20 | 07/14/20 |

| Property | Unit | Type | Acc # |
|---|---|---|---|
| WEC | 298-100 | Office Suite | 77 |

| Previous Balance | Current Charges | Current Credits | Balance Due |
|---|---|---|---|
| 0.00 | 31,131.93 | 9,378.00 | 21,753.93 |

| Date | Reference | Description | | Amount |
|---|---|---|---|---|
| 05/01/20 | | Sewer | Add'l Rent - Sewer | 44.00 |
| 05/01/20 | | Taxes | Add'l Rent - Taxes | 69.00 |
| 05/01/20 | | Trash | Add'l Rent - Trash | 29.00 |
| 05/01/20 | | Water | Add'l Rent - Water | 28.00 |
| 05/01/20 | | Janitorial Charge | Monthly Janitorial Charge | 541.00 |
| 05/01/20 | | Additional Utility Charge | Additional monthly utility charge | 234.00 |
| 05/01/20 | | Parking | $120 per space | 360.00 |
| 05/06/20 | | Late Charge | Late Fee | 1,977.63 |

| | Amount |
|---|---|
| Sub Total | 21,753.93 |
| Unapplied Credits | 0.00 |
| Balance Due | 21,753.93 |

| Comments |
|---|
| |