# EXHIBIT A

**Extension to Standard Office Lease**

The Extension to Standard Office Lease is between Balogh Family Partnership II, LLC as the "Landlord" and The LASIK Vision Institute, LLC, as the "Tenant."

Whereas Landlord and Tenant entered into a Standard Office Lease dated December 12, 2012 for the premises located at 8211 W. Broward Blvd., Suite #PH2-5th Floor, Plantation, FL 33324 (the "Premises").

The Standard Office Lease is extended for a period of one (1) years and shall expire on September 30, 2021.

Commencing October 1, 2020, the minimum base rent shall increase to $5,127.00 per month plus sales tax. Tenant shall continue to pay common area and parking charges as per Tenant's lease agreement.

Commencing October 1, 2020, Landlord agrees to apply a portion of Tenant's security deposit to base rent and its applicable sales tax to the final three (3) each months of this extended term.

Landlord and Tenant agree that the verified BOMA measurements for the Premises are 3,563 square feet; however, Landlord and Tenant agree to bill all rent and additional rent based on the 3,418 square feet reflected in Tenant's original lease agreement.

Tenant shall be permitted to install a monument sign on West Broward Boulevard and/or on the building facade facing West Broward Boulevard at Tenants sole cost and expense with Landlord's prior written consent/approval of plans and approval from all governing municipalities.

So long as Tenant is not in default of its lease for any reason whatsoever and in the event contiguous space to Tenant's leased premises becomes available for lease, Landlord shall immediately notify Tenant of its availability and Tenant shall have five (5) days to exercise its right of first (1st) refusal, in writing to Landlord, to lease the premises at the greater of a) fair market value or b) base rent of Tenant's current leased premises.

So long as Tenant is not in default of its lease for any reason whatsoever and so long as Tenant provides Landlord with a minimum of six (6) months prior written notice of its intent to renew, Tenant shall have two (2) three (3) year renewal option. The minimum base rent for the initial lease year of the renewal option shall be at the prior year's base rent plus three (3) percent and shall increase by three (3) percent each year thereafter.

In order to comply with the provisions of Section 713.10, Florida Statutes, it is specifically provided that neither Tenant nor anyone claiming by, through or under Tenant, including, but not limited to, contractors, subcontractors, materialmen, mechanics and laborers, shall have any right to file or place any construction lien of any kind whatsoever upon the Premises or improvements thereon, any such liens are hereby specifically prohibited. All parties with whom Tenant may deal shall be put on notice that Tenant has no power to subject Landlord's interest to any construction lien of any kind or character, and all such persons so dealing with Tenant must look solely to the credit of Tenant, and not to Landlord's interests or assets. Therefore, potential lienors are hereby put on notice that no lien may be filed against the Landlord's property for any work done or behalf of the Tenant(s) or any other parties on any portion of said Property or Premises.

Counterparts. This Extension to Standard Office Lease may be executed in any number of multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

All other terms and conditions of Standard Office Lease dated December 12, 2012 shall remain in full force and effect.

Agreed to between the parties on February 27, 2020

Balogh Family Partnership II, LLC

_As to Landlord_   Traci A. Bridges    Orli Teitelbaum, COO

_As to Landlord_   Christeen Ladd

The LASIK Vision Institute, LLC

_Lisa Melamed_
Lisa Melamed (Mar 13, 2020)

_As to Tenant_   Lisa Melamed, Interim CEO

_As to Tenant_

**Signature:** _Lisa Melamed_
Lisa Melamed (Mar 13, 2020)

**Email:** lmelamed@vgroupholdings.com

**Title:** Interim CEO

**Company:** Vision Group Holdings

# (LVI11) BFP2PL The Lasik Vision extension_LL executed (002)

Final Audit Report                                                                2020-03-13

| | |
|---|---|
| Created: | 2020-03-10 |
| By: | Juli Askew (jaskew@vgroupholdings.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAuTm5Zl5d7Z6jHVL-cx2AWP_x299VeQVt |

## "(LVI11) BFP2PL The Lasik Vision extension_LL executed (002)" History

🗋 Document created by Juli Askew (jaskew@vgroupholdings.com)
2020-03-10 - 7:00:34 PM GMT- IP address: 170.55.20.51

↳ Document emailed to Lisa Melamed (lmelamed@vgroupholdings.com) for signature
2020-03-10 - 7:02:12 PM GMT

🗋 Email viewed by Lisa Melamed (lmelamed@vgroupholdings.com)
2020-03-13 - 10:19:02 PM GMT- IP address: 170.55.20.51

↳ Document e-signed by Lisa Melamed (lmelamed@vgroupholdings.com)
Signature Date: 2020-03-13 - 10:19:36 PM GMT - Time Source: server- IP address: 170.55.20.51

✅ Signed document emailed to Thomas Piteo (tpiteo@vgroupholdings.com), Lisa Melamed (lmelamed@vgroupholdings.com) and Juli Askew (jaskew@vgroupholdings.com)
2020-03-13 - 10:19:36 PM GMT

Adobe Sign

LEASE BY AND BETWEEN

THE LASIK VISION INSTITUTE, LLC

AND

FUND VIII POINTE BROWARD, L.P.

OF

8211 W. Broward Boulevard
Plantation, Florida 33324

DATED

December 12, 2012

## TABLE OF CONTENTS

PAGE

1. Basic Lease Provisions............................................................................................................1

2. Premises..................................................................................................................................3
    2.1. Lease of Premises and Definition of Project. ...............................................................3
    2.2. Calculation of Size of Building and Premises. .............................................................3
    2.3. Common Areas-Defined. ...............................................................................................3

3. Term. ......................................................................................................................................3
    3.1. Term and Commencement Date.....................................................................................3
    3.2. Delay in Possession. ......................................................................................................3
    3.3. Delays Caused by Tenant. .............................................................................................3
    3.4. Tender of Possession. ....................................................................................................4
    3.5. Early Possession. ...........................................................................................................4

4. Rent. .......................................................................................................................................4
    4.1. Base Rent. ......................................................................................................................4
    4.2. Operating Expenses. ......................................................................................................4

5. Security Deposit. ....................................................................................................................7

6. Use. ........................................................................................................................................7
    6.1. Use...................................................................................................................................7
    6.2. Compliance with Law. ...................................................................................................7
    6.3. Condition of Premises. ..................................................................................................8

7. Maintenance, Repairs and Alterations. .................................................................................8
    7.1. Landlord's Obligations. .................................................................................Error! Bookn
    7.2. Tenant's Obligations. .....................................................................................................9
    7.3. Alterations and Additions. .............................................................................................9
    7.4. Failure of Tenant to Remove Property. .......................................................................10

8. Insurance. .............................................................................................................................10
    8.1. Insurance-Tenant. ........................................................................................................10
    8.2. Insurance-Landlord......................................................................................................11
    8.3. Insurance Policies. .......................................................................................................11
    8.4. Waiver of Subrogation. ................................................................................................11
    8.5. Coverage.......................................................................................................................11

9. Damage or Destruction.........................................................................................................12
    9.1. Effect of Damage or Destruction.................................................................................12
    9.2. Definition of Material Damage.....................................................................................12
    9.3. Abatement of Rent........................................................................................................12
    9.4. Tenant's Acts. ..............................................................................................................12
    9.5. Tenant's Property. ........................................................................................................12
    9.6. Waiver...........................................................................................................................12

10. Real and Personal Property Taxes. .....................................................................................13
    10.1. Definition of "Real Property Tax." ............................................................................13

# TABLE OF CONTENTS
## (Continued)

PAGE

10.2.  Personal Property Taxes. ...13
10.3.  Reassessments. ...13

11. Utilities. ...13
11.1.  Services Provided by Landlord. ...13
11.2.  Occupant Density. ...13
11.3.  Hours of Service. ...13
11.4.  Excess Usage by Tenant. ...14
11.5.  Interruptions. ...14

12. Assignment and Subletting. ...14
12.1.  Landlord's Consent Required. ...14
12.2.  Leveraged Buy-Out. ...15
12.3.  Standard For Approval. ...15
12.4.  Additional Terms and Conditions. ...15
12.5.  Additional Terms and Conditions Applicable to Subletting. ...16
12.6.  Transfer Premium from Assignment or Subletting. ...16
12.7.  Landlord's Option to Recapture Space. ...16
12.8.  Landlord's Expenses. ...16

13. Default; Remedies. ...17
13.1.  Default by Tenant. ...17
13.2.  Remedies. ...18
13.3.  Default by Landlord. ...19
13.4.  Late Charges. ...19
13.5.  Interest on Past-due Obligations. ...19
13.6.  Payment of Rent and Security Deposit After Default. ...19

14. Landlord's Right to Cure Default; Payments by Tenant. ...19

15. Condemnation. ...20

16. Vehicle Parking. ...20
16.1.  Use of Parking Facilities. ...20
16.2. ...20

17. Broker's Fee. ...20

18. Estoppel Certificate. ...21
18.1.  Delivery of Certificate. ...21
18.2.  Failure to Deliver Certificate. ...21

19. Landlord's Liability. ...21

20. Indemnity. ...21

21. Exemption of Landlord from Liability. ...21

18011-     TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

TABLE OF CONTENTS
(Continued)

PAGE

22. Hazardous Material........................................................................................................22
    22.1.  Definition and Consent. .......................................................................22
    22.2.  Duty to Inform Landlord. .....................................................................22
    22.3.  Inspection; Compliance. ......................................................................22

23. Medical Waste..............................................................................................................22
    23.1.  Disposal of Medical Waste. .................................................................22
    23.2.  Duty to Inform Landlord. .....................................................................23
    23.3.  Inspection; Compliance. ......................................................................23

24. Tenant Improvements...................................................................................................23

25. Subordination...............................................................................................................23
    25.1.  Effect of Subordination. ......................................................................23
    25.2.  Execution of Documents. ....................................................................23

26. Options.........................................................................................................................23
    26.1.  Definition. .............................................................................................23
    26.2.  Options Personal. ...............................................................................24
    26.3.  Multiple Options. .................................................................................24
    26.4.  Effect of Default on Options. ...............................................................24
    26.5.  Limitations on Options. .......................................................................24
    26.6.  Notice of Exercise of Option. ..............................................................24

27. Landlord Reservations. ................................................................................................24

28. Changes to Project. .....................................................................................................24

29. Intentionally Omitted.....................................................................................................24

30. Holding Over. ...............................................................................................................24

31. Landlord's Access. .......................................................................................................25
    31.1.  Access..................................................................................................25
    31.2.  Keys. ...................................................................................................25

32. Security Measures. ......................................................................................................25

33. Easements. ..................................................................................................................25

34. Transportation Management..........................................................................................25

35. Severability...................................................................................................................25

36. Time of Essence...........................................................................................................25

37. Definition of Additional Rent.........................................................................................25

iii

## TABLE OF CONTENTS
### (Continued)

|  |  | PAGE |
|---|---|---|
| 38. | Incorporation of Prior Agreements. | 25 |
| 39. | Amendments. | 25 |
| 40. | Notices. | 26 |
| 41. | Waivers. | 26 |
| 42. | Covenants. | 26 |
| 43. | Binding Effect; Choice of Law. | 26 |
| 44. | Attorneys' Fees. | 26 |
| 45. | Auctions. | 26 |
| 46. | Signs. | 26 |
| 47. | Merger. | 27 |
| 48. | Quiet Possession. | 27 |
| 49. | Authority. | 27 |
| 50. | Conflict. | 27 |
| 51. | Multiple Parties. | 27 |
| 52. | Interpretation. | 27 |
| 53. | Prohibition Against Recording. | 27 |
| 54. | Relationship of Parties. | 27 |
| 55. | Rules and Regulations. | 27 |
| 56. | Right to Lease. | 27 |
| 57. | Security Interest. | 27 |
| 58. | Security for Performance of Tenant's Obligations. | 28 |
| 59. | Financial Statements. | 28 |
| 60. | Attachments. | 28 |
| 61. | Confidentiality. | 28 |

18011-

TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

## TABLE OF CONTENTS
### (Continued)

| | | PAGE |
|---|---|---|
| 62. | OFAC Certification. | 28 |
| 63. | Radon Gas. | 28 |
| 64. | Moisture and Mold. | 28 |
| 65. | WAIVER OF JURY TRIAL. | 29 |
| 66. | Counterpart Copies/Electronic Signatures. | 29 |
| | ADDENDUM | Add-1 |
| | EXHIBIT A | A-1 |
| | EXHIBIT B | B-1 |
| | EXHIBIT C | C-1 |
| | EXHIBIT D | D-1 |
| | EXHIBIT E | E-1 |
| | SCHEDULE 1 | Sch 1-1 |
| | SCHEDULE 1-A | Sch 1-A-1 |

**POINTE BROWARD**
**8211 W. BROWARD BOULEVARD**
**PLANTATION, FLORIDA 33324**
**STANDARD OFFICE LEASE**

1. **Basic Lease Provisions.**

    1.1.    **Parties:**  This Lease, dated for reference purposes only December 12, 2012, is made by and between **FUND VIII POINTE BROWARD, L.P.**, a Delaware limited partnership ("Landlord") and **THE LASIK VISION INSTITUTE, LLC,** a Delaware limited liability company ("Tenant").

    1.2.    **Premises:**  Suite Number PH2 located on the fifth (5th) floor of the Building, as shown on Exhibit "A" attached hereto (the "Premises").

    1.3.    **Rentable Area of Premises:**  3,418 rentable square feet.

    1.4.    **Building Address:**  8211 W. Broward Boulevard, Plantation, Florida 33324.

    1.5.    **Use:**  General office purposes, clinical and outpatient lasik surgery and other elective surgical procedures, the retail sale of eyeglasses and eyeglass products, and all uses ancillary thereto, subject to the requirements and limitations contained in Section 6.

    1.6.    **Term:**  Seven (7) years and six (6) months.

    1.7.    **Commencement Date:**  April 1, 2013.

    1.8.    **Base Rent:**  The Base Rent shall be adjusted annually on each anniversary of the Commencement Date (unless the Commencement Date is other than the first day of a month, in which event the Base Rent shall be adjusted annually commencing on the first anniversary of the first day of the calendar month following the Commencement Date) during the Term of the Lease as follows:

| Lease Period in Full Calendar Months | Annual Base Rent (annualized amount) | Monthly Base Rent |
| --- | --- | --- |
| 01 – 12* | $49,560.96 | $4,130.08 |
| 13 – 24 | $51,064.92 | $4,255.41 |
| 25 – 36 | $52,568.88 | $4,380.74 |
| 37 – 48 | $54,141.12 | $4,511.76 |
| 49 – 60 | $55,781.76 | $4,648.48 |
| 61 – 72 | $57,456.60 | $4,788.05 |
| 73 – 84 | $59,199.72 | $4,933.31 |
| 85 – 90 | $60,942.96 | $5,078.58 |

*subject to the Rent Abatement (defined in Paragraph 1 of the Addendum)

    1.9.    **Base Rent, Estimated Monthly Operating Expenses and Sales Tax Paid Upon Execution:**  $5,283.66, which shall be applied to the Base Rent and estimated monthly Operating Expense plus Florida sales tax payment due and owing for the first (1st) full calendar month of the Term for which rent is due hereunder, subject to Paragraph 1 of the Addendum.

    1.10.    **Security Deposit:**  $40,000.00.

    1.11.    **Tenant's Share:**  4.45%.

    1.12.    **Estimated Monthly Operating Expense Payment:**  $2,919.54.

    1.13.    **Number of Parking Spaces:**  Ten (10) parking spaces available for Tenant's use on an unreserved basis in common with other occupants of the Project; Four (4) reserved parking spaces.

1.14.   **Initial Monthly Parking Rates Per Space:** $40.00 per month plus Florida sales tax for each reserved space; No charge for unreserved spaces.

1.15.   **Real Estate Broker:**

   Landlord:      Pointe Group Realty, Inc.

   Tenant:        CBRE

1.16.   **Attachments to Lease:** Addendum, Exhibit A - "Premises", Exhibit B - "Verification Letter", Exhibit C - "Rules and Regulations", Exhibit D - "Form of Letter of Credit", Exhibit E – "License Agreement for Satellite Dish", Schedule 1 - "Work Letter Agreement", Schedule 1-A – "Scope of Work".

1.17.   **Address for Notices:**

   Landlord:      Fund VIII Pointe Broward, L.P.
                  c/o Pointe Group Management
                  8211 W. Broward Boulevard
                  Plantation, Florida 33324
                  Attention:  Property Manager – Broward Assets

   With Copy To:  TA Associates Realty
                  28 State Street
                  Boston, Massachusetts 02109
                  Attention:  Asset Manager – Plantation, Florida

   Tenant:        The Lasik Vision Institute, LLC
                  2000 Palm Beach Lakes Boulevard, Suite 800
                  West Palm Beach, Florida 33409
                  Attention:  President

1.18.   **Agent for Service of Process:** The name and address of Tenant's registered agent for service of process is:

                  Matthew Zifrony, Esq.
                  Tripp Scott, P.A.
                  110 S.E. 6th Street, 15th Floor
                  Fort Lauderdale, Florida 33301

1.19    **Interpretation.** The Basic Lease Provisions shall be interpreted in conjunction with all of the other terms and conditions of this Lease.  Other terms and conditions of this Lease modify and expand on the Basic Lease Provisions.  If there is a conflict between the Basic Lease Provisions and the other terms and conditions of this Lease, the other terms and conditions shall control.

## 2. Premises.

**2.1. Lease of Premises and Definition of Project.** The "Premises" shall mean the area shown on Exhibit "A" to this Lease. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, upon all of the conditions set forth herein the Premises, together with certain rights to the Common Areas (as defined in Section 2.3 below) as hereinafter specified. The Premises shall not include an easement for light, air or view. The building of which the Premises is a part (the "Building"), the Common Areas, the land upon which the same are located, along with all other buildings and improvements thereon or thereunder, including all parking facilities, are herein collectively referred to as the "Project."

**2.2. Calculation of Size of Building and Premises.** The number of rentable square feet in the Premises has been calculated in accordance with the Standard Method for measuring Floor Area in Office Buildings, ANSI Z65.1-1996, as promulgated by the Building Owners and Managers Association ("BOMA") International. If the rentable square feet in the Premises changes after this Lease is executed by Landlord and Tenant, the Base Rent and any advance rent shall be adjusted by multiplying the actual number of rentable square feet in the Premises by the per square foot rental obtained by dividing the Base Rent initially set forth in Section 1.8 by the number of rentable square feet initially set forth in Section 1.3. If the number of rentable square feet in the Premises is changed, Tenant's Share shall be adjusted as provided in Section 4.2(a).

**2.3. Common Areas-Defined.** The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project that are designated by Landlord from time to time for the general non-exclusive use of Landlord, Tenant and the other tenants of the Project and their respective employees, suppliers, customers and invitees, including, but not limited to, common entrances, lobbies, corridors, stairwells, public restrooms, elevators, parking areas, loading and unloading areas, roadways and sidewalks. Landlord may also designate other land and improvements outside the boundaries of the Project to be a part of the Common Areas, provided that such other land and improvements have a reasonable and functional relationship to the Project.

## 3. Term.

**3.1. Term and Commencement Date.** The Term and Commencement Date of this Lease are as specified in Sections 1.6 and 1.7. The Commencement Date set forth in Section 1.7 is an estimated Commencement Date. Subject to the limitations contained in Section 3.3 below, the actual Commencement Date shall be the date possession of the Premises is tendered to Tenant pursuant to Section 3.4 below; provided, however, that if the Commencement Date is other than the first day of a month, then the Term of this Lease shall be computed from the first day of the calendar month following the Commencement Date. When the actual Commencement Date is established by Landlord, Tenant shall, within five (5) days after Landlord's request, complete and execute the letter attached hereto as Exhibit "B" and deliver it to Landlord. Tenant's failure to execute the letter attached hereto as Exhibit "B" within said five (5) day period shall be a material default hereunder and shall constitute Tenant's acknowledgement of the truth of the facts contained in the letter delivered by Landlord to Tenant.

**3.2. Delay in Possession.** Notwithstanding the estimated Commencement Date specified in Section 1.7, if for any reason Landlord cannot deliver possession of the Premises to Tenant on said date, despite its use of commercially reasonable efforts, Landlord shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Tenant hereunder; provided, however, in such a case, Tenant shall not be obligated to pay rent or perform any other obligation of Tenant under this Lease, except as may be otherwise provided in this Lease, until possession of the Premises is tendered to Tenant, as defined in Section 3.4. If Landlord shall not have tendered possession of the Premises to Tenant within one hundred twenty (120) days following the estimated Commencement Date specified in Section 1.7, as the same may be adjusted in accordance with Section 3.3 or in accordance with the terms of any work letter agreement entered into by Landlord and Tenant, Tenant may, at Tenant's option, by notice in writing to Landlord within ten (10) days after the expiration of the one hundred twenty (120) day period, terminate this Lease. If Tenant terminates this Lease as provided in the preceding sentence, the parties shall be discharged from all obligations hereunder, except that Landlord shall return any money previously deposited with Landlord by Tenant; and provided further, that if such written notice by Tenant is not received by Landlord within said ten (10) day period, Tenant shall not have the right to terminate this Lease as provided above unless Landlord fails to tender possession of the Premises to Tenant within one hundred eighty (180) days following the estimated Commencement Date specified in Section 1.7, as the same may be adjusted in accordance with Section 3.3 or in accordance with the terms of any work letter agreement entered into by Landlord and Tenant. If Landlord is unable to deliver possession of the Premises to Tenant on the Commencement Date due to a "Force Majeure Event," the Commencement Date shall be extended by the period of the delay caused by the Force Majeure Event, said period of extension due to delays caused by Force Majeure Events not to exceed sixty (60) days in the aggregate. A Force Majeure Event shall mean fire, earthquake, weather delays or other acts of God, strikes, boycotts, war, riot, insurrection, embargoes, shortages of equipment, labor or materials, delays in issuance of governmental permits or approvals, or any other cause beyond the reasonable control of Landlord.

**3.3. Delays Caused by Tenant.** There shall be no abatement of rent, and the one hundred twenty (120) day period and the one hundred eighty (180) day period specified in Section 3.2 shall be deemed extended, to the extent of any delays caused by acts or omissions of Tenant, Tenant's agents, employees and contractors, or for Tenant delays as defined in the work letter agreement attached to this Lease, if any (hereinafter "Tenant Delays"). Tenant shall pay to Landlord an amount equal to one thirtieth (1/30th) of the Base Rent due for the first full calendar month of the Term for each day of Tenant Delay. For purposes of the foregoing calculation, the Base Rent payable for the first full calendar month of the Term shall not be reduced by any abated rent,

3

conditionally waived rent, free rent or similar rental concessions, if any.   Landlord and Tenant agree that the foregoing payment constitutes a fair and reasonable estimate of the damages Landlord will incur as the result of a Tenant Delay.  Within thirty (30) days after Landlord tenders possession of the Premises to Tenant, Landlord shall notify Tenant of Landlord's reasonable estimate of the date Landlord could have delivered possession of the Premises to Tenant but for the Tenant Delays.  Within five (5) business days after delivery of said notice, Tenant shall pay to Landlord the amount described above for the period of Tenant Delay.

**3.4.  Tender of Possession.**  Possession of the Premises shall be deemed tendered to Tenant when Landlord's architect or agent has determined that (a) the improvements to be provided by Landlord pursuant to a work letter agreement, if any, are substantially completed and, if necessary have been approved by the appropriate governmental entity, (b) the Project utilities are ready for use in the Premises, (c) Tenant has reasonable access to the Premises, and (d) three (3) days shall have expired following advance written notice to Tenant of the occurrence of the matters described in (a), (b) and (c) above of this Section 3.4.  If improvements to the Premises are constructed by Landlord, the improvements shall be deemed "substantially" completed when the improvements have been completed except for minor items or defects which can be completed or remedied after Tenant occupies the Premises without causing substantial interference with Tenant's use of the Premises.

**3.5.  Early Possession.**  Provided that Tenant does not interfere with or delay the completion by Landlord or its agents or contractors of the construction of any tenant improvements, Tenant shall have the right to enter the Premises up to thirty (30) days prior to the anticipated Commencement Date only for the purpose of installing furniture, trade fixtures, equipment, and similar items. Tenant shall be liable for any damages or delays caused by Tenant's activities at the Premises. Such occupancy shall be subject to all provisions of this Lease, provided, however; that so long as Tenant has not begun operating its business from the Premises, the foregoing activity shall not constitute the delivery of possession of the Premises to Tenant and neither the Term of the Lease nor Tenant's obligation to pay Base Rent or any additional rent hereunder shall commence as a result of said activities. Prior to entering the Premises, Tenant shall obtain all insurance it is required to obtain by the Lease and shall provide certificates of said insurance to Landlord. Tenant shall coordinate such entry with Landlord's building manager, and such entry shall be made in compliance with all terms and conditions of this Lease and the Rules and Regulations attached hereto.  In the event Tenant occupies the Premises prior to the Commencement Date for any other purpose, other than as expressly provided herein, such occupancy shall not change the termination date, but Tenant shall pay Base Rent and all other charges provided for in this Lease during the period of such occupancy.

## 4.  Rent.

**4.1.  Base Rent.**  Subject to adjustment as hereinafter provided in Section 4.3, Tenant shall pay to Landlord the Base Rent for the Premises set forth in Section 1.8, without offset or deduction unless specifically set forth in this Lease on the first day of each calendar month during the Term of this Lease.  At the time Tenant executes this Lease it shall pay to Landlord the advance Base Rent and estimated monthly Operating Expense payment described in Section 1.9. Base Rent for any period during the Term hereof which is for less than one month shall be prorated based upon the actual number of days of the calendar month involved.  Base Rent and all other amounts payable to Landlord hereunder shall be payable to Landlord in lawful money of the United States and Tenant shall be responsible for delivering said amounts to Landlord at the address stated herein or to such other persons or to such other places as Landlord may designate in writing.  In addition to Base Rent, Tenant shall also pay to Landlord each month a sum equal to any sales tax, tax on rentals and other similar charges, taxes and/or impositions now or at any time hereafter imposed by the State of Florida and/or by the county or municipality in which the Premises are located to the extent based upon the privilege of renting space leased hereunder or upon the amount of Base Rent, Operating Expenses and other charges collected therefor; provided, however, the foregoing shall exclude any federal or state income taxes imposed upon Landlord.

### See Addendum Paragraph 1

**4.2.  Operating Expenses.**  Tenant shall pay to Landlord during the Term hereof, in addition to the Base Rent, Tenant's Share of all Operating Expenses for each calendar year of the Term hereof.  If less than 95% of the rentable square feet in the Project is occupied by tenants or Landlord is not supplying services to 95% of the rentable square feet of the Project at any time during any calendar year, Operating Expenses for such calendar year that constitute variable rather than fixed costs (as determined in accordance with sound accounting practices and principles) shall be an amount equal to such Operating Expenses which would normally be expected to be incurred had 95% of the Project's rentable square feet been occupied and had Landlord been supplying services to 95% of the Project's rentable square feet throughout such calendar year (hereinafter the "Grossed Up Operating Expenses").  Subject to the provisions of Section 4.2(h) below, Landlord's good faith estimate of Grossed Up Operating Expenses shall not be subject to challenge or recalculation by Tenant.  Tenant's Share of Operating Expenses shall be determined in accordance with the following provisions:

(a)  **"Tenant's Share"** is defined as the percentage set forth in Section 1.11, which percentage has been determined by dividing the number of rentable square feet in the Premises by the total number of rentable square feet in the Project and multiplying the resulting quotient by one hundred (100).  In the event that the number of rentable square feet in the Project or the Premises changes, Tenant's Share shall be adjusted in the year the change occurs, and Tenant's Share for such year shall be determined on the basis of the days during such year that each Tenant's Share was in effect.

(b)  Tenant's Share of the Operating Expenses for any period during the Term hereof which is less than a calendar year shall be prorated according to that portion of such calendar year as to which Tenant is responsible during the Term.

18011-                                                                                                    TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

(c)  "Operating Expenses" shall include all costs, expenses and fees incurred by Landlord in connection with or attributable to the Project, including but not limited to, the following items: (i) all costs, expenses and fees associated with or attributable to the ownership, management, operation, repair, maintenance, improvement, alteration and replacement of the Project, or any part thereof, including but not limited to, the following: (A) all surfaces, coverings, decorative items, carpets, drapes, window coverings, parking areas, loading and unloading areas, trash areas, roadways, sidewalks, stairways, walls, structural elements, landscaped areas, striping, bumpers, irrigation systems, lighting facilities, building exteriors and roofs, fences and gates; (B) all heating, ventilating and air conditioning equipment ("HVAC") (including, but not limited to, the cost of replacing or retrofitting HVAC equipment to comply with laws regulating or prohibiting the use or release of chlorofluorocarbons or hydrochlorofluorocarbons), plumbing, mechanical, electrical systems, life safety systems and equipment, telecommunication equipment, elevators, escalators, tenant directories, fire detection systems including sprinkler system maintenance and repair; (ii) the cost of trash disposal, janitorial services and security services and systems; (iii) the cost of all insurance purchased by Landlord and enumerated in Section 8 of this Lease, including any deductibles; (iv) the cost of water, sewer, gas, electricity, and other utilities available at the Project and paid by Landlord; (v) the cost of labor, salaries and applicable fringe benefits incurred by Landlord; (vi) the cost of materials, supplies and tools used in managing, maintaining and/or cleaning the Project; (vii) the cost of reasonable accounting fees, management fees, legal fees and consulting fees attributable to the ownership, operation, management, maintenance and repair of the Project plus the reasonable cost of any space occupied by the property manager and leasing agent (if Landlord is the property manager, Landlord shall be entitled to receive a fair market management fee); (viii) the cost of operating, replacing, modifying and/or adding improvements or equipment mandated by any law, statute, regulation or directive of any governmental agency and any repairs or removals necessitated thereby (including, but not limited to, the cost of complying with the Americans With Disabilities Act and regulations of the Occupational Safety and Health Administration); (ix) payments made by Landlord under any easement, license, operating agreement, declaration, restrictive covenant, or instrument pertaining to the payment or sharing of costs among property owners; (x) any business property taxes or personal property taxes imposed upon the fixtures, machinery, equipment, furniture and personal property used in connection with the operation of the Project; (xi) the cost of all business licenses, including Business Professional and Occupational License Taxes and Business Improvements Districts Taxes, any gross receipt taxes based on rental income or other payments received by Landlord, commercial rental taxes or any similar taxes or fees; (xii) transportation taxes, fees or assessments, including but not limited to, mass transportation fees, metrorail fees, trip fees, regional and transportation district fees; (xiii) all costs and expenses associated with or related to the implementation by Landlord of any transportation demand management program or similar program; (xiv) fees assessed by any air quality management district or other governmental or quasi-governmental entity regulating pollution; (xv) the cost of installing intra-building network cabling ("INC") and maintaining, repairing, securing and replacing existing INC; (xvi) the cost of all Real Property Taxes as defined in Section 10 of this Lease; and (xvii) the cost of any other service provided by Landlord or any cost that is elsewhere stated in this Lease to be an "Operating Expense". Landlord shall have the right but not the obligation, from time to time, to equitably allocate some or all of the Operating Expenses among different tenants of the Project or among the different buildings which comprise the Project (the "Cost Pools"). Such Cost Pools may include, but shall not be limited to, the office space tenants of the Project and the retail space tenants of the Project.

(d)  Notwithstanding anything to the contrary set forth in this Section 4.2 of the Lease, Operating Expenses expressly exclude the following:

(i)  costs associated with leasing space in the Building or the sale of any interest in the Building, including, without limitation, advertising and marketing, commissions or any amounts paid for or on behalf of tenants of the Project such as space planning, moving costs, rental and other tenant concessions;

(ii)  costs of renovating or otherwise improving space for new tenants or in renovating space vacated by any tenant;

(iii)  any interest and principal payments due under any mortgage or any other non-operating debt encumbering the Project;

(iv)  depreciation and amortization of the Building or any equipment, machinery, fixtures or improvements therein except for amortization of capital improvements specifically permitted in the Lease;

(v)  costs incurred by Landlord for capital improvements, except for the cost incurred for such capital improvements made: (A) to conform with laws (which are amended, become effective, or are interpreted or enforced differently after the date of this Lease; (B) to provide or maintain Building standards (other than Building standard tenant improvements); or (C) with the primary purpose of reducing or controlling increases in Operating Expenses, such as lighting retrofit and installation of energy management systems;

(vi)  any expense for which Landlord is reimbursed from Tenant, any other tenant of the Project, or under the terms of any insurance policy, warranty, or condemnation award;

(vii)  costs incurred to contain, abate, remove or otherwise clean up the Building or the Project required as a result of the presence of Hazardous Materials in, about or below the Building or the Project to the extent caused by Landlord or another tenant;

(viii)  Landlord's general corporate overhead and general and administrative expenses except as it relates specifically to the actual management of the Project;

5

(ix)     costs of electricity sold to tenants of the Building by Landlord or any other special service or benefit to the tenants or service or benefit in excess of that furnished to Tenant whether or not Landlord receives reimbursement from such tenants as an additional charge;

(x)      ground rent payments;

(xi)     salaries, wages and benefits of any employee above the level of senior property manager; or any salary, wages, or other compensation or benefits for off-site employees applicable to the time spent working at other buildings, other than the Building manager (provided that with respect to each employee that services the Building and other buildings, a pro rata portion of such employee's salary shall be included in Operating Expenses);

(xii)    all "tenant allowances", "tenant concessions" and other costs or expenses incurred in completing, fixturing, furnishing, renovating or otherwise improving, decorating or redecorating space for tenants or other occupants of the Building, or vacant lease space in the Building including space planning fees;

(xiii)   costs incurred in connection with the sale, selling or change of ownership of the Building, including brokerage commissions, attorneys' fees and accountants' fees, closing costs, title insurance premiums, transfer taxes and interest charges;

(xiv)    costs resulting directly from the gross negligence or willful misconduct of Landlord or its agents, or employees and/or any judicial determination of the breach of Landlord's obligations under this Lease or any other lease at the Project;

(xv)     costs relating to maintaining Landlord's existence, either as a corporation, partnership, trust or other entity, such as trustee's fees, annual fees, partnership organization or administration expenses, deed recordation expenses, legal and accounting fees (other than with respect to Building operations);

(xvi)    cost of defending and correcting any code violations at the Project, if such code was applicable to the Project and such violation existed prior to the Commencement Date; and

(xvii)   costs related to the enforcement of lease provisions against other tenants, including without limitation, attorney's fees and court costs.

The foregoing definition of Operating Expenses is applicable to Tenant only and Landlord is not prohibited from assessing other tenants for any and all other costs and expenses incurred by Landlord in connection with the operation, maintenance and repair of the Building, the land and all easements, rights and appurtenances thereto.

(e)  If the cost incurred in making an improvement or replacing any equipment is not fully deductible as an expense in the year incurred in accordance with generally accepted accounting principles, the cost shall be amortized over the useful life of the improvement or equipment, as reasonably determined by Landlord, together with an interest factor on the unamortized cost of such item equal to the lesser of (i) twelve percent (12%) per annum, or (ii) the maximum rate of interest permitted by applicable law.

(f)  Tenant's Share of Operating Expenses shall be payable by Tenant within ten (10) days after a reasonably detailed statement of actual expenses is presented to Tenant by Landlord.  At Landlord's option, however, Landlord may, from time to time, estimate what Tenant's Share of Operating Expenses will be, and the same shall be payable by Tenant monthly during the Term of the Lease, on the same day as the Base Rent is due hereunder.  In the event that Tenant pays Landlord's estimate of Tenant's Share of Operating Expenses, Landlord shall use its best efforts to deliver to Tenant within one hundred eighty (180) days after the expiration of each calendar year a reasonably detailed statement (the "Statement") showing Tenant's Share of the actual Operating Expenses incurred during such year.  Landlord's failure to deliver the Statement to Tenant within said period shall not constitute Landlord's waiver of its right to collect said amounts or otherwise prejudice Landlord's rights hereunder.  If Tenant's payments under this Section 4.2(f) during said calendar year exceed Tenant's Share as indicated on the Statement, Tenant shall be entitled to credit the amount of such overpayment against Tenant's Share of Operating Expenses next falling due.  If Tenant's payments under this Section 4.2(f) during said calendar year were less than Tenant's Share as indicated on the Statement, Tenant shall pay to Landlord the amount of the deficiency within thirty (30) days after delivery by Landlord to Tenant of the Statement. Landlord and Tenant shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last calendar year for which Tenant is responsible for Operating Expenses, notwithstanding that the Term of the Lease may have terminated before the end of such calendar year; and this provision shall survive the expiration or earlier termination of the Lease.

(g)  The computation of Tenant's Share of Operating Expenses is intended to provide a formula for the sharing of costs by Landlord and Tenant and will not necessarily result in the reimbursement to Landlord of the exact costs it has incurred.

(h)  If Tenant disputes the amount set forth in the Statement, Tenant shall have the right, at Tenant's sole expense, not later than one hundred twenty (120) days following receipt of such Statement, to cause Landlord's books and records in respect to the calendar year which is the subject of the Statement to be audited by a certified public accountant selected by Tenant

6

and reasonably acceptable to Landlord. The audit shall take place at the offices of Landlord where its books and records are located at a mutually convenient time during Landlord's regular business hours. Before conducting any audit, Tenant must pay the full amount of Operating Expenses billed. Tenant shall have no right to conduct an audit or to give Landlord notice that it desires to conduct an audit at any time Tenant is in default under the Lease. The accountant conducting the audit shall be compensated on an hourly basis and shall not be compensated based upon a percentage of overcharges it discovers. No subtenant shall have any right to conduct an audit, and no assignee shall conduct an audit for any period during which such assignee was not in possession of the Premises. Tenant's right to undertake an audit with respect to any calendar year shall expire one hundred twenty (120) days after Tenant's receipt of the Statement for such calendar year, and such Statement shall be final and binding upon Tenant and shall, as between the parties, be conclusively deemed correct, at the end of such one hundred twenty (120) day period, unless prior thereto Tenant shall have given Landlord written notice of its intention to audit Operating Expenses for the calendar year which is the subject of the Statement. If Tenant gives Landlord notice of its intention to audit Operating Expenses, it must commence such audit within sixty (60) days after such notice is delivered to Landlord, and the audit must be completed within one hundred twenty (120) days after such notice is delivered to Landlord. If Tenant does not commence and complete the audit within such periods, the Statement which Tenant elected to audit shall be deemed final and binding upon Tenant and shall, as between the parties, be conclusively deemed correct. If the parties agree to the results of such audit, Tenant's Share of Operating Expenses shall be appropriately adjusted based upon the results of such audit, and the results of such audit shall be final and binding upon Landlord and Tenant. If the parties do not agree upon the inclusion or amount of any Operating Expense charged by Landlord, the sole remedy of Tenant shall be to conduct an audit within the time specified in this Lease and, if still in disagreement with Landlord, to submit the matter to arbitration within thirty (30) days after completion of the audit to request an adjustment to any disputed Operating Expense item. In no event will this Lease be terminable nor shall Landlord be liable for damages based upon any disagreement regarding an adjustment of Operating Expenses. Tenant agrees that the results of any Operating Expenses audit shall be kept strictly confidential by Tenant and shall not be disclosed to any other person or entity. Any such audit conducted pursuant to this Section shall be conducted at Tenant's sole cost and expense, unless such audit determines that an error has been made in Landlord's determination and calculation of Operating Expenses for the Project which results in an adjustment to the amounts determined and calculated by Landlord in the amount of five percent (5%) or more, in which case Landlord shall reimburse Tenant for the commercially reasonable fees and expenses of Tenant's accounting firm incurred in connection with such audit, provided Landlord's obligation to reimburse Tenant for any such fees and expenses shall not exceed the amount of the refund owed to Tenant in connection with any adjustment made pursuant to this Section.

### See Addendum Paragraph 2

**5. Security Deposit.** Tenant shall deliver to Landlord at the time it executes this Lease the Security Deposit set forth in Section 1.10 as security for Tenant's faithful performance of Tenant's obligations hereunder. If Tenant fails to pay Base Rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, Landlord may use all or any portion of said deposit for the payment of any Base Rent or other charge due hereunder, to pay any other sum to which Landlord may become obligated by reason of Tenant's default, or to compensate Landlord for any loss or damage which Landlord may suffer thereby. If Landlord so uses or applies all or any portion of said deposit, Tenant shall within ten (10) days after written demand therefor deposit cash with Landlord in an amount sufficient to restore said deposit to its full amount. Landlord shall not be required to keep said Security Deposit separate from its general accounts. If Tenant performs all of Tenant's obligations hereunder, said deposit, or so much thereof as has not heretofore been applied by Landlord, shall be returned, without payment of interest or other amount for its use, to Tenant (or, at Landlord's option, to the last assignee, if any, of Tenant's interest hereunder) at the expiration of the Term hereof, and after Tenant has vacated the Premises. No trust relationship is created herein between Landlord and Tenant with respect to said Security Deposit. Tenant acknowledges that the Security Deposit is not an advance payment of any kind or a measure of Landlord's damages in the event of Tenant's default. Tenant hereby waives the provisions of any law which is inconsistent with this Section 5.

### See Addendum Paragraph 3

**6. Use.**

**6.1. Use.** The Premises shall be used and occupied only for the purpose set forth in Section 1.5 and for no other purpose. If Section 1.5 only gives Tenant the right to use the Premises for general office use, by way of example and not limitation, general office use shall not include medical office use or any similar use, laboratory use, classroom use, any use not characterized by applicable zoning and land use restrictions as general office use, or any use which would require Landlord or Tenant to obtain a conditional use permit or variance from any federal, state or local authority, or any use not compatible, in Landlord's sole judgment, with a first class office building. Notwithstanding any permitted use inserted in Section 1.5, Tenant shall not use the Premises for any purpose which would violate the Project's certificate of occupancy, any conditional use permit or variance applicable to the Project or violate any covenants, conditions or other restrictions applicable to the Project. No exclusive use has been granted to Tenant hereunder.

**6.2. Compliance with Law.**

(a) Landlord warrants to Tenant that, to the best of Landlord's knowledge, the Premises, in the state existing on the date this Lease is executed by Landlord and Tenant, but without regard to alterations or improvements to be made by the Tenant or the use for which Tenant will occupy the Premises, does not violate any covenants or restrictions of record, or any applicable

7

building code, regulation or ordinance in effect on such date. If Tenant occupies the Premises at the time this Lease is executed, this warranty shall be of no force or effect.

(b)  Tenant shall, at Tenant's sole expense, promptly comply with all applicable laws (including without limitation, the requirements of the Americans With Disabilities Act that relate to the Premises, and all federal, state and local laws and regulations governing occupational safety and health), ordinances, rules, regulations, orders, certificates of occupancy, conditional use or other permits, variances, covenants and restrictions of record, the reasonable recommendations of Landlord's engineers or other consultants, and requirements of any fire insurance underwriters, rating bureaus or government agencies, now in effect or which may hereafter come into effect, whether or not they reflect a change in policy from that now existing, during the Term or any part of the Term hereof, relating in any manner to the Premises or the occupation and use by Tenant of the Premises. Tenant shall conduct its business and use the Premises in a lawful manner and shall not use or permit the use of the Premises or the Common Areas in any manner that will tend to create waste or a nuisance or shall tend to unreasonably disturb other occupants of the Project. Tenant shall obtain, at its sole expense, any permit or other governmental authorization required to operate its business from the Premises. Landlord shall not be liable for the failure of any other tenant or person to abide by the requirements of this Section or to otherwise comply with applicable laws and regulations, and Tenant shall not be excused from the performance of its obligations under this Lease due to such a failure.

(c)  Tenant shall have the right, throughout the Term and at its sole cost and expense, to file and obtain any license or governmental approval (collectively, the "Approvals") that Tenant requires in order to conduct its business as stated in Section 1.5 hereinabove at the Premises. Landlord agrees to use reasonable efforts, at no cost to Landlord, to cooperate with Tenant in Tenant's efforts to obtain each of the Approvals. Landlord shall, if reasonably required, join in the execution of any such applications.

6.3.  **Condition of Premises.** Except as otherwise provided in this Lease, Tenant hereby accepts the Premises and the Project in their condition existing as of the date this Lease is executed by Landlord and Tenant, subject to all applicable federal, state and local laws, ordinances, regulations and permits governing the use of the Premises, the Project's certificate of occupancy, any applicable conditional use permits or variances, and any easements, covenants or restrictions affecting the use of the Premises or the Project. Tenant acknowledges that it has satisfied itself by its own independent investigation that the Premises and the Project are suitable for its intended use, and that neither Landlord nor Landlord's agents has made any representation or warranty as to the present or future suitability of the Premises, or the Project for the conduct of Tenant's business except as set forth in this Lease.

7.  **Maintenance, Repairs and Alterations.**

7.1.  **Landlord's Obligations.**

(a)  Landlord shall keep the Project (excluding the interior of the Premises and space leased to other occupants of the Project) in good condition and repair. If plumbing pipes, electrical wiring, HVAC ducts or vents within the Premises are in need of repair, Tenant shall immediately notify Landlord, and Landlord shall cause the repairs to be completed within a reasonable time, the cost of which shall be considered an Operating Expense and reimbursed in accordance with Section 4.2, unless the need for such repairs is due to the negligence or willful misconduct of Tenant, in which case Tenant shall immediately pay the entire cost of the repairs to Landlord. Except as provided in Section 9.3, there shall be no abatement of rent or liability to Tenant on account of any injury or interference with Tenant's business with respect to any improvements, alterations or repairs made by Landlord to the Project or any part thereof, however, Landlord shall use commercially reasonable efforts to minimize any unreasonable interference to Tenant's business when making any such improvements, alterations or repairs to the Premises or the Project. Tenant expressly waives the benefits of any statute now or hereafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Project in good order, condition and repair. Nothing in this Section 7.1 shall be deemed to be a waiver of Tenant's right to a claim of constructive eviction.

(b)  Notwithstanding anything to the contrary contained herein, if Landlord defaults in performing any of its repair and maintenance obligations within the Premises as expressly stated in this Lease and such default is not remedied by Landlord within thirty (30) days after Tenant shall have given Landlord written notice specifying such default, then Tenant, shall have the right, but not the obligation, to perform the repair or maintenance obligation to the Premises which Landlord failed to perform; provided, however, in the case of any such default which cannot with due diligence and in good faith be cured within thirty (30) days, the time within which Landlord is required to cure such default shall be extended for such additional period as may be necessary for the curing thereof with due diligence and in good faith, and Tenant shall not be permitted to make such repair during such extended period so long as Landlord is diligently pursuing such cure. Subject to the remaining terms and conditions of this paragraph, the full amount of the reasonable costs and expenses so incurred by Tenant (the "Reimbursable Costs") shall be paid by Landlord to Tenant, within thirty (30) days after written demand therefore (provided that such written demand is accompanied by reasonable documented evidence of the Reimbursable Costs). If Landlord delivers to Tenant within thirty (30) days after receipt of Tenant's invoice of Reimbursable Costs, a written objection to the payment of such invoice, setting forth with reasonable particularity Landlord's reasons for its claim that such action did not have to be taken by Landlord pursuant to the terms of this Lease or that the charges are excessive (in which case Landlord shall pay the amount it contends would not have been excessive), then, as Tenant's sole remedy, Tenant may proceed to claim a default by Landlord and file an action in a court of competent jurisdiction in connection therewith.

18011-

TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

### 7.2. Tenant's Obligations.

(a) Subject to the requirements of Section 7.3, Tenant shall be responsible for keeping the Premises in good condition and repair, at Tenant's sole expense. By way of example, and not limitation, Tenant shall be responsible, at Tenant's sole expense, for repairing and/or replacing, carpet, marble, tile or other flooring, paint, wall coverings, corridor and interior doors and door hardware, telephone and computer equipment, interior glass, window treatments, ceiling tiles, shelving, cabinets, millwork and other tenant improvements and any supplemental and/or dedicated HVAC equipment for the Premises which serves the Premises exclusively. In addition, Tenant shall be responsible for the installation, maintenance and repair of all telephone, computer and related cabling from the telephone terminal room on the floor on which the Premises is located to and throughout the Premises , and Tenant shall be responsible for any loss, cost, damage, liability and expense (including attorneys' fees) arising out of or related to the installation, maintenance, repair and replacement of such cabling. If Tenant fails to keep the Premises in good condition and repair, Landlord may, but shall not be obligated to, make any necessary repairs following written notice to Tenant and the expiration of a five (5) day cure period (except in the event of an emergency). If Landlord makes such repairs, Landlord shall bill Tenant for the cost of the repairs as additional rent, and said additional rent shall be payable by Tenant within ten (10) days.

(b) On the last day of the Term hereof, or on any sooner termination, Tenant shall surrender the Premises to Landlord in the same condition as received, ordinary wear and tear and casualty damage excepted, clean and free of debris and Tenant's personal property. Tenant shall repair any damage to the Premises occasioned by the installation or removal of Tenant's trade fixtures, furnishings and equipment. Tenant shall leave the electrical distribution systems, plumbing systems, lighting fixtures, HVAC ducts and vents, window treatments, wall coverings, carpets and other floor coverings, doors and door hardware, millwork , ceilings and other tenant improvements at the Premises and in good condition, ordinary wear and tear excepted. Notwithstanding any other provision of this Lease to the contrary, Tenant shall remove, at or prior to the expiration or termination of this Lease, at its expense, all wiring and cabling installed at the Premises which shall have been installed by Tenant or which Landlord shall have installed pursuant to this Lease or at the request of Tenant. Such wiring and cabling shall include but not be limited to (a) wiring and cabling above the ceiling panels, behind or within walls, and under or within floors, (b) wiring and cabling for voice, data, security or other purposes, (c) wiring and cabling installed pursuant to Section 7.3 below, pursuant to any work letter agreement attache d to this Lease, or otherwise, and (d) all related installations, equipment and items whatsoever.

### 7.3. Alterations and Additions.

(a) Tenant shall not, without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion, make any alterations, improvements, additions, utility installations or repairs (hereinafter collectively referred to as "Alteration(s)") in, on or about the Premises or the Project. The foregoing to the contrary notwithstanding, Landlord will not unreasonably withhold, condition or delay its consent to any non-structural Alteration provided that Tenant otherwise complies with the provisions of this Section 7.3 and that (i) such Alterations are not visible from the exterior of the Premises, and (ii) such Alterations do not affect any of the Building systems or structure. Alterations shall include, but shall not be limited to, the installation or alteration of security or fire protection systems, communication systems, millwork, shelving, file retrieval or storage systems, carpeting or other floor coverings, window and wall coverings, electrical distribution systems, lighting fixtures, telephone or computer system wiring, HVAC and plumbing. At the expiration of the Term, Landlord may require the removal of any Alterations installed by Tenant and the restoration of the Premises and the Project to their prior condition, at Tenant's expense; provided, however, to the extent Landlord's consent is required pursuant to this Section, at the written request of Tenant, Landlord agrees to notify Tenant concurrently with Landlord's approval of such Alteration whether or not Landlord will require Tenant to remove such Alteration at the end of the Term. If a work letter agreement is entered into by Landlord and Tenant, Tenant shall not be obligated to remove the tenant improvements constructed in accordance with the work letter agreement. If, as a result of any Alteration made by Tenant, Landlord is obligated to comply with the Americans With Disabilities Act or any other law or regulation and such compliance requires Landlord to make any improvement or Alteration to any portion of the Project, as a condition to Landlord's consent, Landlord shall have the right to require Tenant to pay to Landlord prior to the construction of any Alteration by Tenant, the entire cost of any improvement or Alteration Landlord is obligated to complete by such law or regulation. Should Landlord permit Tenant to make its own Alterations, Tenant shall use only such contractor as has been reasonably and expressly approved by Landlord. Except with respect to a Permitted Alteration (defined hereinafter), (1) in connection with Alterations costing in excess of Fifty Thousand Dollars ($50,000.00), Landlord may require Tenant to provide to Landlord, at Tenant's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of such Alterations, to insure Landlord against any liability for mechanic's and materialmen's liens and to insure completion of the work, and (2) Tenant shall pay to Landlord a fee equal to three percent (3%) of the cost of the Alterations to compensate Landlord for the overhead and other costs it incurs in reviewing the plans for the Alterations and in monitoring the construction of the Alterations. Should Tenant make any Alterations without the prior approval of Landlord, or use a contractor not expressly approved by Landlord, Landlord may, at any time during the Term of this Lease, require that Tenant remove all or part of the Alterations and return the Premises to the condition it was in prior to the making of the Alterations. In the event Tenant makes any Alterations, Tenant agrees to obtain or cause its contractor to obtain, prior to the commencement of any work, "builders all risk" insurance in an amount reasonably approved by Landlord and workers compensation insurance. Notwithstanding anything to the contrary in this subsection (a), Tenant shall have the right to make cosmetic (*i.e.*, only painting, carpeting, wall papering, installation of shelving, hanging pictures, furniture installation not requiring power installation) and other non-structural Alterations not requiring governmental permits or approvals, not affecting any Building systems, and costing less than Twenty-Five Thousand Dollars ($25,000.00) in any one instance (hereinafter, "Permitted Alterations") to the Premises without obtaining Landlord's prior written consent, provided that such Permitted Alterations are not visible from the exterior of the Premises and that Tenant provides Landlord with prior written notice of its intention to make such Permitted Alterations and that the Permitted Alterations are otherwise performed by Tenant in accordance with this Section 7.3. For purposes of the Lease, it shall be deemed reasonable for Landlord: (x) to require Tenant to perform Alterations during non-business hours if such Alterations will otherwise

9

create unreasonable noise, noxious fumes or otherwise unreasonably interfere with the quiet enjoyment of the other tenants in the Building, and (y) to require Tenant to perform Alterations in accordance with a reasonable schedule approved by the manager of the Building.

(b) Any Alterations in or about the Premises that Tenant shall desire to make shall be presented to Landlord in written form, with plans and specifications which are sufficiently detailed to obtain a building permit. If Landlord consents to an Alteration, the consent shall be deemed conditioned upon Tenant acquiring a building permit, if required, from the applicable governmental agencies, furnishing a copy thereof to Landlord prior to the commencement of the work, and compliance by Tenant with all conditions of said permit in a prompt and expeditious manner. Except with respect to Permitted Alterations, Tenant shall provide Landlord with as-built plans and specifications for any Alterations made to the Premises.

(c) Other than with respect to the Improvements described in that certain Work Letter attached hereto as Schedule 1, Tenant shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use in the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or the Project, or any interest therein. If Tenant shall, in good faith, contest the validity of any such lien, Tenant shall furnish to Landlord a surety bond satisfactory to Landlord in an amount equal to not less than one and one half times the amount of such contested lien or claim indemnifying Landlord against liability arising out of such lien or claim. Such bond shall be sufficient in form and amount to free the Project from the effect of such lien. In addition, Landlord may require Tenant to pay Landlord's reasonable attorneys' fees and costs in participating in such action. In accordance with Florida Statute 713.10, Landlord shall have the right to post on the Premises and to file and/or record in the Public Records or court registry, as applicable, notices of non-responsibility and such other notices as Landlord may reasonably deem proper for the protection of Landlord's interest in the Premises. Tenant shall give Landlord not less than ten (10) days' advance written notice prior to the commencement of any work in the Premises by Tenant.

(d) All Alterations (whether or not such Alterations constitute trade fixtures of Tenant) which may be made to the Premises by Tenant shall be paid for by Tenant, at Tenant's sole expense, and shall be made and done in a good and workmanlike manner and with new materials satisfactory to Landlord and such Alterations shall be the property of Landlord and remain upon and be surrendered with the Premises at the expiration of the Term of the Lease. Provided Tenant is not in default beyond any applicable notice and cure period, Tenant's personal property and equipment, other than that which is affixed to the Premises so that it cannot be removed without material damage to the Premises or the Project, shall remain the property of Tenant and may be removed by Tenant subject to the provisions of Section 7.2(b).

**7.4. Failure of Tenant to Remove Property.** If this Lease is terminated due to the expiration of its Term or otherwise, and Tenant fails to remove its property as required by Section 7.2(b), in addition to any other remedies available to Landlord under this Lease, and subject to any other right or remedy Landlord may have under applicable law, Landlord may remove any property of Tenant from the Premises and store the same elsewhere at the expense and risk of Tenant.

**8. Insurance.**

**8.1. Insurance-Tenant.**

(a) Tenant shall obtain and keep in force during the Term of this Lease a commercial general liability policy of insurance with coverages acceptable to Landlord, in Landlord's sole discretion, which by way of example and not limitation, protects Tenant and Landlord (as an additional insured) against claims for bodily injury, personal injury and property damage based upon, involving or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount of not less than Three Million Dollars ($3,000,000) combined single limit with an "Additional Insured-Managers and Landlords of Premises Endorsement" and contain the "Amendment of the Pollution Exclusion" for damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease.

(b) Tenant shall obtain and keep in force during the Term of this Lease "all risk" extended coverage property insurance with coverages acceptable to Landlord, in Landlord's sole discretion. Said insurance shall be written on a one hundred percent (100%) replacement cost basis on Tenant's personal property, all tenant improvements installed at the Premises by Landlord or Tenant, Tenant's trade fixtures and other property. By way of example and not limitation, such policies shall provide protection against any peril included within the classification "fire and extended coverage," against vandalism and malicious mischief, theft, sprinkler leakage, earthquake damage and flood damage. If this Lease is terminated as the result of a casualty in accordance with Section 9, the proceeds of said insurance attributable to the replacement of all tenant improvements at the Premises shall be paid to Landlord. If insurance proceeds are available to repair the tenant improvements, at Landlord's option, all insurance proceeds Tenant is entitled to receive to repair the tenant improvements shall be paid by the insurance company directly to Landlord. Landlord shall select the contractor to repair and/or replace the tenant improvements, and Landlord shall cause the tenant improvements to be repaired and/or replaced to the extent insurance proceeds are available.

(c) Tenant shall, at all times during the Term hereof, maintain in effect workers' compensation insurance as required by applicable law (together with employers liability insurance of not less than $1,000,000) and business interruption and extra expense insurance satisfactory to Landlord. In addition, Tenant shall maintain in effect during the Term hereof a policy of

10

automobile liability insurance with bodily injury limits of $500,000 per person, $1,000,000 per accident, and $100,000 per accident for property damage.

**8.2. Insurance-Landlord.**

(a) Landlord shall obtain and keep in force a policy of general liability insurance with coverage against such risks and in such amounts as Landlord deems advisable insuring Landlord against liability arising out of the ownership, operation and management of the Project.

(b) Landlord shall also obtain and keep in force during the Term of this Lease a policy or policies of insurance covering loss or damage to the Project in the amount of not less than eighty percent (80%) of the full replacement cost thereof, as determined by Landlord from time to time. The terms and conditions of said policies and the perils and risks covered thereby shall be determined by Landlord, from time to time, in Landlord's sole discretion. In addition, at Landlord's option, Landlord shall obtain and keep in force, during the Term of this Lease, a policy of rental interruption insurance, with loss payable to Landlord, which insurance shall, at Landlord's option, also cover all Operating Expenses. At Landlord's option, Landlord may obtain insurance coverages and/or bonds related to the operation of the parking areas. At Landlord's option, Landlord may obtain coverage for flood and earthquake damages. In addition, Landlord shall have the right to obtain such additional insurance as is customarily carried by owners or operators of other comparable office buildings in the geographical area of the Project. Tenant will not be named as an additional insured in any insurance policies carried by Landlord and shall have no right to any proceeds therefrom. The policies purchased by Landlord shall contain such deductibles as Landlord may determine. In addition to amounts payable by Tenant in accordance with Section 4.2, Tenant shall pay any increase in the property insurance premiums for the Project over what was payable immediately prior to the increase to the extent the increase is specified by Landlord's insurance carrier as being caused by the nature of Tenant's occupancy or any act or omission of Tenant.

**8.3. Insurance Policies.** Tenant shall deliver to Landlord copies of the insurance policies required under Section 8.1 within fifteen (15) days prior to the Commencement Date of this Lease, and Landlord shall have the right to approve the terms and conditions of said policies. Tenant's insurance policies shall not be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Landlord. Tenant shall, at least thirty (30) days prior to the expiration of such policies, furnish Landlord with renewals thereof. If Tenant provides certificates of insurance to evidence the insurance required under this Lease, all such certificates shall be in form and substance satisfactory to Landlord, shall affirmatively demonstrate all coverage and requirements set forth in this Lease, shall contain no disclaimers of coverage, and shall include a firm and unconditional obligation to give to Landlord at least thirty (30) days' prior written notice prior to cancellation or change in any coverage. Tenant's insurance policies shall be issued by insurance companies authorized to do business in the state in which the Project is located, and said companies shall maintain during the policy term a "General Policyholder's Rating" of at least A and a financial rating of at least "Class X" (or such other rating as may be required by any lender having a lien on the Project) as set forth in the most recent edition of "Best Insurance Reports." All insurance obtained by Tenant shall be primary to and not contributory with any similar insurance carried by Landlord, whose insurance shall be considered excess insurance only. Landlord, and at Landlord's option, the holder of any mortgage or deed of trust encumbering the Project and any person or entity managing the Project on behalf of Landlord, shall be named as an additional insured on all insurance policies Tenant is obligated to obtain by Section 8.1 above. Tenant's insurance policies shall not include deductibles in excess of Five Thousand Dollars ($5,000) other than a Twenty Five Thousand Dollar ($25,000.00) deductible for damage caused by earthquake or damage caused by flood and a Two Percent (2%) deductible for damage caused by windstorm. If any of the insurance coverage which Tenant is obligated to carry pursuant to this Lease is under a blanket insurance policy, then such blanket insurance policy shall expressly afford coverage for the Premises and Landlord as required hereunder. Any umbrella liability policy or excess liability policy shall provide that, if the underlying aggregate is exhausted, the excess coverage will drop down as primary insurance.

**8.4. Waiver of Subrogation.** Landlord waives any and all rights of recovery against Tenant for or arising out of damage to, or destruction of, the Project to the extent that Landlord's insurance policies then in force insure against such damage or destruction and permit such waiver, and only to the extent of the insurance proceeds actually received by Landlord for such damage or destruction. Landlord's waiver shall not relieve Tenant from liability under Section 21 below except to the extent Landlord's insurance company actually satisfies Tenant's obligations under Section 21 in accordance with the requirements of Section 21. Tenant waives any and all rights of recovery against Landlord, Landlord's employees, agents and contractors for liability or damages if such liability or damage is covered by Tenant's insurance policies then in force or the insurance policies Tenant is required to obtain by Section 8.1 (whether or not the insurance Tenant is required to obtain by Section 8.1 is then in force and effect), whichever is broader. Tenant's waiver shall not be limited by the amount of insurance then carried by Tenant or the deductibles applicable thereto. Tenant shall cause the insurance policies it obtains in accordance with this Section 8 to provide that the insurance company waives all right of recovery by subrogation against Landlord in connection with any liability or damage covered by Tenant's insurance policies.

**8.5. Coverage.** Landlord makes no representation to Tenant that the limits or forms of coverage specified above or approved by Landlord are adequate to insure Tenant's property or Tenant's obligations under this Lease, and the limits of any insurance carried by Tenant shall not limit Tenant's obligations or liability under any indemnity provision included in this Lease or under any other provision of this Lease.

**9. Damage or Destruction.**

**9.1. Effect of Damage or Destruction.** If all or part of the Project is damaged by fire, earthquake, flood, explosion, the elements, riot, the release or existence of Hazardous Substances (as defined in Section 22 below) or by any other cause whatsoever (hereinafter collectively referred to as "Damages"), but the Damages are not "Material" (as defined in Section 9.2 below), Landlord shall repair the Damages to the Project as soon as is reasonably possible, and this Lease shall remain in full force and effect. If all or part of the Project is destroyed or Materially Damaged, Landlord shall have the right, in its sole and complete discretion, to repair or to rebuild the Project or to terminate this Lease. Landlord shall within one hundred twenty (120) days after the discovery of such Material Damage or destruction notify Tenant in writing of Landlord's intention to repair or to rebuild or to terminate this Lease. Tenant shall in no event be entitled to compensation or damages on account of annoyance or inconvenience in making any repairs, or on account of construction, or on account of Landlord's election to terminate this Lease. Notwithstanding the foregoing, if Landlord shall elect to rebuild or repair the Project after Material Damage or destruction, but in good faith determines that the Premises cannot be substantially repaired within two hundred seventy (270) days after the date of the discovery of the Material Damage or destruction, without payment of overtime or other premiums, and the Damage to the Project will render all or a substantial portion of the Premises unusable during said two hundred seventy (270) day period, Landlord shall notify Tenant thereof in writing at the time of Landlord's election to rebuild or repair, and Tenant shall thereafter have a period of fifteen (15) days within which Tenant may elect to terminate this Lease, upon thirty (30) days' advance written notice to Landlord; provided further, however, in the event Landlord pursues reconstruction or restoration of the Project and such reconstruction or restoration is not substantially complete due to delays not caused by Tenant or Force Majeure Events, within two hundred seventy (270) days after the date of the occurrence of the Damage, then Tenant shall have a further right to terminate this Lease upon written notice to Landlord, so long as Tenant's written notice is delivered to Landlord prior to Landlord's delivery of the Premises substantially completed to Tenant. Tenant's termination right described in the preceding sentence shall not apply if the Damage was caused by the negligent or intentional acts of Tenant or its employees, agents, contractors or invitees. Failure of Tenant to exercise said election within said fifteen (15) day period shall constitute Tenant's agreement to accept delivery of the Premises under this Lease whenever tendered by Landlord, provided Landlord thereafter pursues reconstruction or restoration diligently to completion, subject to delays caused by Force Majeure Events. If Landlord is unable to repair the Damage to the Premises or the Project during such two hundred seventy (270) day period due to Force Majeure Events, the two hundred seventy (270) day period shall be extended by the period of delay caused by the Force Majeure Events, said period of extension due to delays caused by Force Majeure Events not to exceed sixty (60) days in the aggregate. Subject to abatement pursuant to Section 9.3 below, if Landlord or Tenant terminates this Lease in accordance with this Section 9.1, Tenant shall continue to pay all Base Rent, Operating Expenses and other amounts due hereunder which arise prior to the date of termination.

**9.2. Definition of Material Damage.** "Material Damage" to the Project shall occur if, in Landlord's reasonable judgment, the uninsured cost of repairing the Damage will exceed Twenty-Five Thousand Dollars ($25,000). If insurance proceeds are available to Landlord in an amount which is sufficient to pay the entire cost of repairing all of the Damage to the Project, the Damage shall be deemed material if the cost of repairing the Damage exceeds One Hundred Thousand Dollars ($100,000). Damage to the Project shall be deemed Material if (a) the Project cannot be rebuilt or repaired to substantially the same condition it was in prior to the Damage due to laws or regulations in effect at the time the repairs will be made, (b) the holder of any mortgage or deed of trust encumbering the Project requires that insurance proceeds available to repair the Damage in excess of Twenty-Five Thousand Dollars ($25,000) be applied to the repayment of the indebtedness secured by the mortgage or the deed of trust, or (c) the Damage occurs during the last twelve (12) months of the Term of the Lease.

**9.3. Abatement of Rent.** If Landlord elects to repair Damage to the Project and all or part of the Premises will be unusable or inaccessible to Tenant in the ordinary conduct of its business until the Damage is repaired, and the Damage was not caused by the negligence or intentional acts of Tenant or its employees, agents, contractors or invitees, Tenant's Base Rent and Tenant's Share of Operating Expenses shall be abated until the repairs are completed in proportion to the amount of the Premises which is unusable or inaccessible to Tenant in the ordinary conduct of its business. Notwithstanding the foregoing, there shall be no abatement of Base Rent or Tenant's Share of Operating Expenses by reason of any portion of the Premises being unusable or inaccessible for a period equal to five (5) consecutive business days or less.

**9.4. Tenant's Acts.** If such Damage or destruction occurs as a result of the negligence or the intentional acts of Tenant or Tenant's employees, agents, contractors or invitees, and the proceeds of insurance which are actually received by Landlord are not sufficient to pay for the repair of all of the Damage, Tenant shall pay, at Tenant's sole cost and expense, to Landlord upon demand, the difference between the cost of repairing the Damage and the insurance proceeds received by Landlord.

**9.5. Tenant's Property.** As more fully set forth in Section 21, Landlord shall not be liable to Tenant or its employees, agents, contractors, invitees or customers for loss or Damage to merchandise, tenant improvements, fixtures, automobiles, furniture, equipment, computers, files or other property (hereinafter collectively "Tenant's property") located at the Project. Tenant shall repair or replace all of Tenant's property at Tenant's sole cost and expense. Tenant acknowledges that it is Tenant's sole responsibility to obtain adequate insurance coverage to compensate Tenant for Damage to Tenant's property.

**9.6. Waiver.** Landlord and Tenant hereby waive the provisions of any statutes which relate to the termination of leases when leased property is damaged or destroyed and agree that such event shall be governed by the terms of this Lease.

18011-                                                        TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

**10. Real and Personal Property Taxes.**

    **10.1. Definition of "Real Property Tax."** As used herein, the term "Real Property Tax" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, improvement bond or bonds imposed on the Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Landlord in the Project or in any portion thereof, unless such tax is defined as an Operating Expense by Section 4.2 (c). Real Property Taxes shall not include income, inheritance and gift taxes.

    **10.2. Personal Property Taxes.** Tenant shall pay prior to delinquency all taxes assessed against and levied upon trade fixtures, furnishings, equipment and all other personal property of Tenant contained in the Premises or related to Tenant's use of the Premises. If any of Tenant's personal property shall be assessed with Landlord's real or personal property, Tenant shall pay to Landlord the taxes attributable to Tenant within ten (10) days after receipt of a written statement from Landlord setting for the taxes applicable to Tenant's property.

    **10.3. Reassessments.** From time to time Landlord may challenge the assessed value of the Project as determined by applicable taxing authorities and/or Landlord may attempt to cause the Real Property Taxes to be reduced on other grounds. If Landlord is successful in causing the Real Property Taxes to be reduced or in obtaining a refund, rebate, credit or similar benefit (hereinafter collectively referred to as a "reduction"), Landlord shall have the option, in its sole discretion, to (a) retain the benefit of the reduction and to pay, at Landlord's sole expense, the costs incurred by Landlord in causing the reduction to be made or ( b) to the extent practicable, to credit the reduction(s) to Real Property Taxes for the calendar year to which a reduction applies and to recalculate the Real Property Taxes owed by Tenant for years after the year in which the reduction applies based on the reduced Real Property Taxes. If Landlord proceeds in accordance with (b) above, all costs incurred by Landlord in obtaining the Real Property Tax reductions shall be considered an Operating Expense and Landlord shall determine, in its sole discretion to which years any reductions will be applied. In addition, if Landlord proceeds in accordance with (b) above, all accounting and related costs incurred by Landlord in making all adjustments shall be as Operating Expense. If Landlord proceeds in accordance with (a) above, Landlord shall not be obligated to refund to Tenant all or any portion of the reduction or to reduce Real Property Taxes for the years to which any reductions apply.

**11. Utilities.**

    **11.1. Services Provided by Landlord.** Subject to all governmental rules, regulations and guidelines applicable thereto, Landlord shall use its best efforts to provide HVAC to the Premises for normal office use during the times described in Section 11.4, reasonable amounts of electricity for normal office lighting and fractional horsepower office machines, water in the Premises or in the Common Areas for reasonable and normal drinking and lavatory use, replacement light bulbs and/or fluorescent tubes and ballasts for standard overhead fixtures, and building standard janitorial services. In addition, Tenant shall be responsible for all electricity costs associated with Tenant's use and operation of any dedicated or supplemental HVAC units and computer rooms. Subject to the other terms and conditions of the Lease, Landlord shall provide Tenant with reasonable access to the Common Areas of the Building, including the use of at least one (1) elevator and access to the Building by cardkey access, and to the Premises twenty-four (24) hours a day, three hundred sixty-five (365) days per year. Additionally, Landlord shall install prior to the Commencement Date and keep in place and in good working order during the Term an after-hours tele-entry system at the north entrance to the Building which will allow Tenant's customers to have ongoing after-hours access to the Building and the Premises. Notwithstanding the foregoing, Tenant acknowledges and agrees that repairs, hazardous conditions and other circumstances beyond Landlord's control may prevent access to the Common Areas of the Building and to the Premises from time to time.

    **11.2. Occupant Density.** Tenant acknowledges that the Building is currently equipped to accommodate a ratio of not more than one Occupant for each two hundred (200) square feet of rentable area in the Premises. For purposes of this Section, "Occupants" shall include employees, visitors, contractors and other people that visit the Premises but shall not include people not employed by Tenant that deliver or pick up mail or other packages at the Premises, employees of Landlord or employees of Landlord's agents or contractors. In the event Tenant exceeds such density ratio in connection with its use of the Premises, however, Tenant understands and acknowledges that Tenant, and not Landlord, shall be solely responsible for any discomfort or inconvenience experienced by Tenant and its Occupants in connection with such use or for any additional wear and tear on the Premises and the Common Areas, or any additional use of electricity, water and other utilities, and additional demand by Tenant for other Building services resulting from exceeding such density ratio. To the extent that Tenant's use of the Premises exceeds such density ratio, the cost to (i) supply additional services and utilities to the Premises, (ii) install additional systems and equipment to the Premises, and (iii) repair wear and tear to the Premises and the Common Areas occasioned by such usage shall be borne by Tenant solely. Such increased density ratio shall in no way be construed by Tenant as an implicit increase in the number of parking spaces allocated to Tenant in Section 1.13 of the Lease.

    **11.3. Hours of Service.** Building services and utilities shall be provided Monday through Friday from 8:00 a.m. to 7:00 p.m. and Saturdays from 9:00 a.m. to 2:00 p.m. Janitorial services shall be provided Monday through Friday. HVAC and other Building services shall not be provided at other times or on nationally recognized holidays. Tenant acknowledges that there will be no air circulation or temperature control within the Premises when the HVAC is not operating and , consequently, during such times the Premises may not be suitable for human occupation or for the operation of computers and other heat sensitive equipment. Nationally recognized holidays shall include, but shall not necessarily be limited to, New Year's Day, Martin Luther King Jr. Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. Landlord will use its best

13

18011-                                TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

efforts to provide HVAC to Tenant at times other than those set forth above subject to (a) the payment by Tenant of Landlord's standard charge, as determined by Landlord from time to time, in Landlord's sole discretion, for after-hours HVAC and (b) Tenant providing to Landlord at least one (1) business day's advance written notice of Tenant's need for after-hours HVAC. As of the date of this Lease, and subject to future increases, the standard charge for after-hours HVAC is Thirty Dollars ($30.00) per hour with a two (2) hour minimum (billed in two (2) hour increments). Tenant shall pay all after hours HVAC charges to Landlord within three (3) days after Landlord bills Tenant for said charges.

**11.4. Excess Usage by Tenant.** Tenant shall not install at the Premises office machines, lighting fixtures or other equipment which will generate above average heat, noise or vibration at the Premises or which will adversely effect the temperature maintained by the HVAC system. If Tenant uses Building utilities or services in excess of those used by the average office building tenant, Landlord shall have the right to (a) at Tenant's expense, install separate metering devices at the Premises, and to charge Tenant for its usage, and (b) require Tenant to pay to Landlord any additional costs, expenses and damages reasonably incurred by Landlord as a result of such usage.

**11.5. Interruptions.** Tenant agrees that Landlord shall not be liable to Tenant for its failure to furnish gas, electricity, telephone service, water, HVAC or any other utility services or building services when such failure is occasioned, in whole or in part, by repairs, replacements, or improvements, by any strike, lockout or other labor trouble, by inability to secure electricity, gas, water, telephone service or other utility at the Project, by any accident, casualty or event arising from any cause whatsoever, including the negligence of Landlord, its employees, agents and contractors, by act, negligence or default of Tenant or any other person or entity, or by any other cause, and such failures shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from the obligation of paying rent or performing any of its obligations under this Lease. Furthermore, Landlord shall not be liable under any circumstances for loss of property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any such services or utilities. Landlord may comply with voluntary controls or guidelines promulgated by any governmental entity relating to the use or conservation of energy, water, gas, light or electricity or the reduction of automobile or other emissions without creating any liability of Landlord to Tenant under this Lease. Notwithstanding anything contained herein to the contrary, if any interruption of utilities or services caused by Landlord's negligence or willful misconduct shall continue for more than five (5) consecutive business days and shall render all or any portion of the Premises unusable for the normal conduct of Tenant's business, and if Tenant does not in fact use or occupy such portion of the Premises, then all Base Rent and additional rent payable hereunder with respect to such portion of the Premises which Tenant does not occupy shall be abated from and after the sixth (6th) consecutive business day until full use of such portion of the Premises is restored to Tenant.

## 12. Assignment and Subletting.

**12.1. Landlord's Consent Required.** Tenant shall not voluntarily or by operation of law assign, transfer, hypothecate, mortgage, sublet, or otherwise transfer or encumber all or any part of Tenant's interest in this Lease or in the Premises (hereinafter collectively a "Transfer"), without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. Landlord shall respond to Tenant's written request for consent hereunder within thirty (30) days after Landlord's receipt of the written request from Tenant. Any attempted Transfer without such consent shall be void and shall constitute a material default and breach of this Lease. Tenant's written request for Landlord's consent shall include, and Landlord's thirty (30) day response period referred to above shall not commence, unless and until Landlord has received from Tenant, all of the following information: (a) financial statements for the proposed assignee or subtenant for the past three (3) years prepared in accordance with generally accepted accounting principles, (b) federal tax returns for the proposed assignee or subtenant for the past three (3) years, (c) a TRW credit report or similar report on the proposed assignee or subtenant, (d) a detailed description of the business the assignee or subtenant intends to operate at the Premises, (e) the proposed effective date of the assignment or sublease, (f) a copy of the proposed sublease or assignment agreement which includes all of the terms and conditions of the proposed assignment or sublease, (g) a detailed description of any ownership or commercial relationship between Tenant and the proposed assignee or subtenant, and (h) a detailed description of any Alterations the proposed assignee or subtenant desires to make to the Premises. If the obligations of the proposed assignee or subtenant will be guaranteed by any person or entity, Tenant's written request shall not be considered complete until the information described in (a), (b) and (c) of the previous sentence has been provided with respect to each proposed guarantor. "Transfer" shall also include the transfer (a) if Tenant is a corporation, and Tenant's stock is not publicly traded over a recognized securities exchange, of more than twenty five percent (25%) of the voting stock of such corporation during the Term of this Lease (whether or not in one or more transfers) or the dissolution, merger or liquidation of the corporation, or (b) if Tenant is a partnership or other entity, of more than twenty five percent (25%) of the profit and loss participation in such partnership or entity during the Term of this Lease (whether or not in one or more transfers) or the dissolution, merger or liquidation of the partnership or entity. If Tenant is a limited or general partnership (or is comprised of two or more persons, individually or as co-partners), Tenant shall not be entitled to change or convert to (i) a limited liability company, (ii) a limited liability partnership or (iii) any other entity which possesses the characteristics of limited liability without the prior written consent of Landlord, which consent may be given or withheld in Landlord's sole discretion. Tenant's sole remedy in the event that Landlord shall wrongfully withhold consent to or disapprove any assignment or sublease shall be to obtain an order by a court of competent jurisdiction that Landlord grant such consent; in no event shall Landlord be liable for damages with respect to its granting or withholding consent to any proposed assignment or sublease. If Landlord shall exercise any option to recapture the Premises, or shall deny a request for consent to a proposed assignment or sublease, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all losses, liabilities, damages, costs and claims that may be made against Landlord by the proposed assignee or subtenant, or by any brokers or other persons claiming a commission or similar compensation in connection with the proposed assignment or sublease.

18011-                                                                TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

**12.2. Leveraged Buy-Out.** The involvement by Tenant or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, refinancing, transfer, leveraged buy-out or otherwise) whether or not a formal assignment or hypothecation of this Lease or Tenant's assets occurs, which results or will result in a reduction of the "Net Worth" of Tenant as hereinafter defined, by an amount equal to or greater than twenty-five percent (25%)of such Net Worth of Tenant as it is represented to Landlord at the time of the execution by Landlord of this Lease, or as it exists immediately prior to said transaction or transactions constituting such reduction, at whichever time said Net Worth of Tenant was or is greater, shall be considered to be an assignment of this Lease to which Landlord may reasonably withhold its consent. "Net Worth" of Tenant for purposes of this Section 12.2 shall be the net worth of Tenant (excluding any guarantors) established under generally accepted accounting principles consistently applied.

**12.3. Standard For Approval.** Landlord shall not unreasonably withhold its consent to a Transfer provided that Tenant has complied with each and every requirement, term and condition of this Section 12. Tenant acknowledges and agrees that each requirement, term and condition in this Section 12 is a reasonable requirement, term or condition. It shall be deemed reasonable for Landlord to withhold its consent to a Transfer if any requirement, term or condition of this Section 12 is not complied with or: (a) the Transfer would cause Landlord to be in violation of its obligations under another lease or agreement to which Landlord is a party; (b) in Landlord's reasonable judgment, a proposed assignee has a materially smaller net worth than Tenant had on the date this Lease was entered into with Tenant or is less able financially to pay the rents due under this Lease as and when they are due and payable; (c) a proposed assignee's or subtenant's business will impose a burden on the Project's parking facilities, elevators, Common Areas or utilities that is greater than the burden imposed by Tenant, in Landlord's reasonable judgment; (d) the terms of a proposed assignment or subletting will allow the proposed assignee or subtenant to exercise a right of renewal, right of expansion, right of first offer, right of first refusal or similar right held by Tenant; (e) a proposed assignee or subtenant refuses to enter into a written assignment agreement or sublease, reasonably satisfactory to Landlord, which provides that it will abide by and assume all of the terms and conditions of this Lease for the term of any assignment or sublease and containing such other terms and conditions as Landlord reasonably deems necessary; (f) intentionally omitted; (g) any guarantor of this Lease refuses to consent to the Transfer or to execute a written agreement reaffirming the guaranty; (h) Tenant is in default as defined in Section 13.1 beyond the expiration of any applicable notice and cure period at the time of the request; (i) if requested by Landlord, the assignee or subtenant refuses to sign a non-disturbance and attornment agreement in favor of Landlord's lender; (j) Landlord has sued or been sued by the proposed assignee or subtenant or has otherwise been involved in a legal dispute with the proposed assignee or subtenant; (k) the assignee or subtenant is involved in a business which is not in keeping with the then current standards of the Project; (l) the proposed assignee or subtenant is an existing tenant of the Project or otherwise occupies or utilizes any portion of space in the Project for the conduct of its business, or is a person or entity then negotiating with Landlord for the lease of space in the Project, or is a successor, assignee, or purchaser of any tenant of the Project or otherwise arising from a tenant's bankruptcy proceedings; (m) the assignment or sublease will result in there being more than one subtenant of the Premises (e.g., the assignee or subtenant intends to use the Premises as an executive suite); or (n) the assignee or subtenant is a governmental or quasi-governmental entity or an agency, department or instrumentality of a governmental or quasi-governmental agency.

**12.4. Additional Terms and Conditions.** The following terms and conditions shall be applicable to any Transfer:

(a) Regardless of Landlord's consent, no Transfer shall release Tenant from Tenant's obligations hereunder or alter the primary liability of Tenant to pay the rent and other sums due Landlord hereunder and to perform all other obligations to be performed by Tenant hereunder or release any guarantor from its obligations under its guaranty.

(b) Landlord may accept rent from any person other than Tenant pending approval or disapproval of an assignment or subletting.

(c) Neither a delay in the approval or disapproval of a Transfer, nor the acceptance of rent, shall constitute a waiver or estoppel of Landlord's right to exercise its rights and remedies for the breach of any of the terms or conditions of this Section 12.

(d) The consent by Landlord to any Transfer shall not constitute a consent to any subsequent Transfer by Tenant or to any subsequent or successive Transfer by an assignee or subtenant. However, Landlord may consent to subsequent Transfers or any amendments or modifications thereto without notifying Tenant or anyone else liable on the Lease and without obtaining their consent, and such action shall not relieve such persons from liability under this Lease.

(e) In the event of any default under this Lease, Landlord may proceed directly against Tenant, any guarantors or anyone else responsible for the performance of this Lease, including any subtenant or assignee, without first exhausting Landlord's remedies against any other person or entity responsible therefor to Landlord, or any security held by Landlord.

(f) Landlord's written consent to any Transfer by Tenant shall not constitute an acknowledgment that no default then exists under this Lease nor shall such consent be deemed a waiver of any then existing default.

(g) The discovery of the fact that any financial statement relied upon by Landlord in giving its consent to an assignment or subletting was materially false shall, at Landlord's election, render Landlord's consent null and void.

(h) Landlord shall not be liable under this Lease or under any sublease to any subtenant.

15

(i) No assignment or sublease may be modified or amended without Landlord's prior written consent.

(j) Any assignee of, or subtenant under, this Lease shall, by reason of accepting such assignment or entering into such sublease, be deemed, for the benefit of Landlord, to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Tenant during the term of said assignment or sublease, other than such obligations as are contrary or inconsistent with provisions of an assignment or sublease to which Landlord has specifically consented in writing.

**12.5.  Additional Terms and Conditions Applicable to Subletting.**  The following terms and conditions shall apply to any subletting by Tenant of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)  Tenant hereby absolutely and unconditionally assigns and transfers to Landlord all of Tenant's interest in all rentals and income arising from any sublease entered into by Tenant, and Landlord may collect such rent and income and apply same toward Tenant's obligations under this Lease; provided, however, that until a default shall occur in the performance of Tenant's obligations under the Lease, Tenant may receive, collect and enjoy the rents accruing under such sublease.  Landlord shall not, by reason of this or any other assignment of such rents to Landlord nor by reason of the collection of the rents from a subtenant, be deemed to have assumed or recognized any sublease or to be liable to the subtenant for any failure of Tenant to perform and comply with any of Tenant's obligations to such subtenant under such sublease, including, but not limited to, Tenant's obligation to return any Security Deposit.  Tenant hereby irrevocably authorizes and directs any such subtenant, upon receipt of a written notice from Landlord stating that a default exists in the performance of Tenant's obligations under this Lease, to pay to Landlord the rents due as they become due under the sublease.  Tenant agrees that such subtenant shall have the right to rely upon any such statement and request from Landlord, and that such subtenant shall pay such rents to Landlord without any obligation or right to inquire as to whether such default exists and notwithstanding any notice from or claim from Tenant to the contrary.

(b)  In the event Tenant shall default in the performance of its obligations under this Lease, Landlord at its option and without any obligation to do so, may require any subtenant to attorn to Landlord, in which event Landlord shall undertake the obligations of Tenant under such sublease from the time of the exercise of said option to the termination of such sublease; provided, however, Landlord shall not be liable for any prepaid rents or Security Deposit paid by such subtenant to Tenant or for any other prior defaults of Tenant under such sublease.

**12.6.  Transfer Premium from Assignment or Subletting.**  Landlord shall be entitled to receive from Tenant (as and when received by Tenant) as an item of additional rent the following amounts (hereinafter the "Transfer Premium"): (a) if a sublease is for less than fifty percent (50%) of the usable square feet in the Premises, one-half of all amounts received by Tenant from the subtenant in excess of the amounts payable by Tenant to Landlord hereunder or (b) if a sublease is for fifty percent (50%) or more of the usable square feet in the Premises or Tenant assigns the Lease, all amounts received by Tenant from the subtenant or assignee in excess of the amounts payable by Tenant to Landlord hereunder.  The Transfer Premium shall be reduced by the reasonable brokerage commissions and legal fees actually paid by Tenant in order to assign the Lease or to sublet a portion of the Premises. "Transfer Premium" shall mean all Base Rent, additional rent or other consideration of any type whatsoever payable by the assignee or subtenant in excess of the Base Rent and additional rent payable by Tenant under this Lease.  If less than all of the Premises is transferred, the Base Rent and the additional rent shall be determined on a per rentable square foot basis.  Transfer Premium shall also include, but not be limited to, key money and bonus money paid by the assignee or subtenant to Tenant in connection with such Transfer, and any payment in excess of fair market value for services rendered by Tenant to the assignee or subtenant or for assets, fixtures, inventory, equipment, or furniture transferred by Tenant to the assignee or subtenant in connection with such Transfer.  For purposes of calculating the Transfer Premium, expenses will be amortized over the life of the sublease.

**12.7.  Landlord's Option to Recapture Space.**  Notwithstanding anything to the contrary contained in this Section 12, Landlord shall have the option, by giving written notice to Tenant within thirty (30) days after receipt of any request by Tenant to assign this Lease, or to sublease space in the Premises, to terminate this Lease with respect to said space as of the date thirty (30) days after Landlord's election.  In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Base Rent, Tenant's Share of Operating Expenses and the number of parking spaces Tenant may use shall be adjusted on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet contained in the original Premises, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of same.  If Landlord recaptures only a portion of the Premises, it shall construct and erect at its sole cost such partitions as may be required to sever the space to be retained by Tenant from the space recaptured by Landlord.  Landlord may, at its option, lease any recaptured portion of the Premises to the proposed subtenant or assignee or to any other person or entity without liability to Tenant.  Tenant shall not be entitled to any portion of the profit, if any, Landlord may realize on account of such termination and reletting.  Tenant acknowledges that the purpose of this Section 12.7 is to enable Landlord to receive profit in the form of higher rent or other consideration to be received from an assignee or sublessee, to give Landlord the ability to meet additional space requirements of other tenants of the Project and to permit Landlord to control the leasing of space in the Project.  Tenant acknowledges and agrees that the requirements of this Section 12.7 are commercially reasonable and are consistent with the intentions of Landlord and Tenant.

**12.8.  Landlord's Expenses.**  In the event Tenant shall assign this Lease or sublet the Premises or request the consent of Landlord to any Transfer, then Tenant shall pay Landlord's reasonable costs and expenses incurred in connection therewith, including, but not limited to, attorneys', architects', accountants', engineers' or other consultants' fees.

**12.9. Permitted Sublease to Physician(s) and Optometrist(s).** Notwithstanding anything to the contrary in Section 12.1 of the Lease, Tenant shall have the right to sublet up to three (3) offices of the Premises without obtaining Landlord's prior consent, provided: (a) there shall be no more than three (3) physicians or optometrists occupying the Premises by reason of such sublettings at any one time; (b) such sublettings shall be on a "non-demised" basis and shall be for use and occupancy of the Premises consistent with the terms and conditions of this Lease; and (c) no subletting shall relieve Tenant of its obligations or liabilities hereunder, or shall be deemed a consent to a further subletting.

**12.10. Permitted Transfers.** Notwithstanding anything to the contrary contained in this Section 12, provided Tenant is not in default after expiration of any applicable notice and cure periods, Tenant shall have the right, without Landlord's consent, upon thirty (30) days advance written notice to Landlord, to assign the Lease or sublet the whole or any part of the Premises (i) to any entity or entities which are owned by Tenant, or which owns Tenant or any entity that controls, is controlled by or is under common control with Tenant (which for purposes hereof, "control" shall be deemed to be ownership of more than fifty percent (50%) of the stock or other voting interest of the controlled corporation or other business entity), (ii) in connection with the sale or transfer of substantially all of the assets of the Tenant or the sale or transfer of substantially all of the outstanding ownership interests in Tenant, or (iii) in connection with a merger, consolidation or other corporate reorganization of Tenant (each of the transactions referenced in the above subparagraphs (i), (ii), and (iii) are hereinafter referred to as a "Permitted Transfer," and each surviving entity shall hereinafter be referred to as a "Permitted Transferee"); provided, that such assignment or sublease is subject to the following conditions:

        (a)    Tenant shall remain fully liable under the terms of the Lease;

        (b)    such Permitted Transfer shall be subject to all of the terms, covenants and conditions of the Lease;

        (c)    such Permitted Transferee has a net worth at least equal to the net worth of Tenant as of the date of this Lease, and

        (d)    such Permitted Transferee shall expressly assume the obligations of Tenant under the Lease by a document reasonably satisfactory to Landlord.

Nothing in this paragraph is intended to nor shall permit Tenant to transfer its interest under this Lease as part of a fraud or subterfuge to intentionally avoid its obligations under this Lease (for example, transferring its interest to a shell corporation that subsequently files a bankruptcy), and any such transfer shall constitute a Default hereunder. Any change in control of Tenant resulting from a merger, consolidation, or a transfer of partnership or membership interests, a stock transfer, or any sale of substantially all of the assets of Tenant that do not meet the requirements of this Section 12.10 shall be deemed an assignment or transfer that requires Landlord's prior written consent pursuant to Section 12.1 above.

## 13. Default; Remedies.

**13.1. Default by Tenant.** Landlord and Tenant hereby agree that the occurrence of any one or more of the following events is a material default by Tenant under this Lease and that said default shall give Landlord the rights described in Section 13.2. Landlord or Landlord's authorized agent shall have the right to execute and deliver any notice of default, notice to pay rent or quit or any other notice Landlord gives Tenant.

    (a)    Tenant's failure to make any payment of Base Rent, Tenant's Share of Operating Expenses, parking charges, charges for after-hours HVAC, late charges, or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of three (3) days after written notice thereof from Landlord to Tenant. In the event that Landlord serves Tenant with a notice to pay rent or quit pursuant to applicable unlawful detainer statutes, such notice shall also constitute the notice required by this Section 13.1(a).

    (b)    The abandonment of the Premises by Tenant in which event Landlord shall not be obligated to give any notice of default to Tenant.

    (c)    The failure of Tenant to comply with any of its obligations under Sections 6.1, 6.2(b), 7.2, 7.3, 8, 12, 18, 20, 22, 23, 25, 33, 34, and 55 and 59 where Tenant fails to comply with its obligations or fails to cure any earlier breach of such obligation within ten (10) days following written notice from Landlord to Tenant. In the event Landlord serves Tenant with a notice to quit or any other notice pursuant to applicable unlawful detainer statutes, said notice shall also constitute the notice required by this Section 13.1(c).

    (d)    The failure by Tenant to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Tenant (other than those referenced in Sections 13.1(a), (b) and (c), above), where such failure shall continue for a period of ten (10) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's non-performance is such that more then ten (10) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said ten (10) day period and thereafter diligently pursues such cure to completion. In the event that Landlord serves Tenant with a notice to quit pursuant to applicable unlawful detainer statutes, said notice shall also constitute the notice required by this Section 13.1(d).

(e) (i) The making by Tenant or any guarantor of Tenant's obligations hereunder of any general arrangement or general assignment for the benefit of creditors; (ii) Tenant or any guarantor becoming a "debtor" as defined in 11 U.S.C. 101 or any successor statute thereto (unless, in the case of a petition filed against Tenant or guarantor, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; (iv) the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days; or (v) the insolvency of Tenant.  In the event that any provision of this Section 13.1(e) is contrary to any applicable law, such provision shall be of no force or effect.

(f) The discovery by Landlord that any financial statement, representation or warranty given to Landlord by Tenant, or by any guarantor of Tenant's obligations hereunder was materially false at the time given.  Tenant acknowledges that Landlord has entered into this Lease in material reliance on such information.

(g) If Tenant is a corporation, a partnership, or a limited liability company, the dissolution or liquidation of Tenant.

(h) If Tenant's obligations under this Lease are guaranteed; (i) the death of a guarantor, (ii) the termination of a guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a guarantor becoming insolvent or the subject of a bankruptcy filing, (iv)a guarantor's refusal to honor the guaranty, or (v) a guarantor's breach of its guaranty obligation on an anticipatory breach basis.

### 13.2.  Remedies.

(a) In the event of any material default or breach of this Lease by Tenant, Landlord may, at any time thereafter, with or without notice or demand, and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default:

(i) Terminate Tenant's right to possession of the Premises.  Upon any such termination, Tenant shall immediately surrender possession of the Premises to Landlord.  Landlord reserves all rights and remedies available to it pursuant to the terms and conditions of this Lease as well as under applicable law.  Tenant hereby grants Landlord the full and free right to enter the Premises with or without process of law.  Tenant releases Landlord of any liability for any damage resulting therefrom and waives any right to claim damage for such re-entry.  Tenant also agrees that Landlord's right to re-lease or any other right given to Landlord as a consequence of Tenant's default hereunder or by operation of law is not relinquished.  On termination of Tenant's right of possession, Landlord shall be entitled to recover from Tenant: (i) the unpaid rent which had been earned at the time of the termination; (ii) the amount by which the unpaid rent which would have been earned after termination until the time of the award exceeds the amount of any rental, if any, received for the Premises during such time period; (iii) the amount by which the unpaid rent for the balance of the Term of the Lease after the time of award exceeds the amount of any rent to be received (net of re-letting expenses as described below) from any replacement tenant occupying the Premises at the time of the award, or, if the Premises are not occupied at the time of the award by a rent-paying replacement tenant, the full amount of the rent to be earned hereunder for the balance of the Term of the Lease discounted to net present value assuming a discount rate of one percent (1%) above the discount rate of the Federal Reserve Bank of Richmond in effect at the time of the award; and provided further, however, that Landlord shall repay to Tenant the excess of the foregoing amount over any rent received for the Premises during the balance of the Term of the Lease (net of reletting expenses as described below) similarly discounted; and (iv) at the time of the award any other amount necessary to compensate Landlord for all the damage proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of events would likely result therefrom, including but not limited to, all costs and expenses attributable to recovering possession of the Premises, re-letting expenses (including the costs and expenses of any necessary repairs, renovations and alterations to the Premises), costs of carrying the Premises (including but not limited to, Landlord's payment of real property taxes and insurance premiums), actual legal fees and associated costs and expenses, the unamortized portion of all brokerage commissions paid in connection with this Lease and all costs of tenant improvements (amortized without interest on a straight line basis over the initial Term of the Lease), and reimbursement of any deferred rent or other Lease execution inducement.

(ii) maintain Tenant's right of possession in which event Landlord shall have the remedy which permits Landlord to continue this Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due.  Acts of maintenance or preservation, efforts to relet the Premises, or removal or storage of Tenant's personal property, shall not constitute a termination of Tenant's right to possession or act as an acceptance of any surrender of the Premises.  Landlord shall not be required to relet any or all of the Premises prior to leasing other vacant space at the Project, nor shall Landlord be required to accept a tenant: (i) that does not otherwise meet Landlord's financial and other criteria, nor (ii) a tenant who intends to make a use other than the use permitted by the Lease.

(iii) collect sublease rents (or appoint a receiver to collect such rent) and otherwise perform Tenant's obligations at the Premises, it being agreed, however, that the appointment of a receiver for Tenant shall not constitute an election by Landlord to terminate this Lease.

(iv) pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state in which the Premises are located.

TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

(b) No remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity. The expiration or termination of this Lease and/or the termination of Tenant's right to possession of the Premises shall not relieve Tenant of liability under any indemnity provisions of this Lease as to matters occurring or accruing during the Term hereof or by reason of Tenant's occupancy of the Premises.

(c) If Tenant abandons or vacates the Premises, Landlord may re-enter the Premises and such re-entry shall not be deemed to constitute Landlord's election to accept a surrender of the Premises or to otherwise relieve Tenant from liability for its breach of this Lease. No surrender of the Premises shall be effective against Landlord unless Landlord has entered into a written agreement with Tenant in which Landlord expressly agrees to (i) accept a surrender of the Premises and (ii) relieve Tenant of liability under the Lease. The delivery by Tenant to Landlord of possession of the Premises shall not constitute the termination of the Lease or the surrender of the Premises.

(d) Landlord shall be under no obligation to relet the Premises but shall use commercially reasonable efforts to do so. The phrase "reasonable efforts" as it relates to Landlord's duty to attempt to relet the Premises, shall require Landlord to do only the following: (i) notify Landlord's leasing agent in writing of the availability of the Premises for reletting, (ii) post Landlord's leasing contact telephone number in the Project management office, (iii) show the Premises to any prospective tenant who requests to see the Premises and to any prospective tenant specifically referred to Landlord by Tenant, and (iv) show the "vacant" status of the Premises in posters and information brochures used at leasing trade meetings and conventions. Landlord shall not be required to relet the Premises before reletting any space in the Project not producing any income to Landlord.

**13.3. Default by Landlord.** Landlord shall not be in default under this Lease unless Landlord fails to perform obligations required of Landlord within thirty (30) days after written notice by Tenant to Landlord and to the holder of any mortgage or deed of trust encumbering the Project whose name and address shall have theretofore been furnished to Tenant in writing, specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for its cure, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently pursues the same to completion. In no event shall Tenant have the right to terminate this Lease as a result of Landlord's default, and Tenant's remedies shall be limited to damages and/or an injunction. This Lease and the obligations of Tenant hereunder shall not be affected or impaired because Landlord is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of a Force Majeure Event, and the time for Landlord's performance shall be extended for the period of any such delay. Any claim, demand, right or defense by Tenant that arises out of this Lease or the negotiations which preceded this Lease shall be barred unless Tenant commences an action thereon, or interposes a defense by reason thereof, within six (6) months after the date of the inaction, omission, event or action that gave rise to such claim, demand, right or defense.

**13.4. Late Charges.** Tenant hereby acknowledges that late payment by Tenant to Landlord of Base Rent, Tenant's Share of Operating Expenses, parking charges, after hours HVAC charges, or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by the terms of any mortgage or trust deed encumbering the Project. Accordingly, if any installment of Base Rent, Tenant's Share of Operating Expenses, parking charges, after hours HVAC charges or any other sum due from Tenant shall not be received by Landlord when such amount shall be due, then, without any requirement for notice or demand to Tenant, Tenant shall immediately pay to Landlord a late charge equal to six percent (6%) of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder including the assessment of interest under Section 13.5.

**13.5. Interest on Past-due Obligations.** Except as expressly herein provided, any amount due to Landlord that is not paid when due shall bear interest at the lesser of ten percent (10%) per annum, or the maximum rate permitted by applicable law. Payment of such interest shall not excuse or cure any default by Tenant under this Lease; provided, however, that interest shall not be payable on late charges incurred by Tenant nor on any amounts upon which late charges are paid by Tenant.

**13.6. Payment of Rent and Security Deposit After Default.** If Tenant fails to pay Base Rent, Tenant's Share of Operating Expenses, parking charges or any other monetary obligation due hereunder on the date it is due, after Tenant's third failure to pay any monetary obligation on the date it is due, at Landlord's option, all monetary obligations of Tenant hereunder shall thereafter be paid by cashier's check, and Tenant shall, upon demand, provide Landlord with an additional Security Deposit equal to three (3) months' Base Rent. If Landlord has required Tenant to make said payments by cashier's check or to provide an additional Security Deposit, Tenant's failure to make a payment by cashier's check or to provide an additional Security Deposit, shall be a material default hereunder.

**14. Landlord's Right to Cure Default; Payments by Tenant.** All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of rent. If Tenant shall fail to perform any of its obligations under this Lease, within a reasonable time after such performance is required by the terms of this Lease, Landlord may, but shall not be obligated to, after three (3) days' prior written notice to Tenant, make any such payment or perform any such act on Tenant's behalf without waiving its rights based upon any default of Tenant and without releasing Tenant from any obligations hereunder. Tenant shall pay to Landlord, within ten (10) days after delivery by Landlord to Tenant of

19

statements therefor, an amount equal to the expenditures reasonably made by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of this Section 14.

**15. Condemnation.** If any portion of the Premises or the Project are taken under the power of eminent domain, or sold under the threat of the exercise of such power (all of which are herein called "Condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs; provided that if so much of the Premises or Project are taken by such Condemnation as would substantially and adversely affect the operation and profitability of Tenant's business conducted from the Premises, and said taking lasts for ninety (90) days or more, Tenant shall have the option, to be exercised only in writing within thirty (30) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession. If a taking lasts for less than ninety (90) days, Tenant's rent shall be abated during said period but Tenant shall not have the right to terminate this Lease. If Tenant does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the rent, and Tenant's Share of Operating Expenses shall be reduced in the proportion that the usable floor area of the Premises taken bears to the total usable floor area of the Premises. Common Areas taken shall be excluded from the Common Areas usable by Tenant and no reduction of rent shall occur with respect thereto or by reason thereof. Landlord shall have the option in its sole discretion to terminate this Lease as of the taking of possession by the condemning authority, by giving written notice to Tenant of such election within thirty (30) days after receipt of notice of a taking by Condemnation of any part of the Premises or the Project. Any award for the taking of all or any part of the Premises or the Project under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such award shall be made as compensation for diminution in value of the leasehold, for good will, for the taking of the fee, as severance damages, or as damages for tenant improvements; provided, however, that Tenant shall be entitled to any separate award for loss of or damage to Tenant's removable personal property and for moving expenses. In the event that this Lease is not terminated by reason of such Condemnation, and subject to the requirements of any lender that has made a loan to Landlord encumbering the Project, Landlord shall to the extent of severance damages received by Landlord in connection with such Condemnation, repair any damage to the Project caused by such Condemnation except to the extent that Tenant has been reimbursed therefor by the condemning authority. This Section, not general principles of law or the State of Florida Code of Civil Procedure shall govern the rights and obligations of Landlord and Tenant with respect to the Condemnation of all or any portion of the Project.

**16. Vehicle Parking.**

      **16.1. Use of Parking Facilities.** During the Term and subject to the rules and regulations attached hereto as Exhibit "C", as modified by Landlord from time to time (the "Rules"), Tenant shall be entitled to use the number of parking spaces set forth in Section 1.13 in the parking facility of the Project at no charge during the initial Term hereof. Landlord may, in its sole discretion, assign tandem parking spaces to Tenant and designate the location of any reserved parking spaces. For purposes of this Lease, a "parking space" refers to the space in which one (1) motor vehicle is intended to park (e.g., a tandem parking stall includes two tandem parking spaces). Landlord reserves the right at any time to relocate Tenant's reserved and unreserved parking spaces; provided, any such reserved spaces must be within a reasonable proximity to the Premises. If Tenant commits or allows in the parking facility any of the activities prohibited by the Lease or the Rules, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable by Tenant upon demand by Landlord. Tenant's parking rights are the personal rights of Tenant and Tenant shall not transfer, assign, or otherwise convey its parking rights separate and apart from this Lease.

      **16.2. Parking Charges.** The initial monthly parking rate per parking space is set forth in Section 1.14 and is subject to change by Landlord, in Landlord's reasonable discretion and only if Landlord is increasing parking rates at the Project generally, upon five (5) days prior written notice to Tenant. Monthly parking fees shall be payable in advance prior to the first day of each calendar month. Visitor parking rates shall be determined by Landlord from time to time in Landlord's sole but reasonable discretion. The parking rates charged to Tenant or Tenant's visitors may not be the lowest parking rates charged by Landlord for the use of the parking facility. Notwithstanding anything to the contrary contained herein, any tax imposed on the privilege of occupying space in the parking facility, upon the revenues received by Landlord from the parking facility or upon the charges paid for the privilege of using the parking facility by any governmental or quasi-governmental entity may be added by Landlord to the monthly parking charges paid by Tenant at any time, or Landlord may require Tenant and other persons using the parking facility to pay said amounts directly to the taxing authority. The foregoing notwithstanding, Landlord agrees to abate parking rent for two (2) of the reserved parking spaces for the initial Term ("Parking Rent Abatement"). In the event Tenant is in default under the Lease after the expiration of any applicable notice and cure periods, Tenant shall no longer be entitled to the Parking Rent Abatement and the Parking Rent coming due thereafter shall not be waived, and all Parking Rent that Landlord conditionally waived in the past pursuant to this provision shall be immediately due and payable by Tenant to Landlord without notice or demand from Landlord.

**17. Broker's Fee.** Tenant and Landlord each represent and warrant to the other that neither has had any dealings or entered into any agreements with any person, entity, broker or finder other than the persons, if any, listed in Section 1.15, in connection with the negotiation of this Lease, and no other broker, person, or entity is entitled to any commission or finder's fee in connection with the negotiation of this Lease, and Tenant and Landlord each agree to indemnify, defend and hold the other harmless from and against any claims, damages, costs, expenses, attorneys' fees or liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings, actions or agreements of the indemnifying party.

20

18011-                                           TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

**18. Estoppel Certificate.**

18.1. **Delivery of Certificate.** Tenant shall at any time upon not less than ten (10) days' prior written notice from Landlord execute, acknowledge and deliver to Landlord a statement in writing certifying such information as Landlord may reasonably request including, but not limited to, the following: (a) that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) (b) the date to which the Base Rent and other charges are paid in advance and the amounts so payable, (c) that there are not, to Tenant's knowledge, any uncured defaults or unfulfilled obligations on the part of Landlord, or specifying such defaults or unfulfilled obligations, if any are claimed, (d) that all tenant improvements to be constructed by Landlord, if any, have been completed in accordance with Landlord's obligations and (e) that Tenant has taken possession of the Premises. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Project.

18.2. **Failure to Deliver Certificate.** At Landlord's option, the failure of Tenant to deliver such statement within such time shall constitute a material default of Tenant hereunder, or it shall be conclusive upon Tenant that (a) this Lease is in full force and effect, without modification except as may be represented by Landlord, (b) there are no uncured defaults in Landlord's performance, (c) not more than one month's Base Rent has been paid in advance, (d) all tenant improvements to be constructed by Landlord, if any, have been completed in accordance with Landlord's obligations and (e) Tenant has taken possession of the Premises.

**19. Landlord's Liability.** Tenant acknowledges that Landlord shall have the right to transfer all or any portion of its interest in the Project and to assign this Lease to the transferee. Tenant agrees that in the event of such a transfer Landlord shall automatically be released from all liability under this Lease; and Tenant hereby agrees to look solely to Landlord's transferee for the performance of Landlord's obligations hereunder after the date of the transfer. Upon such a transfer, Landlord shall, at its option, return Tenant's Security Deposit to Tenant or transfer Tenant's Security Deposit to Landlord's transferee and, in either event, Landlord shall have no further liability to Tenant for the return of its Security Deposit. Subject to the rights of any lender holding a mortgage or deed of trust encumbering all or part of the Project, Tenant agrees to look solely to Landlord's equity interest in the Project for the collection of any judgment requiring the payment of money by Landlord arising out of (a) Landlord's failure to perform its obligations under this Lease or (b) the negligence or willful misconduct of Landlord, its partners, employees and agents. No other property or assets of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of any judgment or writ obtained by Tenant against Landlord. No partner, employee or agent of Landlord shall be personally liable for the performance of Landlord's obligations hereunder or be named as a party in any lawsuit arising out of or related to, directly or indirectly, this Lease and the obligations of Landlord hereunder. The obligations under this Lease do not constitute personal obligations of the individual partners of Landlord and Tenant shall not seek recourse against the individual partners of Landlord or their assets.

**20. Indemnity.** Tenant hereby agrees to indemnify, defend and hold harmless Landlord, and its employees, partners, agents, contractors, lenders and ground lessors (said persons and entities are hereinafter collectively referred to as the "Indemnified Parties") from and against any and all liability, loss, cost, damage, claims, loss of rents, liens, judgments, penalties, fines, settlement costs, investigation costs, the cost of consultants and experts, attorney's fees, court costs and other legal expenses, the effects of environmental contamination, the cost of environmental testing, the removal, remediation and/or abatement of the effects of Hazardous Substances or Medical Waste (as those terms are defined below), insurance policy deductibles and other expenses (hereinafter collectively referred to as "Losses") arising out of or related to an "Indemnified Matter" (as defined below). For purposes of this Section 20, an "Indemnified Matter" shall mean any matter for which one or more of the Indemnified Parties incurs liability or Losses if the Losses arise out of or involve, directly or indirectly, (a) Tenant's or its employees, agents, contractors or invitees (all of said persons or entities are hereinafter collectively referred to as "Tenant Parties") use or occupancy of the Premises or the Project, (b) any act, omission or neglect of a Tenant Party, (c) Tenant's failure to perform any of its obligations under the Lease, (d) the existence, use or disposal of any Hazardous Substance (as defined in Section 22 below) brought on to the Project by a Tenant Party, (e) the existence, use or disposal of any Medical Waste (as described in Section 23 below) brought on to the Project by a Tenant Party or (f) any other matters for which Tenant has agreed to indemnify Landlord pursuant to any other provisions of this Lease. Tenant's obligations hereunder shall include, but shall not be limited to (a) compensating the Indemnified Parties for Losses arising out of Indemnified Matters within ten (10) days after written demand from an Indemnified Party and (b) providing a defense, with counsel reasonably satisfactory to the Indemnified Party, at Tenant's sole expense, within ten (10) days after written demand from the Indemnified Party, of any claims, action or proceeding arising out of or relating to an Indemnified Matter whether or not litigated or reduced to judgment and whether or not well founded. If Tenant is obligated to compensate an Indemnified Party for Losses arising out of an Indemnified Matter, Landlord shall have the immediate and unconditional right, but not the obligation, without notice or demand to Tenant, to pay the Losses in the Common Areas, another tenant's premises or to any other part of the Project to be repaired and to compensate other tenants of the Project or other persons or entities for Losses arising out of an Indemnified Matter. The Indemnified Parties need not first pay any Losses to be Indemnified hereunder. This indemnity is intended to apply to the fullest extent permitted by applicable law. Tenant's obligations under this Section shall survive the expiration or termination of this Lease unless specifically waived in writing by Landlord after said expiration or termination.

**21. Exemption of Landlord from Liability.** Tenant hereby agrees that Landlord shall not be liable for injury to Tenant's business or any loss of income therefrom or for loss of or damage to the merchandise, tenant improvements, fixtures, furniture, equipment, computers, files, automobiles, or other property of Tenant, Tenant's employees, agents, contractors or invitees, or any other person in or about the Project, nor shall Landlord be liable for injury to the person of Tenant, Tenant's employees, agents, contractors or invitees, whether such damage or injury is caused by or results from any cause whatsoever including, but not limited to, theft, criminal activity at the Project, negligent security measures, bombings or bomb scares, Hazardous Substances or Medical Waste, fire, steam, electricity, gas, water or rain, flooding, breakage of pipes, sprinklers, plumbing, air conditioning or lighting fixtures, or from any other cause, whether said damage or injury results from conditions arising upon the Premises or upon other portions of the

21

Project, or from other sources or places, or from new construction or the repair, alteration or improvement of any part of the Project, unless the cause of the damage or injury arises out of Landlord's or its employees, agents or contractors grossly negligent or intentional acts. Landlord shall not be liable for any damages arising from any act or neglect of any employees, agents, contractors or invitees of any other tenant, occupant or user of the Project, nor from the failure of Landlord to enforce the provisions of the lease of any other tenant of the Project. Tenant, as a material part of the consideration to Landlord hereunder, hereby assumes all risk of damage to Tenant's property or business or injury to persons, in, upon or about the Project arising from any cause, excluding Landlord's gross negligence or the gross negligence of its employees, agents or contractors, and Tenant hereby waives all claims in respect thereof against Landlord, its employees, agents and contractors.

**22. Hazardous Material.** For purposes of this Lease, the term "Hazardous Material" means any hazardous substance, hazardous waste, infectious waste, or toxic substance, material, or waste which becomes regulated or is defined as such by any local, state or federal governmental authority. Except for small quantities of ordinary office supplies such as copier toners, liquid paper, glue, ink and common household cleaning materials or ordinary medical office supplies, Tenant shall not cause or permit any Hazardous Material to be brought, kept or used in or about the Premises or the Project by Tenant, its agents, employees, contractors, or invitees. Tenant hereby agrees to indemnify Landlord from and against any breach by Tenant of the obligations stated in the preceding sentence, and agrees to defend and hold Landlord harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, diminution in value of the Project, damages for the loss or restriction or use of rentable space or of any amenity of the Project, damages arising from any adverse impact on marketing of space in the Project, sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees) which arise during or after the Term of this Lease as result of such breach. This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions and any cleanup, remedial removal, or restoration work required due to the presence of Hazardous Material. Tenant shall promptly notify Landlord of any release of a Hazardous Material in the Premises or at the Project of which Tenant becomes aware, whether caused by Tenant or any other person or entity. The provisions of this Section 22 shall survive the termination of the Lease.

    **22.1. Definition and Consent.** The term "Hazardous Substance" as used in this Lease shall mean any product, substance, chemical, material or waste whose presence, nature, quantity and/or intensity of existence, use, manufacture, disposal, transportation, spill, release or affect, either by itself or in combination with other materials expected to be on the Premises, is either: (a) potentially injurious to the public health, safety or welfare, the environment or the Premises, (b) regulated or monitored by any governmental entity, (c) a basis for liability of Landlord to any governmental entity or third party under any federal, state or local statute or common law theory or (d) defined as a hazardous material or substance by any federal, state or local law or regulation. Except for small quantities of ordinary medical office supplies and general office supplies such as copier toner, liquid paper, glue, ink and common household cleaning materials, and except as expressly provided in Section 22 above, Tenant shall not cause or permit any Hazardous Substance to be brought, kept, or used in or about the Premises or the Project by Tenant, its agents, employees, contractors or invitees.

    **22.2. Duty to Inform Landlord.** If Tenant knows, or has reasonable cause to believe, that a Hazardous Substance, or a condition involving or resulting from same, has come to be located in, on or under or about the Premises or the Project, Tenant shall immediately give written notice of such fact to Landlord. Tenant shall also immediately give Landlord (without demand by Landlord) a copy of any statement, report, notice, registration, application, permit, license, given to or received from, any governmental authority or private party, or persons entering or occupying the Premises, concerning the presence, spill, release, discharge of or exposure to, any Hazardous Substance or contamination in, on or about the Premises or the Project.

    **22.3. Inspection; Compliance.** Landlord and Landlord's employees, agent, contractors and lenders shall have the right to enter the Premises at any time in the case of an emergency, and otherwise at reasonable times, for the purpose of inspecting the condition of the Premises and for verifying compliance by Tenant with this Section 22. Landlord shall have the right to employ experts and/or consultants in connection with its examination of the Premises and with respect to the installation, operation, use, monitoring, maintenance, or removal of any Hazardous Substance on or from the Premises. The costs and expenses of any such inspections shall be paid by the party requesting same, unless a contamination, caused or materially contributed to by Tenant, is found to exist or be imminent, or unless the inspection is requested or ordered by governmental authority as the result of any such existing or imminent violation or contamination. In any such case, Tenant shall upon request reimburse Landlord for the cost and expenses of such inspection.

**23. Medical Waste.**

    **23.1. Disposal of Medical Waste.** Tenant hereby agrees, at Tenant's sole expense, to dispose of its medical waste generated at the Premises in compliance with all federal, state and local laws, rules and regulations relating to the disposal of medical waste and to dispose of the medical waste in a prudent and reasonable manner. Tenant shall not place any medical waste in refuse containers emptied by Landlord's janitorial staff or in the Project's refuse containers. If Tenant fails to comply with the provisions of this Section 23, then, Landlord shall have the right but not the obligation, upon thirty (30) days' advance written notice to Tenant, to elect to provide medical waste disposal services to Tenant. If Landlord elects to provide medical waste disposal services to Tenant as provided herein, all costs incurred by Landlord in providing such services shall be paid by Tenant to Landlord as additional rent. Landlord may bill Tenant for said costs based upon the actual cost of providing said services to Tenant, as determined by Landlord, in Landlord's sole but reasonable discretion, or Landlord may bill said expenses based upon Tenant's Share of the total cost of providing said services.

**23.2. Duty to Inform Landlord.** Within ten (10) days following Landlord's written request, Tenant shall provide Landlord with any information reasonably requested by Landlord concerning the existence, generation or disposal of medical waste at the Premises, including, but not limited to, the following information: (a) the name, address and telephone number of the person or entity employed by Tenant to dispose of its medical waste, including a copy of any contract with said person or entity, (b) a list of each type of medical waste generated by Tenant at the Premises and a description of how Tenant disposes of said medical waste, (c) a copy of any laws, rules or regulations in Tenant's possession relating to the disposal of the medical waste generated by Tenant, and (d) copies of any licenses or permits obtained by Tenant in order to generate or dispose of said medical waste. Tenant shall also immediately provide to Landlord (without demand by Landlord) a copy of any notice, registration, application, permit, or license given to or received from any governmental authority or private party, or persons entering or occupying the Premises, concerning the presence, release, exposure or disposal of any medical waste in or about the Premises or the Project.

**23.3. Inspection; Compliance.** Landlord and Landlord's employees, agents, contractors and lenders shall have the right to enter the Premises at any time in the case of an emergency, and otherwise at reasonable times, for the purpose of verifying compliance by Tenant with this Section 23. Landlord shall have the right to employ experts and/or consultants in connection with its examination of the Premises and with respect to the generation and disposal of medical waste on or from the Premises. The cost and expenses of any such inspection shall be paid by Landlord, unless it is determined that Tenant is not disposing of its medical waste in a manner permitted by applicable law, in which case Tenant shall immediately reimburse Landlord for the cost of such inspection.

**24. Tenant Improvements.** Tenant acknowledges and agrees that Landlord shall not be obligated to construct any tenant improvements on behalf of Tenant unless a work letter agreement (the "Work Letter") is attached to this Lease as Schedule 1. If a space plan is attached to the Work Letter, the space plan shall not be binding on Landlord unless the space plan has been approved by Landlord in writing. Except as set forth in a Work Letter, it is specifically understood and agreed that Landlord has no obligation and has made no promises to alter, remodel, improve, renovate, repair or decorate the Premises, the Project, or any part thereof, or to provide any allowance for such purposes, and that no representations respecting the condition of the Premises or the Project have been made by Landlord to Tenant.

See Addendum Paragraph 4

**25. Subordination.**

**25.1. Effect of Subordination.** This Lease, and any Option (as defined in Section 26 below) granted hereby, upon Landlord's written election, shall be subject and subordinate to any ground lease, mortgage, deed of trust, or any other hypothecation or security now or hereafter placed upon the Project and to any and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding such subordination, Tenant's right to quiet possession of the Premises shall not be disturbed if Tenant is not in default and so long as Tenant shall pay the rent and observe and perform all of the provisions of this Lease, unless this Lease is otherwise terminated pursuant to its terms. At the request of any mortgagee, trustee or ground lessor shall elect to have this Lease and any Options granted hereby prior to the lien of its mortgage, deed of trust or ground lease, and shall give written notice thereof to Tenant, this Lease and such Options shall be deemed prior to such mortgage, deed of trust or ground lease, whether this Lease or such Options are dated prior or subsequent to the date of said mortgage, deed of trust or ground lease or the date of recording thereof. In the event of the foreclosure of a security device, the new owner shall not (a) be liable for any act or omission of any prior landlord or with respect to events occurring prior to its acquisition of title, (b) be liable for the breach of this Lease by any prior landlord, (c) be subject to any offsets or defenses which Tenant may have against the prior landlord or (d) be liable to Tenant for the return of its Security Deposit.

**25.2. Execution of Documents.** Tenant agrees to execute and acknowledge any documents Landlord reasonably requests that Tenant execute to effectuate an attornment, a subordination, or to make this Lease or any Option granted herein prior to the lien of any mortgage, deed of trust or ground lease, as the case may be. Tenant acknowledges that the subordination agreement may give the lender the right, in the lender's sole discretion, to continue this Lease in effect or to terminate this Lease in the event of a foreclosure sale. Tenant's failure to execute such documents within ten (10) days after written demand shall constitute a material default by Tenant hereunder or, at Landlord's option, Landlord shall have the right to execute such documents on behalf of Tenant as Tenant's attorney-in-fact. Tenant does hereby make, constitute and irrevocably appoint Landlord as Tenant's attorney-in-fact and in Tenant's name, place and stead, to execute such documents in accordance with this Section 25.2.

**26. Options.**

**26.1. Definition.** As used in this Lease, the word "Option" has the following meaning: (1) the right or option to extend the Term of this Lease or to renew this Lease, and (2) the option or right of first refusal to lease the Premises or the right of first offer to lease the Premises or the right of first refusal to lease other space within the Project or the right of first offer to lease other space within the Project, and (3) the right or option to terminate this Lease prior to its expiration date or to reduce the size of the Premises. Any Option granted to Tenant by Landlord must be evidenced by a written option agreement attached to this Lease as a rider or addendum or said option shall be of no force or effect.

23

**26.2. Options Personal.** Each Option granted to Tenant in this Lease, if any, is personal to the original Tenant and may be exercised only by the original Tenant while occupying the entire Premises and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than Tenant, including, without limitation, any permitted transferee as defined in Section 12. The Options, if any, herein granted to Tenant are not assignable separate and apart from this Lease, nor may any Option be separated from this Lease in any manner, either by reservation or otherwise. If at any time an Option is exercisable by Tenant, the Lease has been assigned, or a sublease exists as to any portion of the Premises, the Option shall be deemed null and void and neither Tenant nor any assignee or subtenant shall have the right to exercise the Option. For purposes of this Section 26.2 only, the restrictions set forth herein shall not apply to (i) any Option granted to Tenant to renew the Lease or extend the Term of the Lease, or (ii) to a Permitted Transferee, and, a Permitted Transferee to whom this Lease has been assigned shall have the same rights to exercise an Option as the original Tenant.

**26.3. Multiple Options.** In the event that Tenant has multiple Options to extend or renew this Lease a later Option cannot be exercised unless the prior Option to extend or renew this Lease has been so exercised.

**26.4. Effect of Default on Options.** Tenant shall have no right to exercise an Option during the time commencing from the date Landlord gives to Tenant a notice of default pursuant to Section 13.1 and continuing until the noncompliance alleged in said notice of default is cured. The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise an Option because of the provisions of this Section 26.4.

**26.5. Limitations on Options.** Notwithstanding anything to the contrary contained in any rider or addendum to this Lease, any options (other than any options to renew the Lease granted to Tenant pursuant to Paragraph 5 of the Addendum), rights of first refusal or rights of first offer granted hereunder shall be subject and secondary to Landlord's right to first offer and lease any such space to any tenant who is then occupying or leasing such space at the time the space becomes available for leasing and shall be subject and subordinated to any other options, rights of first refusal or rights of first offer previously given to any other person or entity.

**26.6. Notice of Exercise of Option.** Notwithstanding anything to the contrary contained in Section 40, Tenant may only exercise an option by delivering its written notice of exercise to Landlord by certified mail, return receipt and date of delivery requested. It shall be Tenant's obligation to prove that such notice was so sent in a timely manner and was delivered to Landlord by the U.S. Postal Service.

### See Addendum Paragraphs 5, 6 and 7

**27. Landlord Reservations.** Landlord shall have the right: (a) to change the name and address of the Project or Building upon not less than ninety (90) days prior written notice; (b) to, at Tenant's expense, provide and install Building standard graphics on or near the door of the Premises and such portions of the Common Areas as Landlord shall determine, in Landlord's sole discretion; (c) to permit any tenant the exclusive right to conduct any business as long as such exclusive right does not conflict with any rights expressly given herein; and (d) to place signs, notices or displays upon the roof, interior, exterior or Common Areas of the Project. Tenant shall not use a representation (photographic or otherwise) of the Building or the Project or their name(s) in connection with Tenant's business or suffer or permit anyone, except in an emergency, to go upon the roof of the Building. Landlord reserves the right to use the exterior walls of the Premises, and the area beneath, adjacent to and above the Premises, together with the right to install, use, maintain and replace equipment, machinery, pipes, conduits and wiring through the Premises, which serve other parts of the Project, provided that Landlord's use does not unreasonably interfere with Tenant's use of the Premises.

**28. Changes to Project.** Landlord shall have the right, in Landlord's sole discretion, from time to time, to make changes to the size, shape, location, number and extent of the improvements comprising the Project (hereinafter referred to as "Changes") including, but not limited to, the Project interior and exterior, the Common Areas, elevators, escalators, restrooms, HVAC, electrical systems, communication systems, fire protection and detection systems, plumbing systems, security systems, parking control systems, driveways, entrances, parking spaces, parking areas and landscaped areas so long as such Changes do not have a permanent material adverse effect on Tenant's use and occupancy of the Premises. In connection with the Changes, Landlord may, among other things, erect scaffolding or other necessary structures at the Project, limit or eliminate access to portions of the Project, including portions of the Common Areas, or perform work in the Building, which work may create noise, dust or leave debris in the Building. Tenant hereby agrees that such Changes and Landlord's actions in connection with such Changes shall in no way constitute a constructive eviction of Tenant or entitle Tenant to any abatement of rent. Landlord shall have no responsibility or for any reason be liable to Tenant for any direct or indirect injury to or interference with Tenant's business arising from the Changes, nor shall Tenant be entitled to any compensation or damages from Landlord for any inconvenience or annoyance occasioned by such Changes or Landlord's actions in connection with such Changes.

**29. Intentionally Omitted.**

**30. Holding Over.** If Tenant remains in possession of the Premises or any part thereof after the expiration or earlier termination of the term hereof with Landlord's consent, such occupancy shall be a tenancy from month to month upon all the terms and conditions of this Lease pertaining to the obligations of Tenant, except that the Base Rent payable shall be the one hundred fifty percent (150%) of the Base Rent and additional rent payable immediately preceding the termination date of this Lease, and all Options, if any, shall be deemed terminated and be of no further effect. If Tenant remains in possession of the Premises or any part thereof

after the expiration of the Term hereof without Landlord's consent, Tenant shall, at Landlord's option, be treated as a tenant at sufferance or a trespasser. Nothing contained herein shall be construed to constitute Landlord's consent to Tenant holding over at the expiration or earlier termination of the Term. Tenant hereby agrees to indemnify, hold harmless and defend Landlord from any cost, loss, claim or liability (including attorneys' fees) Landlord may incur as a result of Tenant's failure to surrender possession of the Premises to Landlord upon the termination of this Lease.

**31. Landlord's Access.**

31.1. **Access.** Landlord and Landlord's agents and employees shall have the right to enter the Premises at reasonable times upon reasonable prior notice (except for the provision of Building standard janitorial services and in the case of an emergency in which case no such notice shall be required) for the purpose of inspecting the Premises, performing any services required of Landlord, showing the Premises to prospective purchasers, lenders, or tenants, undertaking safety measures and making alterations, repairs, improvements or additions to the Premises or to the Project. In the event of an emergency, Landlord may immediately gain access to the Premises by any reasonable means, and Landlord shall not be liable to Tenant for damage to the Premises or to Tenant's property resulting from such access. Landlord may at any time place on or about the Building for sale or for lease signs and Landlord may at any time during the last one hundred twenty (120) days of the Term hereof place on or about the Premises for lease signs.

31.2. **Keys.** Landlord shall have the right to retain keys to the locks on the entry doors to the Premises and all interior doors at the Premises. At Landlord's option, Landlord may require Tenant to obtain all keys to door locks at the Premises from Landlord's engineering staff or Landlord's locksmith and to only use Landlord's engineering staff or Landlord's locksmith to change locks at the Premises. Tenant shall pay Landlord's or its locksmith's standard charge for all keys and other services obtained from Landlord's engineering staff or locksmith.

**32. Security Measures.** Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Project, and Landlord shall have no liability to Tenant due to its failure to provide such services. Tenant assumes all responsibility for the protection of Tenant, its agents, employees, contractors and invitees and the property of Tenant and of Tenant's agents, employees, contractors and invitees from acts of third parties. Nothing herein contained shall prevent Landlord, at Landlord's sole option, from implementing security measures for the Project or any part thereof, in which event Tenant shall participate in such security measures and the cost thereof shall be included within the definition of Operating Expenses, and Landlord shall have no liability to Tenant and its agents, employees, contractors and invitees arising out of Landlord's negligent provision of security measures. Landlord shall have the right, but not the obligation, to require all persons entering or leaving the Project to identify themselves to a security guard and to reasonably establish that such person should be permitted access to the Project.

**33. Easements.** Landlord reserves to itself the right, from time to time, to grant such easements, rights and dedications that Landlord deems necessary or desirable, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Tenant. Tenant shall sign any of the aforementioned documents within ten (10) days after Landlord's request and Tenant's failure to do so shall constitute a material default by Tenant. The obstruction of Tenant's view, air, or light by any structure erected in the vicinity of the Project, whether by Landlord or third parties, shall in no way affect this Lease or impose any liability upon Landlord.

**34. Transportation Management.** Tenant shall fully comply at its sole expense with all present or future programs implemented or required by any governmental or quasi-governmental entity or Landlord to manage parking, transportation, air pollution, or traffic in and around the Project or the metropolitan area in which the Project is located.

**35. Severability.** The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

**36. Time of Essence.** Time is of the essence with respect to each of the obligations to be performed by Tenant and Landlord under this Lease.

**37. Definition of Additional Rent.** All monetary obligations of Tenant to Landlord under the terms of this Lease, including, but not limited to, Base Rent, Tenant's Share of Operating Expenses, parking charges, late charges and charges for after-hours HVAC shall be deemed to be rent.

**38. Incorporation of Prior Agreements.** This Lease and the attachments listed in Section 1.16 contain all agreements of the parties with respect to the lease of the Premises and any other matter mentioned herein. No prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective. Except as otherwise stated in this Lease, Tenant hereby acknowledges that no real estate broker nor Landlord or any employee or agents of any of said persons has made any oral or written warranties or representations to Tenant concerning the condition or use by Tenant of the Premises or the Project or concerning any other matter addressed by this Lease.

**39. Amendments.** This Lease may be modified in writing only, signed by the parties in interest at the time of the modification.

18011-                                                          TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

**40. Notices.** Subject to the requirements of Section 26.6 of this Lease, all notices required or permitted by this Lease shall be in writing and may be delivered (a) in person (by hand, by messenger or by courier service), (b) by U.S. Postal Service regular mail, (c) by U.S. Postal Service certified mail, return receipt requested, (d) by U.S. Postal Service Express Mail, Federal Express or other overnight courier, or (e) by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Section 40. Any notice permitted or required hereunder, and any notice to pay rent or quit or similar notice, shall be deemed personally delivered to Tenant on the date the notice is personally delivered to any employee of Tenant at the Premises. The addresses set forth in Section 1.17 of this Lease shall be the address of each party for notice purposes. Landlord or Tenant may by written notice to the other specify a different address for notices purposes, except that upon Tenant's taking possession of the Premises, the Premises shall constitute Tenant's address for the purpose of mailing or delivering notices to Tenant. A copy of all notices required or permitted to be given to Landlord hereunder shall be concurrently transmitted to such party or parties at such addresses as Landlord may from time to time hereinafter designate by written notice to Tenant. Any notice sent by regular mail or by certified mail, return receipt requested, shall be deemed given three (3) days after deposited with the U.S. Postal Service. Notices delivered by U.S. Express Mail, Federal Express or other courier shall be deemed given on the date delivered by the carrier to the appropriate party's address for notice purposes. If any notice is transmitted by facsimile transmission, the notice shall be deemed delivered upon telephone confirmation of receipt of the transmission thereof at the appropriate party's address for notice purposes. A copy of all notices delivered to a party by facsimile transmission shall also be mailed to the party on the date the facsimile transmission is completed. If notice is received on Saturday, Sunday or a legal holiday, it shall be deemed received on the next business day. Nothing contained herein shall be construed to limit Landlord's right to serve any notice to pay rent or quit or similar notice by any method permitted by applicable law, and any such notice shall be effective if served in accordance with any method permitted by applicable law whether or not the requirements of this Section have been met.

**41. Waivers.** No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Landlord or Tenant of the same or any other provision. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act by Tenant. The acceptance of rent hereunder by Landlord shall not be a waiver of any preceding breach by Tenant of any provision hereof, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No acceptance by Landlord of partial payment of any sum due from Tenant shall be deemed a waiver by Landlord of its right to receive the full amount due, nor shall any endorsement or statement on any check or accompanying letter from Tenant be deemed an accord and satisfaction. Tenant hereby waives for Tenant and all those claiming under Tenant all rights now or hereafter existing to redeem by order or judgment of any court or by legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.

**42. Covenants.** This Lease shall be construed as though the covenants contained herein are independent and not dependent and Tenant hereby waives the benefit of any statute to the contrary. All provisions of this Lease to be observed or performed by Tenant are both covenants and conditions.

**43. Binding Effect; Choice of Law.** Subject to any provision hereof restricting assignment or subletting by Tenant, this Lease shall bind the parties, their heirs, personal representatives, successors and assigns. This Lease shall be governed by the laws of the state in which the Project is located and any litigation concerning this Lease between the parties hereto shall be initiated in the county in which the Project is located.

**44. Attorneys' Fees.** If Landlord or Tenant brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, or appeal thereon, shall be entitled to its reasonable attorneys' fees and court costs to be paid by the losing party as fixed by the court in the same or separate suit, and whether or not such action is pursued to decision or judgment. The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees and court costs reasonably incurred in good faith. Landlord shall be entitled to reasonable attorneys' fees and all other costs and expenses incurred in the preparation and service of notices of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default. Landlord and Tenant agree that attorneys' fees incurred with respect to defaults and bankruptcy are actual pecuniary losses within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code or any successor statute.

**45. Auctions.** Tenant shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction upon the Premises or the Common Areas. The holding of any auction on the Premises or Common Areas in violation of this Section 45 shall constitute a material default hereunder.

**46. Signs.** Tenant shall not place any sign upon the Premises (including on the inside or the outside of the doors or windows of the Premises or inside of the Premises when the same can be seen from outside the Premises) or the Project without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion. Landlord shall have the right to place any sign it deems appropriate on any portion of the Project except the interior of the Premises. Any sign Landlord permits Tenant to place upon the Premises shall be maintained by Tenant, at Tenant's sole expense. If Landlord permits Tenant to include its name in the Building's directory, the cost of placing Tenant's name in the directory and the cost of any subsequent modifications thereto shall be paid by Tenant, at Tenant's sole expense.

**See Addendum Paragraph 8**

TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

**47. Merger.** The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or a termination by Landlord, shall not result in the merger of Landlord's and Tenant's estates, and shall, at the option of Landlord, terminate all or any existing subtenancies or may, at the option of Landlord, operate as an assignment to Landlord of any or all of such subtenancies.

**48. Quiet Possession.** Subject to the other terms and conditions of this Lease, and the rights of any lender, and provided Tenant is not in default hereunder, Tenant shall have quiet possession of the Premises for the entire term hereof, subject to all of the provisions of this Lease.

**49. Authority.** If Tenant is a corporation, trust, general or limited partnership, or other entity, Tenant, and each individual executing this Lease on behalf of such entity, represents and warrants that such individual is duly authorized to execute and deliver this Lease on behalf of said entity, that said entity is duly authorized to enter into this Lease, and that this Lease is enforceable against said entity in accordance with its terms. If Tenant is a corporation, trust or partnership, Tenant shall deliver to Landlord upon demand evidence of such authority satisfactory to Landlord.

**50. Conflict.** Except as otherwise provided herein to the contrary, any conflict between the printed provisions, exhibits, addenda or riders of this Lease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions.

**51. Multiple Parties.** If more than one person or entity is named as Tenant herein, the obligations of Tenant shall be the joint and several responsibility of all persons or entities named herein as Tenant. Service of a notice in accordance with Section 40 on one Tenant shall be deemed service of notice on all Tenants.

**52. Interpretation.** This Lease shall be interpreted as if it was prepared by both parties and ambiguities shall not be resolved in favor of Tenant because all or a portion of this Lease was prepared by Landlord. The captions contained in this Lease are for convenience only and shall not be deemed to limit or alter the meaning of this Lease. As used in this Lease the words tenant and landlord include the plural as well as the singular. Words used in the neuter gender include the masculine and feminine gender. Notwithstanding anything to the contrary contained in this Lease, if the Term of the Lease has not commenced within twenty-one (21) years after the date of this Lease, this Lease shall automatically terminate on the twenty-first (21st) anniversary of such date. The sole purpose of this provision is to avoid any interpretation of this Lease as a violation of the Rule Against Perpetuities, or any other rule of law or equity concerning restraints on alienation.

**53. Prohibition Against Recording.** Neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant. Landlord shall have the right to, record a memorandum of this Lease, and Tenant shall execute, acknowledge and deliver to Landlord for recording any memorandum prepared by Landlord.

**54. Relationship of Parties.** Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant.

**55. Rules and Regulations.** Tenant agrees to abide by and conform to the Rules and to cause its employees, suppliers, customers and invitees to so abide and conform. Landlord shall have the right, from time to time, to modify, amend and enforce the Rules, so long as any such modifications or amendments do not increase Tenant's obligations nor decrease Tenant's rights hereunder except to a de minimis extent. Landlord shall not be responsible to Tenant for the failure of other persons including, but not limited to, other tenants, their agents, employees and invitees to comply with the Rules. In the event of any conflict between the terms and provisions of this Lease and the Rules, the terms and provisions of this Lease shall control.

**56. Right to Lease.** Landlord reserves the absolute right to effect such other tenancies in the Project as Landlord in its sole discretion shall determine, and Tenant is not relying on any representation that any specific tenant or number of tenants will occupy the Project.

**57. Security Interest.** In consideration of the covenants and agreements contained herein, and as a material consideration to Landlord for entering into this Lease, Tenant hereby unconditionally grants to Landlord a continuing security interest in and to all personal property of Tenant located or left at the Premises and the Security Deposit, if any, and any advance rent payment or other deposit, now in or hereafter delivered to or coming into the possession, custody or control of Landlord, by or for the account of Tenant, together with any increase in profits or proceeds from such property. The security interest granted to Landlord here under secures payment and performance of all obligations of Tenant under this Lease now or hereafter arising or existing, whether direct or indirect, absolute or contingent, or due or to become due. In the event of a default under this Lease which is not cured within the applicable grace period, if any, Landlord is and shall be entitled to all the rights, powers and remedies granted a secured party under the State of Florida Uniform Commercial Code and otherwise available at law or in equity, including, but not limited to, the right to retain as damages the personal property, Security Deposit and other funds held by Landlord, without additional notice or demand regarding this security interest. Tenant agrees that it will execute such other documents or instruments as may be reasonably necessary to carry out and effectuate the purpose and terms of this Section, or as otherwise reasonably requested by Landlord, including without limitation, execution of a UCC-1 financing statement. Tenant's failure to execute such documents within ten (10) days after written demand shall constitute a material default by Tenant hereunder and, at Landlord's option, Landlord shall have the right to execute such documents on behalf of Tenant as Tenant's attorney-in-fact. Tenant does hereby make, constitute and

27

irrevocably appoint Landlord as Tenant's attorney-in-fact, and Landlord shall have the right to execute such documents in Tenant's name. Tenant hereby waives any rights it may have under Sections 680.501 through 680.532 of the Florida Uniform Commercial Code which are inconsistent with Landlord's rights under this Section. Landlord's rights under this Section are in addition to Landlord's rights under Sections 5 and 13.

**58. Security for Performance of Tenant's Obligations.** Notwithstanding any Security Deposit held by Landlord pursuant to Section 5 and any security interest held by Landlord pursuant to Section 57, Tenant hereby agrees that in the event of a default by Tenant beyond any applicable notice and cure provision, Landlord shall be entitled to seek and obtain a writ of attachment and/or a temporary protective order and Tenant hereby waives any rights or defenses to contest such a writ of attachment and/or temporary protective order on the basis of Florida Code of Civil Practice and Procedure Section 76.24 or any other related statute or rule.

**59. Financial Statements.** From time to time, at Landlord's request, Tenant shall cause the following financial information to be delivered to Landlord, at Tenant's sole cost and expense, upon not less than ten (10) days' advance written notice from Landlord: (a) a current financial statement for Tenant and Tenant's financial statements for the previous two accounting years, (b) a current financial statement for any guarantor(s) of this Lease and the guarantor's financial statements for the previous two accounting years and (c) such other financial information pertaining to Tenant or any guarantor as Landlord or any lender or purchaser of Landlord may reasonably request. All financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant. Tenant hereby authorizes Landlord, from time to time, without notice to Tenant, to obtain a credit report or credit history on Tenant form any credit reporting company. Except as required by law and/or unless such information otherwise becomes public (other than as a result of Landlord's breach of this provision), Landlord agrees that it shall keep such information confidential and it and its partners, officers, directors, employees, brokers, and attorneys, if any, shall not disclose the information contained in such financial statements to any other person or entity, other than Landlord's mortgagees, brokers, agents, accountants and attorneys on an as needed basis under the condition of confidentiality, without the prior written consent of Tenant, which such consent shall not be unreasonably withheld.

**60. Attachments.** The items listed in Section 1.16 are a part of this Lease and are incorporated herein by this reference.

### See Addendum Paragraph 9 and 10

**61. Confidentiality.** Tenant acknowledges and agrees that the terms of this Lease are confidential and constitute propriety information of Landlord. Disclosure of the terms hereof could adversely affect the ability of Landlord to negotiate other leases with respect to the Project and may impair Landlord's relationship with other tenants of the Project. Tenant agrees that it and its partners, officers, directors, employees, brokers, and attorneys, if any, shall not disclose the terms and conditions of this Lease to any other person or entity without the prior written consent of Landlord which may be given or withheld by Landlord, In Landlord's sole discretion. It is understood and agreed that damages alone would be an inadequate remedy for the breach of this provision by Tenant, and Landlord shall also have the right to seek specific performance of this provision and to seek injunctive relief to prevent its breach or continued breach.

**62. OFAC Certification.**

     **62.1.** Tenant certifies that; (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.

     **62.2.** Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

**63. Radon Gas.** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. The foregoing disclosure is provided to comply with state law and is for informational purposes only. Landlord has not conducted radon testing with respect to the Building and specifically disclaims any and all representations and warranties as to the absence of radon gas or radon producing conditions in connection with the Building and the Premises.

**64. Moisture and Mold.** Tenant acknowledges and agrees that: (i) mold spores are present essentially everywhere, and that (ii) mold can grow in most moist locations and (iii) good housekeeping, ventilation and moisture control (especially in kitchens, janitor's closets, bathrooms, break rooms and around outside walls) are essential for mold prevention. Tenant has previously inspected the Premises and certifies that Tenant has not observed mold, mildew or moisture within the Premises. Tenant agrees to immediately notify Landlord (and Landlord's property manager) if Tenant observes mold/mildew and/or moisture conditions (from any source, including leaks) and allow Landlord to evaluate and make recommendations and/or take appropriate corrective action. Tenant

18011-                                                            TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

releases Landlord (and Landlord's property manager) from any liability for any personal injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew in or on the Premises.

**65. WAIVER OF JURY TRIAL.** LANDLORD AND TENANT HEREBY WAIVE THEIR RESPECTIVE RIGHT TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION, PROCEEDING AND/OR HEARING BROUGHT BY EITHER LANDLORD AGAINST TENANT OR TENANT AGAINST LANDLORD ON ANY MATTER WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR ANY CLAIM OF INJURY OR DAMAGE, OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY LAW, STATUTE, OR REGULATION, EMERGENCY OR OTHERWISE, NOW OR HEREAFTER IN EFFECT.

**66. Counterpart Copies/Electronic Signatures.** This Lease may be executed in two or more counterpart copies, each of which shall be deemed to be an original and all of which counterparts shall have the same force and effect as if the parties hereto had executed a single copy of this Lease. The parties acknowledge and agree that notwithstanding any law or presumption to the contrary, an electronic or telefaxed signature (hereinafter, an "Electronic Signature") of either party, whether upon this Lease or any related document, shall be deemed valid and binding and admissible by either party against the other as if same were an original ink signature. Landlord and Tenant hereby acknowledge and agree that they (i) intend to be bound by any Electronic Signatures, (ii) are aware that the other party will rely on such Electronic Signatures, and (iii) hereby waive any defenses to the enforcement of the terms of this Lease based on the foregoing forms of signature.

**[SIGNATURES APPEAR ON NEXT PAGE]**

18011-                                                    TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

LANDLORD AND TENANT ACKNOWLEDGE THAT THEY HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.   THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LANDLORD AND TENANT WITH RESPECT TO THE PREMISES.   TENANT ACKNOWLEDGES THAT IT HAS BEEN GIVEN THE OPPORTUNITY TO HAVE THIS LEASE REVIEWED BY ITS LEGAL COUNSEL PRIOR TO ITS EXECUTION.  PREPARATION OF THIS LEASE BY LANDLORD OR LANDLORD'S AGENT AND SUBMISSION OF SAME TO TENANT SHALL NOT BE DEEMED AN OFFER BY LANDLORD TO LEASE THE PREMISES TO TENANT OR THE GRANT OF AN OPTION TO TENANT TO LEASE THE PREMISES.  THIS LEASE SHALL BECOME BINDING UPON LANDLORD AND TENANT ONLY WHEN FULLY EXECUTED BY BOTH PARTIES AND WHEN LANDLORD HAS DELIVERED THIS LEASE TO TENANT IN THE MANNER SET FORTH IN THIS LEASE, INCLUDING BY ELECTRONIC SIGNATURE.

LANDLORD

**FUND VIII POINTE BROWARD, L.P.,**
a Delaware limited partnership

By:  Fund VIII Pointe Broward, LLC,
     a Delaware limited liability company,
     General Partner

   By:  The Realty Associates Fund VIII, L.P.,
        a Delaware limited liability company,
        Sole Member

      By:  Realty Associates Fund VIII LLC, a
           Massachusetts limited liability company,
           general partner

         By:  Realty Associates Advisors LLC, a Delaware
              limited liability company, Manager

            By:  Realty Associates Advisors Trust, a
                 Massachusetts business trust, Manager

                 By: _____  Alan Brand, Regional Director
                                                Dec 27 2012 12:04 PM
                           Officer

TENANT

**THE LASIK VISION INSTITUTE, LLC,**
a Delaware limited liability company

By: _____ (CEO)
         Ben Cook
         (Print Name)

Its: _____
         CEO
         (Print Title)

Date of Tenant's Execution:  12-14-2012

Witnesses as to Landlord:

_____  Alyssa Healy
Alyssa Healy              Dec 27 2012 2:09 PM
Signature of Landlord's Witness 1

_____  Danielle Dachaine
Danielle Dachaine         Dec 27 2012 2:31 PM
Signature of Landlord's Witness 2

Witnesses as to Tenant:

_____
Signature of Tenant's Witness 1

_____
Signature of Tenant's Witness 2

18011-                                          TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

ADDENDUM

THIS ADDENDUM (the "Addendum") is attached to the Lease dated as of December 12, 2012 by and between **FUND VIII POINTE BROWARD, L.P.**, a Delaware limited partnership ("Landlord") and **THE LASIK VISION INSTITUTE, LLC**, a Delaware limited liability company ("Tenant") and incorporated herein by reference thereto. To the extent that there are any conflicts between the provisions of the Lease and the provisions of this Addendum, the provisions of this Addendum shall supersede the conflicting provisions of the Lease.

1.  **Rent Abatement.**

a.      Notwithstanding anything to the contrary contained in this Lease, no Base Rent or Tenant's Share of Operating Expenses (the "First Rent Abatement") shall be paid by Tenant for the first (1st) three (3) full calendar months of the Term of the Lease (the "First Rent Abatement Period"). No other amounts due to Landlord under this Lease during the First Rent Abatement Period other than the First Rent Abatement shall be abated, except as expressly provided herein.

b.      In addition to the First Rent Abatement, provided that Tenant is not in default under the Lease beyond any applicable notice and cure period, a portion of the Base Rent payable by Tenant hereunder in the amount of Two Thousand Sixty Five and 04/100 Dollars ($2,065.04) shall be abated for a period of six (6) consecutive full calendar months (the "Second Rent Abatement Period") commencing on the first day of the fourth (4th) full calendar month of the Term of the Lease and ending on the last day of the ninth (9th) full calendar month of the Term of the Lease (the "Second Rent Abatement"). Accordingly, Tenant shall pay Base Rent for the Premises during the Second Rent Abatement Period in the amount of Two Thousand Sixty Five and 04/100 Dollars ($2,065.04) per month. Commencing at the expiration of the Second Rent Abatement Period, Tenant shall commence paying Base Rent in the full amount set forth in the rent table contained in Section 1.8 of the Lease. No other amounts due to Landlord under this Lease during the Second Rent Abatement Period other than the Second Rent Abatement shall be abated, except as expressly provided herein.

c.      In the event Tenant defaults under Lease at any time during the Term of the Lease and fails to cure such default within any applicable notice and cure period, Tenant shall not be entitled to any further abatement of Base Rent or Operating Expenses pursuant to this provision and all Base Rent and Operating Expenses previously abated shall be immediately paid by Tenant to Landlord. Nothing contained in this Paragraph shall be construed to relieve Tenant of the obligation set forth in Section 4.1 of the Lease to pay to Landlord the first month's Base Rent concurrently with Tenant's execution of the Lease or to pay any prorated portion of Base Rent for the period between the Commencement Date and the first day of the first full calendar month of the Term (if the Commencement Date is other than the first day of a calendar month).

2.      **Operating Expense Increases.**      Section 4.2 of the Lease is hereby modified by adding the following new Section 4.2(i) therein:

Notwithstanding anything to the contrary contained in this Section 4.2, Tenant shall not be obligated to pay to Landlord Tenant's Share of increases in Controllable Operating Expenses (defined hereinafter) for each calendar year during the Term hereof following the first full calendar year of the Term, to the extent that such increases in Controllable Operating Expenses exceed five percent (5%) of the previous calendar year's Controllable Operating Expenses (the "Controllable Operating Expenses Cap"). For purposes of this Section, "Controllable Operating Expenses" shall mean all Operating Expenses other than Non-Controllable Expenses (defined hereinafter). "Non-Controllable Expenses" shall mean utilities, insurance costs, cost increases in connection with government regulation, real property tax increases, and any other costs that are beyond Landlord's reasonable control. The Controllable Operating Expense Cap shall be applied separately during each year of the Term and shall function as follows:  If Controllable Operating Expenses have increased by more than five percent (5%) in a previous calendar year and by less than five percent (5%) in a subsequent calendar year, Landlord shall have the right to pass through to Tenant the increase in Controllable Operating Expenses in such subsequent calendar year that Landlord was unable to pass through in such previous calendar year provided that Landlord does not exceed in any calendar year a maximum increase of five percent (5%). For example, assume that Controllable Operating Expenses for the calendar year 2013 increased by eight percent (8%). Assume further that Controllable Operating Expenses for the calendar year 2014 increased by two percent (2%). In this event, Tenant's Share of Controllable Operating Expenses could be increased by five percent (5%) in 2013 and by five percent (5%) in 2014.

3.      **Security Deposit Letter of Credit.** Section 5 of the Lease is hereby amended by adding the following at the end of Section 5:

a.      The security deposit shall be in the form of cash or, at Tenant's option, an irrevocable letter of credit (the "Security Deposit L/C) in the amount set forth in Section 1.10 as security for Tenant's full and faithful performance of Tenant's obligations hereunder. If the security deposit is in the form of a letter of credit, the Security Deposit L/C shall be delivered to Landlord at Tenant's sole cost and expense. The Security Deposit L/C shall be issued by and drawn on a bank reasonably acceptable to Landlord, in Landlord's reasonable discretion, and shall name Landlord as Beneficiary. The Security Deposit L/C shall be substantially in the form attached hereto as Exhibit D. If the maturity date of the Security Deposit L/C is prior to the one hundred twentieth (120th) day following the end of the Term of the Lease, Tenant shall renew the Security Deposit L/C as often as is

necessary with the same bank or financial institution (or a similar bank or financial institution reasonably acceptable to Landlord) and upon the same terms and conditions, not less than thirty (30) days prior to the purported expiration date of the Security Deposit L/C in order that the Security Deposit L/C shall not expire prior to that day which is one hundred twenty (120) days following the expiration of the Term.  In the event that Tenant fails to timely renew the Security Deposit L/C as aforesaid, Landlord shall be entitled to draw against the entire amount of the Security Deposit L/C. The Security Deposit L/C shall be assignable by Landlord and upon such assignment to any party assuming in writing the lessor interest in this Lease, Landlord shall be relieved from all liability to Tenant therefor.

b.     Upon the occurrence of any default by Tenant in the payment of Base Rent or upon the occurrence of the events described in Section 13.1 of the Lease that continue beyond the expiration of any applicable notice and cure period set forth therein or in the event that Landlord terminates this Lease in accordance with the terms hereof following a default by Tenant that continues beyond the expiration of any applicable notice and cure period set forth therein, Landlord shall have the right to draw the entire amount of the Security Deposit L/C.  Landlord agrees to copy Tenant on any notice to the issuing bank requesting a draw against the Security Deposit L/C.  In the event that Tenant defaults in making any money payment required to be made by Tenant under the terms of this Lease other than the payment of Base Rent, then Landlord shall be entitled to draw upon so much of the Security Deposit L/C as equals the defaulted payment(s), plus any interest or other charges due thereon in accordance with this Lease. If Landlord elects to make a partial draw upon the Security Deposit L/C, Tenant shall promptly restore the Security Deposit L/C to its original amount within ten (10) business days after written demand therefor. Landlord's election to make a partial draw upon the Security Deposit L/C shall in no event prejudice or waive Landlord's right to terminate this Lease if permitted under applicable provisions of this Lease, nor shall such election prejudice or waive any other remedy of Landlord reserved under the terms of this Lease, including the right to draw the entire amount of the Security Deposit L/C, if applicable.  The Security Deposit L/C shall be available for payment against the presentation of a sight draft by the Landlord together with a certificate from Landlord that Tenant is in default of its obligations hereunder beyond expiration of any applicable notice and cure periods and that Landlord is entitled, by the terms of this Lease, to draw upon the Security Deposit L/C.  The proceeds of the Security Deposit L/C, if drawn by Landlord pursuant to the terms hereof, shall be held by Landlord in accordance with the provisions of Section 5 of the Lease and applied to reduce any amount owed by Tenant to Landlord.  No interest shall be payable for any Security Deposit L/C proceeds held on account.

c.     In the event that (1) Landlord draws the full amount of the Security Deposit L/C as a result of a default by Tenant that continues beyond the expiration of any applicable notice and cure period set forth therein, (2) this Lease is not terminated by Landlord as a result of such default, (3) such default is fully cured by Tenant, and (4) there is no outstanding uncured default by Tenant, then the balance of the sums drawn (after the payment of any sums related to the curing of any defaults) shall be applied first to obtain a replacement letter of credit as security for Tenant's performance hereunder, and the remaining balance, if any, will be refunded to Tenant. Upon the termination of this Lease and the payment in full to Landlord of all damages, costs and expenses to which Landlord is entitled, the balance of any funds drawn from the Security Deposit L/C after satisfying such obligations in full shall be refunded to Tenant.

d.     To the extent that the Security Deposit L/C is either lost or the issuing bank will not honor the Security Deposit L/C, Tenant guarantees the proceeds of the Security Deposit L/C and will immediately remit to Landlord the amount of the Security Deposit in cash to be held in accordance with this Section 5 of the Lease.

e.     Notwithstanding anything to the contrary contained in Section 5 of the Lease or herein, provided Tenant has not been in default under the Lease beyond the expiration of any applicable notice and cure period at anytime during the Term of the Lease, Landlord shall permit the Security Deposit L/C to be amended (at Tenant's sole cost and expense) to reduce the face amount of the Security Deposit L/C according to the following schedule:

| Date of Reduction | Reduction Amount | New Face Amount |
|---|---|---|
| 1st day of the 37th month of the Term of the Lease | $12,500.00 | $27,500.00 |
| 1st day of the 49th month of the Term of this Lease | $12,500.00 | $15,000.00 |

In no event shall a reduction to the amount of the Security Deposit L/C be deemed to have occurred absent a written amendment to the Security Deposit L/C by the issuing bank.  It shall be Tenant's sole obligation to obtain such written amendment from the issuing bank at Tenant's sole cost and expense.  The remaining Fifteen Thousand and No/100 Dollars ($15,000.00) (or such greater amount if Tenant's right to make a reduction hereunder terminates prior to the date of the last reduction) shall be held as the Security Deposit during the Term of the Lease, including any renewals or extensions thereof.  If Tenant is in default beyond the expiration of any applicable notice and cure period under the Lease at anytime during the Term of this Lease, then Tenant's right thereafter to reduce the amount of the Security Deposit L/C set forth in this subparagraph (e) shall no longer apply and this subparagraph (e) shall become null and void and of no further force and effect.

4.     Tenant Improvements.

a.     At Landlord's expense up to the amount of Landlord's Maximum Contribution (defined below), Landlord shall construct tenant improvements ("Improvements") for the Premises using Building standard methods, materials and finishes in accordance with the Work Letter Agreement attached hereto and incorporated herein as Schedule 1 and generally in accordance

18011-                                                                                                   TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

with the scope of work attached hereto as <u>Schedule 1-A</u> and incorporated herein by reference thereto.  In the event that a discrepancy exists between <u>Schedule 1</u> and <u>Schedule 1-A</u>, then <u>Schedule 1-A</u> shall control.  Tenant's initial occupancy of the Premises shall be deemed an acknowledgment that the Premises are in good and tenantable order and that Landlord has provided or constructed all improvements to be provided or constructed by Landlord except those items, if any, specified on a punch list delivered by Tenant pursuant to <u>Schedule 1</u>.

      b.      Notwithstanding anything to the contrary contained herein, in no event shall Landlord's maximum obligation for the cost of the improvements exceed Thirty Two and 50/100 Dollars ($32.50) per square foot of space in the Premises (i.e., 3,418 rentable square feet multiplied by $32.50 = $111,085.00) ("Landlord's Maximum Contribution").  In the event the total cost of the improvements exceed Landlord's Maximum Contribution, Tenant shall pay such costs in excess of Landlord's Maximum Contribution within five (5) business days following Landlord's invoice therefor.  In the event the total cost of the improvements is less than Landlord's Maximum Contribution, such unused portion of Landlord's Maximum Contribution shall not be paid or refunded to Tenant or available to Tenant as a credit against any of Tenant's obligations under the Lease.  Notwithstanding anything to the contrary contained herein, at Tenant's election, Tenant may use up to Two and No/100 Dollars ($2.00) per square foot of space in the Premises (i.e., $2.00 multiplied by 3,418 rentable square feet = $6,836.00) to reimburse Tenant for Tenant's documented third party moving-related expenses, including without limitation, Tenant's furniture, fixtures and equipment for the Premises and telephone and data cabling and wiring in the Premises.  Tenant's request for reimbursement from the unused portion of the Landlord's Maximum Contribution, if any, of its eligible moving expenses must be submitted to Landlord within ninety (90) days following the date that Landlord substantially completes the Improvements in accordance with this Lease or Landlord shall have no further obligation to make such a reimbursement hereunder.

      5.      **Options to Renew.**

      a.      Subject to the provisions of Section 26 of the Lease, and provided that Tenant is not in default beyond any applicable notice and cure period at the time of Tenant's exercise of the applicable Option (as defined hereinafter) or at the commencement of the extended term, Tenant shall have two (2) three (3) year Options to renew this Lease (each, an "Option Period").  Tenant shall provide to Landlord on a date which is prior to the date that the applicable Option period would commence (if exercised) by at least one hundred eighty (180) days and not more than two hundred seventy (270) days, a written notice of the exercise of the applicable Option to extend the Lease for the additional Option term, time being of the essence.  Such notice shall be given in accordance with Section 40 of the Lease, as modified by Section 26.6 of the Lease.  If notification of the exercise of an Option is not so given and received, all Options granted hereunder shall automatically expire.  Base Rent applicable to the Premises for the first Option Period shall be equal to ninety-five percent (95%) of the Fair Market Rental (as that term is defined hereinafter).  Base Rent applicable to the Premises for the second Option Period shall be equal to one hundred percent (100%) of the Fair Market Rental.  All other terms and conditions of the Lease shall remain the same, except that Tenant shall not be entitled any tenant improvement allowance during the Option Periods and after the exercise of the renewal Option for the first Option Period, Tenant shall have only one (1) remaining Option to renew the Lease.  Upon determination of the base rent payable pursuant to this provision, the parties shall promptly execute an amendment to this Lease stating the rent so determined.

      b.      If Tenant exercises the Option, Landlord shall determine the Fair Market Rental by using its good faith judgment.  Landlord shall provide Tenant with written notice of such amount within fifteen (15) days after Tenant exercises its Option.  Tenant shall have fifteen (15) days ("Tenant's Review Period") after receipt of Landlord's notice of the new base rent within which to accept such rental.  In the event Tenant fails to accept in writing such rental proposal by Landlord, then such proposal shall be deemed rejected and Landlord and Tenant shall attempt to agree upon such Fair Market Rental, using their best good faith efforts.  If Landlord and Tenant fail to reach agreement within fifteen (15) days following Tenant's Review Period ("Outside Agreement Date") then the parties shall each within ten (10) days following the Outside Agreement Date appoint a real estate broker who shall be licensed in the State of Florida and who specializes in the field of commercial office space leasing in the Plantation, Florida market, has at least five (5) years of experience and is recognized within the field as being reputable and ethical.  If one party does not appoint a broker within the above specified time, then the broker appointed by the other party shall promptly appoint a broker for such party.  Such two individuals shall each determine within ten (10) days after their appointment such base rent.  If such individuals do not agree on base rent, then the two individuals shall, within five (5) days, render separate written reports of their determinations and together appoint a third similarly qualified individual having the qualifications described above.  If the two brokers are unable to agree upon a third broker, the third broker shall be appointed by the President of the Plantation Florida Board of Realtors.  In the event the Plantation, Florida Board of Realtors is no longer in existence, the third broker shall be appointed by the President of its successor organization.  If no successor organization is in existence, the third broker shall be appointed by the Chief Judge of the Circuit Court of Broward County, Florida.  The third individual shall within ten (10) days after his or her appointment make a determination of such base rent.  The third individual shall determine which of the determinations of the first two individuals is closest to his own and the determination that is closest shall be final and binding upon the parties, and such determination may be enforced in any court of competent jurisdiction.  Landlord and Tenant shall each bear the cost of its broker and shall share equally the cost of the third broker.

      c.      The term "Fair Market Rental" shall mean the annual amount per rentable square foot that a willing, comparable renewal tenant would pay and a willing, comparable landlord of a similar office building would accept at arm's length for similar space, giving appropriate consideration to the following matters: (i) annual rental rates per rentable square foot; (ii) the type of escalation clauses (including, without limitation, operating expenses, real estate taxes, and CPI) and the extent of liability under the escalation clauses (i.e., whether determined on a "net lease" basis or by increases over a particular base year or base dollar amount); (iii) rent abatement provisions reflecting free rent and/or no rent during the lease term; (iv) length of lease term; (v) size and location of premises being leased; and (vi) other generally applicable terms and conditions of tenancy for similar space; provided, however, Tenant shall not be entitled to any tenant improvement or refurbishment allowance.  The Fair Market Rental may also designate periodic rental increases and similar economic adjustments.  The Fair Market Rental shall be the Fair Market Rental in effect as of the beginning of the Option Period, even though the determination may be made in advance of that date, and Landlord may use recent trends in rental rates in determining the proper Fair Market

Rental as of the beginning of the applicable Option Period.

6.    **Right of First Offer.** Subject to the provisions of Section 26 of the Lease and provided this Lease is in full force and effect and that Tenant is not in default after expiration of any applicable notice and cure periods either at the time of Tenant's exercise of the option or at the commencement of the term at the commencement of the Option term, and subject to all other options held by tenants of the Building and Landlord's right to first offer and lease any such space to any tenant who is then occupying or leasing such space at the time the space becomes available for leasing, Tenant shall have the right of first offer with respect to any space that becomes available on the fifth (5th) floor of the Building which is contiguous with the Premises during the Initial Term of the Lease (the "Option Space"). Prior to leasing any of the Option Space, Landlord shall give Tenant written notice of its intent to lease the Option Space. Tenant may exercise such right only as to all of the Option Space described in the Landlord's notice, and not to merely a part of such Option Space. Tenant shall have five (5) business days in which to provide Landlord with written notice of its election to exercise such right. Such notice shall be given in accordance with Section 40 of the Lease as modified by Section 26.6 of the Lease. If Tenant exercises the Option prior to the expiration of the twenty fourth (24th) month of the Term, the term of the lease with respect to the Option Space shall be coterminous with the expiration of the Term of the Lease with respect to the Premises, the Base Rent payable for the Option Space shall be at the same rate per rentable square foot then in effect for the Premises as of the commencement date of the Lease with respect to the Option Space. Such Base Rent shall escalate at the same time and at the same rate as Base Rent for the Premises throughout the Term of the Lease from and after the date Base Rent becomes payable as aforesaid. If Tenant exercises the Option at anytime after the expiration of the twenty fourth (24th) month of the Term, the Base Rent payable for the Option Space shall be the Fair Market Rental of the Option Space as of the commencement date of the Lease with respect to the Option Space, and the Term of the Lease with respect to the Option Space shall be determined by Landlord, it being understood that the "Fair Market Rental" shall take into account the length of the term. If the parties are unable to agree on "Fair Market Rental", the provisions of Paragraph 4(b) hereinabove shall apply. If Tenant does not give Landlord written notice of its election to lease such Option Space within the five (5) business day period, Landlord shall thereafter be free to lease such Option Space to a third party on any terms and conditions that Landlord shall select, with no further obligation to Tenant. In the event that Landlord offers any space to Tenant pursuant to this right of first offer, and Tenant elects not to lease the space, the space so offered shall no longer be subject to this right of first offer, and thereafter Landlord shall not be obligated to offer said space to Tenant until such time as the Option Space again becomes available for leasing following the expiration of the lease for such Option Space to a third party tenant. Upon determination of the terms applicable to the Option Space, the parties shall promptly execute an amendment to this Lease stating the terms so determined.

7.    **Tenant's Option to Terminate.** Subject to the provisions of Section 26 of the Lease, and provided that Tenant is not in default beyond any applicable notice and cure period at the time of Tenant's exercise of the Option or as of the Termination Date (as defined hereinafter), Tenant shall have the one time option to terminate this Lease effective on the last day of the sixtieth (60th) full calendar month of the Initial Term (the "Termination Date"). Tenant shall provide to Landlord on a date which is prior to the Termination Date by at least three hundred sixty five (365) days (the "Notice Date"), a written notice of the exercise of the Option to terminate the Lease, time being of the essence. Such notice shall be given in accordance with Section 40 of the Lease, as modified by Section 26.6 of the Lease. If notification of the exercise of the Option is not so given and received, the Option granted hereunder shall automatically expire. As a condition to the effectiveness of this Option, Tenant shall pay to Landlord on the Notice Date an amount equal to (i) one hundred percent (100%) of all the (i) unamortized brokerage commissions, rental abatement and tenant improvement costs (as detailed by Landlord in a written statement), and (ii) an amount equal to four (4) months' Base Rent which would have been due under the Lease during the four (4) consecutive calendar months following the Termination Date, as detailed by Landlord in a written statement (items (i) and (ii) are, collectively, the "Termination Payment"). The Termination Payment is in addition to payment by the Tenant of all other amounts payable by Tenant to Landlord pursuant to the Lease prior to the Termination Date.

8.    **Signage.** Notwithstanding anything to the contrary contained in Section 46 of the Lease, Landlord shall provide and maintain throughout the Term, at Landlord's sole cost and expense, one (1) Building standard suite identification sign at the main entrance to the Premises, directional signage in the lobby for the floor on which the Premises is located as well as Building directory signage located in the main lobby for the Building. The design, size, location and materials of such signage shall be in accordance with Landlord's standard Building signage package. Any changes in the Building standard graphics in the suite entry signage, directional signage and Building directory following their initial installation are subject to Landlord's approval and at Tenant's sole cost and expense. In addition, Tenant shall have the right, at Tenant's sole cost and expense, and subject to all applicable codes and regulations and Landlord's signage and design criteria, and otherwise subject to Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed, to place one line of signage on a Building Identity monument sign for the Building to be located at the northeastern entrance to the Project. The signage rights granted to Tenant in this paragraph are personal to the original Tenant and may not be assigned by or to any person or entity other than Tenant.

9.    **Security System.** Tenant shall be permitted to install its own security system, which may include but is not limited to an access system, buzzer system, alarm, cameras and monitors and the associated wiring required for the system which will allow Tenant to allow its customers and invitees to access the Premises twenty four hours a day, seven days a week, provided Tenant complies with all terms and conditions contained in Section 7.3 of this Lease.

10.    **Roof-top Access.** Landlord hereby agrees that Tenant shall have, subject to the rights of other roof-top users in the Building, non-exclusive access to and use of a portion of the Building roof for Tenant to install, maintain and operate one (1) satellite dish or antennae (including appropriate conduit and utilities for the operation thereof), the location of which shall be reasonably agreed upon by Landlord and Tenant, such use by Tenant to be free of charge during the Initial Term hereof. In the event Tenant wishes to place communication equipment on the roof, it shall be (i) screened in a manner and design acceptable to

Landlord in its sole but reasonable discretion, (ii) installed and maintained in compliance in all aspects with all applicable codes, and (iii) at Tenant's sole cost and expense.  Prior to installing any such equipment on the roof of the Building, Tenant shall execute a license agreement substantially in the form attached to this Lease as Exhibit E.

EXHIBIT A

PREMISES

FLOOR PLAN

A-1

TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc



EXHIBIT B

VERIFICATION LETTER

**THE LASIK VISION INSTITUTE, LLC,** a Delaware limited liability company ("Tenant") hereby certifies that it has entered into a lease with **FUND VIII POINTE BROWARD, L.P.,** a Delaware limited partnership ("Landlord") and verifies the following information as of the _____ day of _____, 20___:

| | |
|---|---|
| Number of Rentable Square Feet in Premises: | _____ |
| Commencement Date: | _____ |
| Lease Termination Date: | _____ |
| Tenant's Share: | _____ |
| Initial Base Rent: | _____ |
| Billing Address for Tenant: | _____ |
| | _____ |
| | _____ |
| | _____ |
| Attention: | _____ |
| Telephone Number: | _____ |
| Federal Tax I.D. No.: | _____ |

Tenant acknowledges and agrees that all tenant improvements Landlord is obligated to make to the Premises, if any, have been completed and that Tenant has accepted possession of the Premises and that as of the date hereof, there exist no offsets or defenses to the obligations of Tenant under the Lease. Tenant acknowledges that it has inspected the Premises and found them suitable for Tenant's intended commercial purposes.

TENANT

**THE LASIK VISION INSTITUTE, LLC,**
a Delaware limited liability company

By:    _____

_____
(print name)

Its:    _____
(print title)

B-1
TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

18011-

ACKNOWLEDGED AND AGREED TO:

LANDLORD

**FUND VIII POINTE BROWARD, L.P.,**
a Delaware limited partnership

By:  Fund VIII Pointe Broward, LLC,
     a Delaware limited liability company,
     General Partner

     By:  The Realty Associates Fund VIII, L.P.,
           a Delaware limited liability company,
           Sole Member

          By:  Realty Associates Fund VIII LLC, a
               Massachusetts limited liability company,
               general partner

              By:  Realty Associates Advisors LLC, a
                   Delaware limited liability company,
                   Manager

                 By:  Realty Associates Advisors Trust, a
                     Massachusetts business trust,
                     Manager

                 By: _____
                          Officer

18011-

TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

EXHIBIT C

RULES AND REGULATIONS

GENERAL RULES

Tenant shall faithfully observe and comply with the following Rules and Regulations.

1.  Tenant shall not alter any locks or install any new or additional locks or bolts on any doors or windows of the Premises without obtaining Landlord's prior written consent.  Tenant shall bear the cost of any lock changes or repairs required by Tenant.  Keys required by Tenant must be obtained from Landlord at a reasonable cost to be established by Landlord.

2.  All doors opening to public corridors shall be kept closed at all times except for normal ingress and egress to the Premises. Tenant shall assume any and all responsibility for protecting the Premises from theft, robbery and pilferage, which includes keeping doors locked and other means of entry to the Premises closed.

3.  Landlord reserves the right to close and keep locked all entrance and exit doors of the Project except during the Project's normal hours of business as defined in Section 11.4 of the Lease.  Tenant, its employees and agents must be sure that the doors to the Project are securely closed and locked when leaving the Premises if it is after the normal hours of business of the Project.  Tenant, its employees, agents or any other persons entering or leaving the Project at any time when it is so locked, or any time when it is considered to be after normal business hours for the Project, may be required to sign the Project register.  Access to the Project may be refused unless the person seeking access has proper identification or has a previously received authorization for access to the Project.  Landlord and its agents shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Project of any person.  In case of invasion, mob, riot, public excitement, or other commotion, Landlord reserves the right to prevent access to the Project during the continuance thereof by any means it deems appropriate for the safety and protection of life and property.

4.  No furniture, freight or equipment of any kind shall be brought into the Project without Landlord's prior authorization.  All moving activity into or out of the Project shall be scheduled with Landlord and done only at such time and in such manner as Landlord designates.  Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy property brought into the Project and also the times and manner of moving the same in and out of the Project.  Safes and other heavy objects shall, if considered necessary by Landlord, stand on supports of such thickness as is necessary to properly distribute the weight, and Tenant shall be solely responsible for the cost of installing all supports.  Landlord will not be responsible for loss of or damage to any such safe or property in any case.  Any damage to any part of the Project, its contents, occupants or visitors by moving or maintaining any such safe or other property shall be the sole responsibility and expense of Tenant.

5.  The requirements of Tenant will be attended to only upon application at the management office for the Project or at such office location designated by Landlord.  Tenant shall not ask employees of Landlord to do anything outside their regular duties without special authorization from Landlord.

6.  Tenant shall not disturb, solicit, or canvass any occupant of the Project and shall cooperate with Landlord and its agents to prevent the same.  Tenant, its employees and agents shall not loiter in or on the entrances, corridors, sidewalks, lobbies, halls, stairways, elevators, or any Common Areas for the purpose of smoking tobacco products or for any other purpose, nor in any way obstruct such areas, and shall use them only as a means of ingress and egress for the Premises.  Smoking shall not be permitted in the Common Areas.

7.  The toilet rooms, urinals and wash bowls shall not be used for any purpose other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein.  The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or agents, shall have caused it.

8.  Except for vending machines intended for the sole use of Tenant's employees and invitees, no vending machine or machines other than fractional horsepower office machines shall be installed, maintained or operated upon the Premises without the written consent of Landlord.

9.  Tenant shall not use or keep in or on the Premises or the Project any kerosene, gasoline or other inflammable or combustible fluid or material.  Tenant shall not bring into or keep within the Premises or the Project any animals, birds, bicycles or other vehicles.

10.  Tenant shall not use, keep or permit to be used or kept, any foul or noxious gas or substance in or on the Premises, or permit or allow the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Project by reason of noise, odors, or vibrations, or to otherwise interfere in any way with the use of the Project by other tenants.

11.  No cooking shall be done or permitted on the Premises, nor shall the Premises be used for the storage of merchandise, for loading or for any improper, objectionable or immoral purposes.  Notwithstanding the foregoing, Underwriters' Laboratory approved equipment and microwave ovens may be used in the Premises for heating food and brewing coffee, tea, hot chocolate and similar

18011-

TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

beverages for employees and visitors of Tenant, provided that such use is in accordance with all applicable federal, state and city laws, codes, ordinances, rules and regulations; and provided further that such cooking does not result in odors escaping from the Premises.

12.    Landlord shall have the right to approve where and how telephone wires are to be introduced to the Premises.  No boring or cutting for wires shall be allowed without the consent of Landlord.  The location of telephone call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord.  Tenant shall not mark, drive nails or screws, or drill into the partitions; woodwork or plaster contained in the Premises or in any way deface the Premises or any part thereof without Landlord's prior written consent.  Tenant shall not install any radio or television antenna, satellite dish, loudspeaker or other device on the roof or exterior walls of the Project.  Tenant shall not interfere with broadcasting or reception from or in the Project or elsewhere.

13.    Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of these Rules and Regulations.

14.    Tenant shall not waste electricity, water or air conditioning and agrees to cooperate fully with Landlord to ensure the most effective operation of the Project's heating and air conditioning system, and shall refrain from attempting to adjust any controls.  Tenant shall not without the prior written consent of Landlord use any method of heating or air conditioning other than that supplied by Landlord.

15.    Tenant shall store all its trash and garbage within the interior of the Premises.  No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash in the vicinity of the Project without violation of any law or ordinance governing such disposal.  All trash, garbage and refuse disposal shall be made only through entry-ways and elevators provided for such purposes at such times as Landlord shall designate.

16.    Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

17.    No awnings or other projection shall be attached to the outside walls or windows of the Project by Tenant.  No curtains, blinds, shades or screens shall be attached to or hung in any window or door of the Premises without the prior written consent of Landlord.  All electrical ceiling fixtures hung in the Premises must be fluorescent and/or of a quality, type, design and bulb color approved by Landlord.  Tenant shall abide by Landlord's regulations concerning the opening and closing of window coverings which are attached to the windows in the Premises.  The skylights, windows, and doors that reflect or admit light and air into the halls, passageways or other public places in the Project shall not be covered or obstructed by Tenant, nor shall any bottles, parcels or other articles be placed on the windowsills.

18.    Tenant shall not employ any person or persons other than the janitor of Landlord for the purpose of cleaning the Premises unless otherwise agreed to in writing by Landlord.  Except with the prior written consent of Landlord, no person or persons other than those approved by Landlord shall be permitted to enter the Project for the purpose of cleaning same.  Landlord shall in no way be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant or any of its employees or other persons by the janitor of Landlord.  Janitor service shall include ordinary dusting and cleaning by the janitor assigned to such work and shall not include cleaning of carpets or rugs, except normal vacuuming, or moving of furniture and other special services.  Window cleaning shall be done only by Landlord at reasonable intervals and as Landlord deems necessary.

PARKING RULES

1.    Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles".

2.    Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers, or invitees to be loaded, unloaded, or parked in areas other than those designated by Landlord for such activities.  Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking.

3.    Parking stickers or identification devices shall be the property of Landlord and shall be returned to Landlord by the holder thereof upon termination of the holder's parking privileges.  Tenant will pay such replacement charges as is reasonably established by Landlord for the loss of such devices.  Loss or theft of parking identification stickers or devices from automobiles must be reported to the parking operator immediately.  Any parking identification stickers or devices reported lost or stolen found on any unauthorized car will be confiscated and the illegal holder will be subject to prosecution.

4.    Landlord reserves the right to relocate all or a part of parking spaces from floor to floor, within one floor, and/or to reasonably adjacent off site locations(s), and to allocate them between compact and standard size and tandem spaces, as long as the same complies with applicable laws, ordinances and regulations.

5. Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle. Landlord will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which risks are assumed by the party using the parking area.

6. Validation of visitor parking, if established, will be permissible only by such method or methods as Landlord may establish at rates determined by Landlord, in Landlord's sole discretion.

7. The maintenance, washing, waxing or cleaning of vehicles in the parking structure or Common Areas is prohibited.

8. Tenant shall be responsible for seeing that all of its employees, agents and invitees comply with the applicable parking rules, regulations, laws and agreements. Garage managers or attendants are not authorized to make or allow any exceptions to these Parking Rules and Regulations. Landlord reserves the right to terminate parking rights for any person or entity that willfully refuses to comply with these rules and regulations.

9. Every driver is required to park his own car. Where there are tandem spaces, the first car shall pull all the way to the front of the space leaving room for a second car to park behind the first car. The driver parking behind the first car must leave his key with the parking attendant. Failure to do so shall subject the driver of the second car to a Fifty Dollar ($50.00) fine. Refusal of the driver to leave his key when parking in a tandem space shall be cause for termination of the right to park in the parking facilities. The parking operator, or his employees or agents, shall be authorized to move cars that are parked in tandem should it be necessary for the operation of the garage. Tenant agrees that all responsibility for damage to cars or the theft of or from cars is assumed by the driver, and further agrees that Tenant will hold Landlord harmless for any such damages or theft.

10. No vehicles shall be parked in the parking garage overnight. The parking garage shall only be used for daily parking and no vehicle or other property shall be stored in a parking space.

Landlord reserves the right at any time to change or rescind any one or more of these Rules and Regulations, or to make such other and further reasonable Rules and Regulations as in Landlord's judgment may from time to time be necessary for the management, safety, care and cleanliness of the Project, and for the preservation of good order therein, as well as for the convenience of other occupants and tenants therein. Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenant, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant, nor prevent Landlord from thereafter enforcing any such Rules or Regulations against any or all tenants of the Project. Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition of its occupancy of the Premises.

EXHIBIT D

FORM OF LETTER OF CREDIT
IRREVOCABLE STANDBY LETTER OF CREDIT
NUMBER _____

| LETTER OF CREDIT AMOUNT | ISSUE DATE | EXPIRY DATE |
|---|---|---|
| US [AMOUNT] | [DATE] | [DATE] |

BENEFICIARY:                                       APPLICANT:
[LANDLORD]                                       [TENANT]
C/O TA ASSOCIATES REALTY                [ADDRESS OF PROPERTY]
28 STATE STREET
BOSTON, MASSACHUSETTS 02109
ATTENTION:  LEASE ADMINISTRATOR- PLANTATION, FL

WITH COPY TO:
[PROPERTY MANAGER]
[ADDRESS]

GENTLEMEN:

WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR FAVOR FOR THE ACCOUNT OF THE ABOVE REFERENCED APPLICANT IN THE AGGREGATE AMOUNT OF US [AMOUNT] WHICH IS AVAILABLE BY PAYMENT OF YOUR DRAFT(S), AT SIGHT, DRAWN ON OURSELVES, , WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1.      A STATEMENT PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF [LANDLORD] (HEREIN CALLED "THE LANDLORD") STATING THAT:

            "THIS CERTIFIES THAT A DEFAULT EXISTS PURSUANT TO THAT CERTAIN DEED OF LEASE BETWEEN [LANDLORD], LANDLORD AND [TENANT], TENANT, AS AMENDED FROM TIME TO TIME."

-OR-

            "[TENANT] (THE "TENANT") HAS FAILED TO RENEW OR REPLACE THIS LETTER OF CREDIT THIRTY (30) DAYS BEFORE ITS CURRENT EXPIRATION DATE AND LANDLORD IS ACCORDINGLY ENTITLED TO DRAW UPON THIS LETTER OF CREDIT."

2.      THE ORIGINAL OF THIS LETTER OF CREDIT.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT WRITTEN AMENDMENT FOR ONE YEAR FROM THE PRESENT OR ANY FUTURE EXPIRY DATE UNLESS AT LEAST FORTY-FIVE (45) DAYS PRIOR TO SUCH EXPIRATION DATE, WE NOTIFY YOU IN WRITING AT THE ABOVE ADDRESS BY EXPRESS COURIER THAT WE ELECT NOT TO RENEW THIS LETTER OF CREDIT FOR ANY SUCH ADDITIONAL PERIODS(S).  UPON RECEIPT BY YOU OF SUCH NOTICE, YOU MAY DRAW HEREUNDER BY PRESENTATION OF YOUR DRAFT AT SIGHT ON US.

PARTIAL DRAWINGS ARE PERMITTED.

THIS LETTER OF CREDIT SHALL BE TRANSFERABLE BY BENEFICIARY ON ONE (1) OR MORE OCCASIONS.

THIS IRREVOCABLE LETTER OF CREDIT SETS FORTH IN FULL THE TERMS OF OUR UNDERTAKING.  THIS UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED, AMENDED, AMPLIFIED OR INCORPORATED BY REFERENCE TO ANY DOCUMENT OR CONTRACT REFERRED TO HEREIN.

WE HEREBY AGREE WITH YOU THAT DRAFT(S) DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS CREDIT SHALL BE DULY HONORED IF PRESENTED TOGETHER WITH DOCUMENT(S) AS SPECIFIED ABOVE AND THE ORIGINAL OF THIS CREDIT, AT OUR OFFICE LOCATED AT [MUST BE ADDRESS LOCAL TO THE PLANTATION, FLORIDA AREA] ON OR BEFORE THE ABOVE STATED EXPIRY DATE.  DRAFT(S) DRAWN UNDER THIS CREDIT MUST SPECIFICALLY

REFERENCE OUR CREDIT NUMBER.  DRAFTS DRAWN IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT SHALL BE HONORED BY US WITHOUT INQUIRY AS OF THE TRUTH OF THE STATEMENTS SET FORTH IN THE DRAW REQUEST AND REGARDLESS OF WHETHER APPLICANT DISPUTES THE CONTENT OR ACCURACY OF SUCH STATEMENTS. FACSIMILE DRAWINGS ARE PERMITTED.  IF A DRAFT IS PRESENTED TO US BY FACSIMILE TO OUR FAX NUMBER _____, THE ORIGINAL LETTER OF CREDIT IS NOT REQUIRED.

WE HEREBY ENGAGE WITH YOU THAT DRAWINGS PRESENTED UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED WITHIN TWO (2) BUSINESS DAYS AFTER OUR RECEIPT OF YOUR PRESENTATION OF THE CERTIFICATE AND ANY SUCH DOCUMENTS SPECIFIED HEREIN AT THE ABOVE ADDRESS.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS, ESTABLISHED BY THE INTERNATIONAL CHAMBER OF COMMERCE, AS IN EFFECT ON THE DATE OF ISSUANCE OF THIS CREDIT.

SINCERELY,

_____
AUTHORIZED REPRESENATIVE

**EXHIBIT E**

**LICENSE AGREEMENT FOR SATELLITE DISH**

THIS LICENSE AGREEMENT FOR SATELLITE DISH (the "Agreement") is made as of this _____ day of _____, 20___, by and between _____ (the "Licensor"), and _____ (the "Licensee"), a limited partnership

**RECITALS**

A.    This Agreement is attached to and made a part of that certain Lease Agreement dated _____ ("Lease") by and between Licensee, as tenant, and Licensor, as landlord, for the lease by Licensee of approximately _____ rentable square feet of office space (the "demised premises") in the building located at _____ (the "Building"), all as more particularly described in the Lease.

B.    Under the terms of the Lease, Licensor has the exclusive right to use or permit the use of all or any portion of the roof of the Building for any purpose; Licensee desires to use a portion of the roof space to maintain and operate thereon a satellite dish and/or related microwave facilities, antennae and related equipment, all as more particularly described in Exhibit A and Exhibit B attached hereto and incorporated herein by this reference (the "Equipment Location and Specifications").

C.    Licensor and Licensee desire to provide the terms and conditions for Licensee's use of the roof space as a location for an antenna and the equipment required for the operation thereof.

NOW, THEREFORE, in consideration of the foregoing, the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee, intending legally to be bound, hereby agree as follows:

1.    The foregoing recitals are hereby incorporated herein and made a part hereof by this reference.

2.    Satellite Dish Equipment; Permitted Uses. Provided Licensee is not in default under the terms and conditions of the Lease, Licensee's agent, as approved by Licensor, in Licensor's sole discretion, will install and maintain, at the sole cost of Licensee and Licensee may, at its own expense, operate on the roof of the Building, a satellite dish and/or related microwave facilities and antenna as specified in Exhibit A attached hereto, to be located as designated on Exhibit B attached hereto (said equipment is collectively referred to hereinafter as the "Satellite Dish"). The Satellite Dish shall be deemed to be the Licensee's Personal Property (as defined in the Lease) and to the extent not inconsistent with this Agreement, the ownership, installation, use and removal thereof shall be governed by the terms of the Lease applicable to Licensee's Personal Property.

3.    Licensor's Prior Approval. Licensor may approve or reject the installation and operation of the Satellite Dish within a reasonable time after Licensee submits (i) plans and specifications for the Satellite Dish (including size, location, height, weight and color); (ii) copies of all required governmental and quasi-governmental permits, licenses, special zoning variances, and authorizations, all of which Licensee shall obtain at its own cost and expense; and (iii) a policy or certificate of insurance evidencing such insurance coverage as may reasonably be required by Licensor for the installation, operation and maintenance of the Satellite Dish and sufficient to cover, among other things, the indemnities from Licensee to Licensor as hereinafter provided. Licensor may withhold approval if the installation, operation or removal of the Satellite Dish may (a) damage the structural integrity of the Building; (b) unreasonably interfere with any service provided by Licensor; (c) interfere with any zoning ordinances or other governmental regulation applicable to the Building; or (d) reduce the amount of leasable space in the Building. Licensee shall not be entitled to rely on any such approval as being a representation by Licensor that such installation and operation is permitted by or in accordance with any governmental or quasi-governmental entity, authority or regulation.

4.    Installation.

(a)    Installation and maintenance of the Satellite Dish shall be performed solely by Licensee's agent or its contractors, as approved by Licensor, in Licensor's reasonable discretion. The Satellite Dish shall not be located on top of any existing structure on the roof of the building.

(b)    Licensee shall bear all costs and expenses incurred in connection with the installation, operation and maintenance of the Satellite Dish. If operation of the Satellite Dish shall require electrical power Licensor may, at its sole option, install a separate meter, at Licensee's sole expense. Licensee shall pay the actual cost of all electricity used in the operation of the Satellite Dish, all as determined by Licensor.

5.    Rental Payments. If Licensor's insurance premium or real estate tax assessment increases as a result of the Satellite Dish, or if any governmental or quasi-governmental authority shall levy, assess or impose any tax, license fee, use fee or other sum against Licensor, as owner of the Building, as a result of the Satellite Dish, Licensee shall pay all such amounts as additional rent (as defined in the Lease), promptly upon receipt of a bill from Licensor for any such amount. Licensee will have no right to an abatement or reduction in the amount of basic monthly rent, additional rent or any other sums due and payable under the Lease if for any reason Licensee is unable to obtain any required approval for installation of the Satellite Dish, or is thereafter unable to use the "Satellite Dish for any reason, but Licensee shall not be obligated to pay the fee specified in this Section 5 during any month or portion thereof during which Licensee is unable to use the Satellite Dish.

18011-                                    TA Fund VIII Pointe Broward Lasik Vision Institute  Lease 5.doc

6.  Indemnification.  Licensee covenants and agrees that the installation, operation, maintenance and removal of the Satellite Dish, or the demised premises with respect thereto, shall be solely at its own risk.  Licensee covenants and agrees absolutely and unconditionally to indemnify, defend and hold Licensor harmless against all claims, actions, damages, judgments, settlements, liability, costs and expenses (including reasonable attorneys' fees and expenses) in connection with death, bodily or personal injury, damage to property or business or any other loss or injury arising out of or related to the installation, operation, maintenance or removal of the Satellite Dish.

7.  Termination Rights.  Licensor may require Licensee, at any time prior to the expiration of the Lease, to terminate the operation of the Satellite Dish if it is causing physical damage to the structural integrity of the Building, unreasonably interfering with any other service provided by the Building, unreasonably interfering with any prior licensee of the roof, or causing the violation of any condition or provision of the lease or any law, regulation or ordinance promulgated by any governmental or quasi-governmental authority now or hereafter permitted to continue any similar use or operation.  If, however, Licensee can correct the damage or prevent said interference caused by the Satellite Dish to Licensor's satisfaction within thirty (30) days, Licensee may restore its operation so long as Licensee promptly commences to cure such damage and diligently pursues such cure to completion.  If the Satellite Dish is not completely corrected and restored to operation within thirty (30) days, Licensor, at its sole option, may require that the Satellite Dish be removed at Licensee's expense.  If Licensor or any other tenant in the Building shall require that the Satellite Dish be moved to another location on the roof, either to accommodate Licensor or to provide other tenants in the Building with access to the roof for placement of other antennas, other electrical equipment or other Licensor-approved uses or installations, Licensor shall have the right, at its sole expense, to relocate the Satellite Dish to another place on the roof.

8.  Removal of the Satellite Dish.  At the expiration or earlier termination of the Lease or upon termination of the operation of the Satellite Dish as provided hereinabove in Section 7, the Satellite Dish and all cabling and other equipment relating thereto shall be removed from the Building at Licensee's sole cost.  Licensee hereby authorizes Licensor to remove and dispose of the Satellite Dish and charge Licensee for all costs and expenses incurred.  Licensee agrees that Licensor shall not be liable for any property disposed of or removed by Licensor.  Licensee's obligation to perform and observe this covenant shall survive the expiration or earlier termination of the Term of this Agreement.

9.  Time of the Essence.  Time shall be of the essence of the Licensee's obligations hereunder.

10.  Entire Agreement.  This Agreement contains the entire agreement of the parties hereto and neither Licensor nor any agent or representative of Licensor has made or is making, and Licensee, in executing and delivering this Agreement, is not relying upon any warranties, representations, promises or statements whatsoever.  No waiver or modification of any provision of this Agreement shall be effective unless expressed in writing and signed by all parties hereto.

11.  Successors and Assigns.  The obligations of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12.  Notices.  All notices hereunder shall be given by hand delivery or by certified mail, return receipt requested, and shall be deemed delivered upon receipt or refusal to accept delivery, if addressed as noted in the Lease.

13.  Governing Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of Florida.

IN WITNESS WHEREOF, Licensor and Licensee have duly executed this Agreement under seal as of the day and year first above written.

LICENSOR:

WITNESS/ATTEST:                                   _____

By: _____                      By: _____

                                                 Date: _____

LICENSEE:

WITNESS/ATTEST:                                   _____

By: _____                      By: _____

                                                 Date: _____

SCHEDULE 1

WORK LETTER AGREEMENT

1.      **Tenant Improvements.**  Landlord, at its sole cost and expense, except as otherwise provided in this Work Letter Agreement and subject to the provisions of Paragraph 4(b) of the Addendum, shall furnish and install, in or for the benefit of the Premises, the improvements ("Improvements") generally described in Schedule 1-A attached hereto (and which scope of work shall be further modified once a Space Plan has been prepared and approved).  All architectural and engineering work for such Improvements and any required occupancy permits for the Premises shall also be provided at Landlord's sole cost and expense.

2.      **Plans and Specifications.**

        2.1.    **Space Plan.**  Within fifteen (15) business days after the execution of the Lease, Landlord shall submit to Tenant for approval a detailed space plan ("Space Plan") for Tenant's leasehold improvements to the Premises (the "Improvements") prepared by Landlord's architects and consultants, which shall include without limitation, the location of doors, partitions, electrical and telephone outlets, plumbing fixtures, heavy floor loads and other special requirements.  If applicable, Landlord reserves the right to reasonably approve Tenant's architect and/or space planner.  Tenant agrees to cooperate with Landlord and its design representatives in connection with the preparation of the Space Plan.  Within five (5) days after receipt by Tenant of the Space Plan, Tenant (i) shall give its written approval with respect thereto, or (ii) shall notify Landlord in writing of its disapproval and state with specificity the grounds for such disapproval and the revisions or modifications necessary in order for Tenant to give its approval.  Within five (5) days following Landlord's receipt of Tenant's disapproval, Landlord shall submit to Tenant for approval the requested revisions or modifications.  Within three (3) days following receipt by Tenant of such revisions or modifications, Tenant shall give its written approval with respect thereto or shall request other revisions or modifications therein, and any time delay incurred in the approval of the Space Plan from the date of this second notice of disapproval shall constitute Tenant Delay (as that term is defined in Section 7 hereof).

        2.2.    **Plans.**  Based on the approved Space Plan, Landlord shall cause its architects and engineers to prepare and submit to Tenant for approval detailed plans, specifications and working drawings ("Plans") for the construction of Tenant's leasehold improvements to the Premises (the "Improvements").  Landlord reserves the right to approve any space planner, architect or engineer if employed by Tenant.  As used herein, the term "Improvements" shall include all non-base building work to be done in the Premises pursuant to the Plans, including, but not limited to: demolition work, partitioning, doors, ceiling, floor coverings, wall finishes (including paint and wall coverings), window coverings, electrical (excluding the cost of computer cabling, Tenant's telephone system and wiring, and any other special electrical or wiring dedicated to the Tenant's operations or business), plumbing, heating, ventilating and air conditioning, fire protection, cabinets and other millwork.  If Tenant has leased an entire floor, the Improvements shall include finished toilet rooms, corridors and elevator vestibules.  Landlord shall submit the Plans to Tenant for approval within fifteen (15) business days following Tenant's approval of the Space Plan.  Within five (5) days after receipt by Tenant of the Plans, Tenant (i) shall give its written approval with respect thereto, or (ii) shall notify Landlord in writing of its disapproval and state with specificity the grounds for such disapproval and the revisions or modifications necessary in order for Tenant to give its approval.  Within five (5) business days following Landlord's receipt of Tenant's disapproval, Landlord shall submit to Tenant for approval the requested revisions or modifications.  Within three (3) days following receipt by Tenant of such revisions or modifications, Tenant shall give its written approval with respect thereto or shall request other revisions or modifications therein, and any time delay incurred in the approval of the Plans from the date of this second notice of disapproval shall constitute Tenant Delay.  After approval of the Plans by Tenant, no further changes to the Plans shall be made without the prior written approval of Landlord and only after Tenant agreeing that any delays in design and/or construction resulting from such change shall constitute a Tenant Delay.

3.      **Specifications for Building Standard Improvements.**  Specifications and details for building standard improvements ("Standards") are available in the office of the Building.  Except as specified in Section 4 below, the Space Plan and Plans shall be consistent with the Standards, and no deviations shall be permitted from the Standards without Landlord's consent as set forth in Section 4 below.

4.      **Grounds for Disapproval.**  Tenant may request deviations from the Standards for Improvements provided that the deviations ("Non-Standards") shall not be of lesser quality than the Standards.  Landlord shall not be required to approve any item of the Space Plan, the Plans or the Non-Standards that (a) does not conform to applicable governmental regulations or is disapproved by any governmental agency; (b) requires building service (including electrical power) beyond the level normally provided to other tenants in the Building; or (c) overloads the floors.

5.      **Construction of Improvements.**

        5.1.    **Construction.**  Within a reasonable period following approval of the Plans by Tenant, Landlord shall instruct its contractor to secure a building permit and commence construction of the Improvements in accordance with the Plans.

        5.2.    **Change in Plans.**  In the event that Tenant requests a change in the Plans subsequent to approval of the Plans, and Landlord approves such change, then upon the completion of any required revisions to the Plans, Landlord shall notify Tenant of the cost which will be chargeable to Tenant by reason of such change and Tenant shall notify Landlord whether Tenant desires to

proceed with such change.  Until such time as Tenant has approved such change and Landlord has received payment in full of the total costs of such change (including payment for all architectural and engineering costs and related design expenses), Landlord shall not be obligated to stop or alter any work to incorporate the desired change and may continue to work on Tenant's Premises in accordance with the Plans.  Any and all delays in the completion of the Premises resulting from any such changes shall be deemed a Tenant Delay whether or not the items covered by the change are Improvements.

      5.3       **Completion.**   Landlord shall endeavor to cause the contractor to substantially complete construction of the Improvements in a diligent manner, but, except to the extent expressly provided elsewhere in the Lease, Landlord shall not be liable for any loss or damage as a result of delays in construction or delivery of possession of the Premises.  Landlord shall construct the Improvements in a good and workmanlike manner and in accordance with all applicable laws.

6.       **Commencement Date.**   The Commencement Date and Tenant's obligation to pay rent under the Lease shall be governed by Section 3 of the Lease.  However, if there shall be a delay ("Tenant Delay") beyond the scheduled Commencement Date in the substantial completion of the Improvements as a result of:

      6.1      Tenant's failure to submit or revise the Plans within the time limits provided herein;

      6.2      Tenant's request for Non-Standards, whether as to materials or installation, that extend the time it takes to obtain necessary building permits or other governmental authorizations or extends the time for the construction period;

      6.3      Insufficiency of the Plans that extends the time it takes to obtain necessary building permits or other governmental authorizations or changes in the Plans required by the applicable governmental regulatory agencies reviewing the Plans;

      6.4      Tenant's changes in the Plans after the approval by Landlord; or

      6.5      Any other act or omission of Tenant constituting a Tenant Delay under the terms of this Agreement;

then the Commencement Date shall not occur until such time as the Improvements are substantially complete, however, Tenant shall pay to Landlord an amount equal to one thirtieth (1/30th) of the Base Rent due for the first full calendar month of the Term of the Lease for each day of Tenant Delay.  Upon substantial completion of the Improvements, Landlord shall notify Tenant of the reasonable estimate of the date Landlord could have delivered possession of the Premises to Tenant but for Tenant Delays and Tenant shall immediately pay to Landlord the amount described above for the period of Tenant Delay.

7.       **Final Inspection.**   Prior to delivery of possession and acceptance of the Premises by Tenant, Tenant together with Landlord and Landlord's contractor shall make a final inspection of the Premises to ensure that the construction of the Improvements has been accomplished substantially in accordance with the Plans.  A punch list (the "Punch List") of items to be completed or corrected shall be prepared at the time of such inspection.  Landlord agrees to use reasonable efforts to complete all items on such Punch List as soon as reasonably possible thereafter.

8.       **Incorporation.**   This Agreement is and shall be incorporated by reference in the Lease, and all of the terms and conditions of the Lease are and shall be incorporated herein by this reference.

**SCHEDULE 1-A**

**SCOPE OF WORK**

### Orangemen Development and Construction Corporation
### Certified General Contractors
### CGC 1508462

August 31, 2012

Deborah Fink | Vice President
CBRE | Brokerage Services
5100 Town Center Circle, Tower II - Suite 600 | Boca Raton, FL 33486
T +1 561 393 1644 | F +1 561 393 1650 | C +1 561 715 5894
deborah.fink@cbre.com | www.cbre.com/deborah.fink

RE: Preliminary Proposal for "The Lasik Vision Institute" @ Amtrust Bank Building-
8211 W Broward Blvd Suite #PH 2-Plantation, Fl.

Dear Ms. Fink

At this time we are providing preliminary pricing to complete scopes of work listed below as
determined by preliminary drawings and Lasik Vision facility standards provided within jobsite
meeting on 8/28/12. All pricing is contingent upon a full set of plans being provided to us and
subsequently approved by the city of Plantation building department.

#### SCOPES OF WORK:

| | |
|---|---|
| ➢ Demolition | $3,640.00 |
| ➢ Drywall Systems: | $10,900.00 |
| ➢ Plumbing: | $3,350.00 |
| ➢ Electrical: | $9,200.00 |
| ➢ HVAC: | $8,500.00 |
| ➢ Masonry: (coring) | $1,750.00 |
| ➢ Painting: | $5,000.00 |
| ➢ Doors & Hardware (Interior/Common Area) | $6,340.00 |
| ➢ Acoustical Ceilings: | $2,150.00 |
| ➢ Millwork:(Cabinetry/Reception Desk) | $9,250.00 |
| ➢ Flooring & Base: | $6,935.00 |
| ➢ Fire Alarm: (includes shop drawings) | $2,200.00 |
| ➢ Fire Sprinklers:(includes shop drawings) | $4,900.00 |
| ➢ Trim Package: (includes black out shades) | $1,950.00 |
| ➢ General Conditions: | $3,100.00 |
| ➢ Architectural/Engineered Drawings: | $6,750.00 |
| ➢ Permit Fees: | $3,500.00 |
| ➢ Supervision, Overhead & Profit: | $18,500.00 |

**BUDGET TO COMPLETE ABOVE WORK:**     $107,915.00 +/-

Not included within the above pricing:
- Low voltage work
- Signage of any kind
- Tenant specified equipment including installation

**_Orangemen Development and Construction Corporation_**
**_Certified General Contractors_**
_CGC 1508462_

- Work to existing light fixtures, exit/emergency fixtures, outlets, switching remaining in place are said to be in working order.
- Work other than stated above

Please feel free to give me a call once you review if you have any questions.

Thank You,

Scott Gorton
President

The LASIK Vision Institute, LLC

_[signature]_ CEO   9/5/12

BEN L Coede, CEO

# EXHIBIT B

BFP2/Plantation                         BFP2/Plantation
1391 Sawgrass Corporate Pkwy            1391 Sawgrass Corporate Pkwy
Sunrise, FL 33323                       Sunrise, FL 33323
(305) 532-4355                          (305) 532-4355

| The Lasik Vision Institute | DATE | ACCOUNT NUMBER | | DATE | ACCOUNT NUMBER |
|---|---|---|---|---|---|
| 1555 Palm Beach Lakes Blvd., | 7/7/2020 | 00000978  1 | | 7/7/2020 | 00000978  1 |
| Suite 600 | INVOICE #: | | | INVOICE #: | |
| West Palm Beach, FL 33401 | | | | The Lasik Vision Institute | |

**MAKE CHECKS PAYABLE TO:** Balogh Family Partnership 2

| Date | Code | Description | Charges | Payments | Amount Due | Date | Code | Amount Due |
|---|---|---|---|---|---|---|---|---|
| 5/14/2020 | ATT | Widom P.A. Inv 282 - Evic | 1,631.83 | 0.00 | 1,631.83 | 5/14/2020 | ATT | 1,631.83 |
| 5/19/2020 | ATT | Gallinar Inv. 4740.31 | 500.00 | 0.00 | 500.00 | 5/19/2020 | ATT | 500.00 |
| 7/6/2020 | ATT | Jones Law inv 3339 | 937.50 | 0.00 | 937.50 | 7/6/2020 | ATT | 937.50 |
| 5/1/2020 | CAM | COMMON AREA MAINTE | 3,336.66 | 368.53 | 2,968.13 | 5/1/2020 | CAM | 2,968.13 |
| 5/10/2020 | LAT | Late fee 6% | 591.16 | 0.00 | 591.16 | 5/10/2020 | LAT | 591.16 |
| 5/1/2020 | OPX | OPERATING EXPENSE | 720.00 | 0.00 | 720.00 | 5/1/2020 | OPX | 720.00 |
| 5/1/2020 | PAR | PARKING | 160.00 | 0.00 | 160.00 | 5/1/2020 | PAR | 160.00 |
| 5/1/2020 | RNT | RENT | 5,078.58 | 0.00 | 5,078.58 | 5/1/2020 | RNT | 5,078.58 |
| 5/1/2020 | STX | Tax for PAR | 10.40 | 0.00 | 10.40 | 5/1/2020 | STX | 10.40 |
| 5/1/2020 | STX | Tax for CAM | 216.88 | 23.95 | 192.93 | 5/1/2020 | STX | 192.93 |
| 5/1/2020 | STX | Tax for RNT | 330.11 | 0.00 | 330.11 | 5/1/2020 | STX | 330.11 |

| Current | 30 | 60 | 90 | 120 | BALANCE DUE |
|---|---|---|---|---|---|
| 937.50 | 2,722.99 | 9,460.15 | 0.00 | 0.00 | 13,120.64 |

BALANCE DUE        13,120.64